IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------X

ABRAHAM RON FRAENKEL, *et al.*,

                            Plaintiff,                    Docket No:

                                                 1:15-CV-01080(RMC)

                -against-

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

                            Defendants.

-------------------------------------------------------------------X

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Attached are plaintiffs' proposed findings of fact and conclusions of law with respect to the default judgment hearing scheduled to be held on December 6-7, 2016.

Dated:   Brooklyn, New York

           November 29, 2016

                                  Respectfully submitted,

                                  THE BERKMAN LAW OFFICE, LLC

                                  *Attorneys for the Plaintiffs*

                                by:  _____

                                      Robert J. Tolchin

                                  111 Livingston Street, Suite 1928

                                  Brooklyn, New York 11201

                                  718-855-3627

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------X

ABRAHAM RON FRAENKEL, *et al.*,

                            Plaintiff,                   Docket No:

                    -against-                1:15-CV-01080(RMC)

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

                            Defendants.

-------------------------------------------------------------------X

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Introduction**

        This is a civil action brought pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., against the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS") and the Syrian Arab Republic ("Syria"). Plaintiffs are seven American citizens and one Israeli citizen who are the family members of the victim, decedent Yaakov Naftali Fraenkel ("Naftali"), a 16 year-old United States citizen who was kidnapped and murdered by Hamas terrorists on the night of June 12, 2014 along with two other teenagers. The bodies of the three teens were found 18 days later on June 30, 2014 in a field near the city of Hebron.

        On July 9, 2015, plaintiffs filed a complaint against all three defendants seeking damages pursuant to 28 U.S.C. § 1605A. Plaintiffs effectuated service on defendant Syria by DHL pursuant to 28 U.S.C. §1608(a)(3) on November 29, 2015. DE 21. Syria failed to respond or appear. On February 8, 2016, the Clerk noted Syria's default. DE 24. Plaintiffs effectuated service on defendants Iran and MOIS pursuant to 28 U.S.C. §1608(a)(4) via diplomatic channels

1

on January 13, 2016. DE 29. Iran and MOIS failed to respond or appear. The Clerk noted the defaults of Iran and MOIS on March 23, 2016. DE 30.

Notwithstanding indicia of defendants' willful default, this Court is compelled to make further inquiry prior to entering a judgment by default. The FSIA requires that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e). *See, e.g., Holland v. Islamic Rep. of Iran*, 496 F. Supp. 2d 1, 12 (D.D.C. 2005) ("Every case brought against a foreign state raises two distinct legal questions. First, the Court must look to whether it has jurisdiction to hear the claim. In the context of claims implicating the parameters of the FSIA, this jurisdictional determination is guided by an inquiry into whether the case falls within one of the statutory exception to the sovereign immunity of the foreign state. Second, the Court must consider the actual liability of the defendant foreign sovereign.") (Citations omitted).

Accordingly, on July 19, 2016, plaintiffs filed a motion for default judgment attaching declarations from five experts regarding liability, as follows: Arieh Spitzen, Israel Defense Forces Colonel (retired) to address Hamas responsibility for the attack; Dr. Patrick Clawson and Dr. Matthew Levitt to address Iran's provision of material support to Hamas; and Dr. Marius Deeb and Dr. Benedetta Berti to address Syria's provision of material support to Hamas. Plaintiffs also attached declarations from three of the plaintiffs – Abraham Ron Fraenkel, father of the victim; Rachelle Devora Sprecher Fraenkel, mother of the victim; and Tzvi Amitay Fraenkel, older brother of the victim – and from psychiatric expert, Dr. Rael Strous, MD, concerning each of the plaintiffs' psychological and emotional damages. In their motion, plaintiffs requested the Court to set an evidentiary hearing at which plaintiffs would present

testimony and evidence to support their claims in accordance with 28 U.S.C. § 1608(e). The Court held the evidentiary hearing on December 6 and 7, 2016.

Under § 1608(e), "the Court may accept as true plaintiffs' uncontroverted evidence." *Wachsman v. Islamic Rep. of Iran*, 603 F. Supp. 2d 148, 155 (D.D.C. 2009) (internal quotations omitted) (citing *Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)); *see also Botvin v. Islamic Rep. of Iran*, 604 F. Supp. 2d 22, 26 (D.D.C. 2009) (same); *Gates v. Syrian Arab Rep.*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008) (same); *Alejandre v. Rep. of Cuba*, 996 F. Supp. 1239, 1243 (S.D. Fla. 1997) (same). The "satisfactory to the court" standard contained in 28 U.S.C. § 1608(e) is identical to the standard for entry of default judgments against the U.S. government in Rule 55(e). *Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996). Plaintiffs may establish their proof in FSIA default judgment proceedings via affidavits and expert reports. *Wachsman*, 603 F. Supp. 2d at 152; *Campuzano v. Islamic Rep. of Iran*, 281 F. Supp.2d 258, 268 (D.D.C. 2003).

For the reasons set forth below, and after reviewing plaintiffs' complaint, plaintiffs' testimony, expert witness testimony, and the entire record in this case, the Court finds that plaintiffs have clearly demonstrated both the Court's jurisdiction and the defendants' liability for their injuries "by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).

## FINDINGS OF FACT REGARDING LIABILITY

The Court has determined Hamas's responsibility for the kidnapping and murder based on the expert testimony from Arieh Spitzen, Israel Defense Forces Colonel (retired), who provided a written affidavit and live testimony concerning the kidnapping and murder and Hamas's responsibility for this attack. Furthermore, the Court has determined the Iranian and Syrian defendants' liability for the provision of material support and resources to Hamas,

primarily through the testimony of four expert witnesses, Dr. Matthew Levitt, Dr. Patrick Clawson, Dr. Marius Deeb and Dr. Benedetta Berti, all of whom provided both written affidavits and live testimony. In addition, the Court takes judicial notice of judgments in other cases involving terrorist attacks perpetrated by Hamas in which American citizens were killed and injured. *See, e.g., Roth v. Islamic Rep. of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015); *Bodoff v. Islamic Rep. of Iran*, 907 F. Supp. 2d 93 (D.D.C. 2012); *Beer v. Islamic Rep. of Iran*, No. 08-cv-1807, 2010 WL 5105174 (D.D.C. Dec. 9, 2010); *Belkin v. Islamic Rep. of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009); *Weinstein v. Islamic Rep. of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002); *see also Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, No. 06-727, 2013 WL 351546, at *3 (D.D.C. Jan. 29, 2013) (noting Syria's support for Hamas).

Some of plaintiffs' evidence is cumulative, but because of the level of detail and insight the witnesses provided with respect to Hamas, its relationship to Iran, MOIS and Syria and their support for Hamas terror attacks against civilians, the Court will quote at length from their expert testimony.

### A.  Testimony of Arieh Spitzen

Plaintiffs presented affidavit and live testimony of Arieh Spitzen, Israel Defense Forces Colonel (retired), an expert in Palestinian affairs and society, including the modes of operation and conduct of various Palestinian Islamic terror groups, particularly Hamas. DE 31-3 at ¶¶ 1-3. Mr. Spitzen has been researching these issues during the entire course of his year 40 year career, 34 years of which were in Israel Defense Forces ("IDF") service. *Id.* During the majority of his IDF service, Mr. Spitzen held senior positions, heading up teams of researchers on Palestinian affairs in both the West Bank and Gaza. *Id.* at ¶¶ 3-7. During his last 8 years in the IDF, Mr. Spitzen served as Department Head for Palestinian Affairs in the Administered Territories and

Advisor to the Coordinator of Government Activities in the Territories. *Id.* at ¶ 7. He retired with a rank of Colonel. *Id.* Mr. Spitzen continues to serve in the IDF reserves as the emergency Department Head for Palestinian Affairs in the Administered Territories, and thus continues to be fully up to date in all that occurs in the Palestinian realm including the recent waves of terror and profiles of the terrorists. *Id.* at ¶ 8. He also provides independent consulting services on Palestinian affairs to various government agencies, research institutes and private parties. *Id.* at ¶ 9.

Mr. Spitzen has been designated and qualified as an expert on issues relating to Palestinian affairs and Hamas by four U.S. federal courts and has served as an expert in these areas in dozens of civil and military cases in Israel, including in the Israeli Supreme Court. *Id.* at ¶¶ 10-11. Among other things, he reviewed materials from the court file on the Israeli military court conviction of Hussam Qawasmeh and the Israeli police file on the kidnapping. *Id.* at ¶ 18; *see also* Supplemental Declaration of Arieh Dan Sitzen ("Supplemental Spitzen Decl.") at ¶ 2. His declaration dated June 23, 2016, describes the June 2014 kidnapping and murder of the three Israeli teens, including decedent Yaakov Naftali Fraenkel, and sets forth in detail Hamas's responsibility for the attack. Accordingly, the Court will adopt Mr. Spitzen's testimony and quote and summarize extensively from his affidavit:

> On June 12, 2014, Izz al-Din al-Qassam Brigades operatives – Marwan Saadi Abd al-Afu al-Qawasmeh and Amer Omar Abu Aisheh – arrived at the Gush Etzion Junction on route 60 south of Jerusalem in a stolen Hyundai. The two were armed with weapons purchased by Hamas cell commander, Hussam Ali Hasan al-Qawasmeh, with funds from Hamas's Gaza based Al-Nur Association for the Care of Prisoners and the Families of Shahids in the Gaza Strip (the "Al-Nur Association") transferred to Hussam al-Qawasmeh through his brother, Mahmoud Ali Hasan al-Qawasmeh, an employee of the Al-Nur Association, and their mother, Subhiya Rushdi al-Qawasmeh.

The terrorists picked up the three teens (Eyal Yifrach, Gil-'Ad Michael Shaer and Naftali Yaakov Fraenkel) who were hitchhiking home . . ., promising to provide them a ride to their destinations. Soon after the trio entered the vehicle, the terrorists aimed their pistols at the boys and informed them that they were being held captive. When the boys resisted the kidnapping, the two terrorists shot and killed them at point blank range. Following the murder, the terrorists continued driving towards Hebron. They stopped at Wadi Hasaka, a short distance outside of Hebron, where they removed the boys' bodies from the vehicle and then burned the vehicle with the victims' personal belongings inside. The terrorists transferred the bodies to a getaway car that was waiting for them and transported the bodies some distance away from the location where they burned the car. After Marwan al-Qawasmeh reported the results of the attack to cell-commander, Hussam al-Qawasmeh, the two returned to move the bodies to a plot of land belonging to Hussam al-Qawasmeh, where they buried them in the ground. They camouflaged the burial site in order to prevent discovery. Hussam al-Qawasmeh also assisted the two murderers by offering them shelter and providing them with food and beverage. Despite a massive manhunt search by the Israeli security and military forces as well as hundreds of volunteers, it took almost three weeks to locate the buried bodies. The fugitive murderers were themselves eventually hunted down and killed on September 23, 2014, during the course of an attempted arrest by the IDF.

The murderers were part of a Hamas cell and were dispatched by its cell commander – Hussam al-Qawasmeh, a Hamas operative from Hebron. Hussam al-Qawasmeh was captured by the IDF and tried in the Judea Military Court where he was convicted and sentenced to three life terms and a financial penalty for his role in the attack. Hussam al-Qawasmeh's main accomplice was his Gaza based brother, Hamas operative Mahmoud al-Qawasmeh. Mahmoud al-Qawasmeh previously had been sentenced to 20 years in prison for his involvement in a double suicide attack in Beersheba on August 31, 2004, in which 16 people were killed. He was released by Israel to Gaza as one of the prisoners exchanged as part of the Shalit Deal. Other Hamas operatives took part in various aspects and stages of this kidnapping and murder, both pre-attack planning and post-attack cover-up, including selling the weapons that were used during the attack; attempts to cover up the tracks of the murderers and their dispatchers; helping hide the perpetrators-turned-fugitives; and aiding the attempt of cell commander Hussam al-Qawasmeh to escape to Jordan.

DE 31-3 at ¶¶ 20-22.

Spitzen concluded that Hamas was responsible for planning, financing and executing the kidnapping and murder of the three teens based on the following factors:

Objective (Hamas's use of kidnapping as a strategic weapon). Spitzen testified that the kidnapping of Jews—designed to obtain the release of Hamas prisoners from Israeli prisons—is a preferred modus operandi for Hamas. Hamas views the Shalit prisoner exchange deal as a significant success and has increasingly preferred kidnapping, considering it to be highly effective. *Id*. at ¶ 24. Spitzen testified:

> As far back as 2013, one of the murderers, Marwan al-Qawasmeh, asked Hussam al-Qawasmeh for assistance in acquiring money from Hamas's Al-Nur Association to carry out a terror attack.

> In April 2014, Hussam and Marwan al-Qawasmeh began planning a terrorist kidnapping of a Jew, with the goal of using the hostage as leverage to obtain the release of Palestinian prisoners. The planning of the terrorist murder (as is evident from Hussam al-Qawasmeh's court verdict) was extremely thorough. It included recruiting another operative, choosing a location for the kidnapping, planning for the acquisition of escape cars and for their disposal so as to obliterate the evidence, locating hideouts, etc. As cell commander, Hussam al-Qawasmeh was responsible for financing the attack, providing the cell with weapons, and hiding the murderers and hostages following the planned attack.

Hamas affiliation of central operatives in terror cell. Spitzen testified:

> Most of the central operatives (and accomplices) of the Hamas terrorist cell which carried out the kidnapping and murder already had a prior record of being active Hamas operatives. Some of them had served prison sentences due to previous Hamas activities. After the murder, Hamas recognized some of them as Hamas operatives and some were explicitly dubbed in Hamas media and on Hamas posters as "operatives of the Izz al-Din al-Qassam Brigades", the Hamas terrorist-operative wing.

Id. at ¶¶ 25-26; 34.

In Particular, Spitzen described the prior Hamas affiliations and activities of the cell commander, Hussam al-Qawasmeh, the two perpetrators, Marwan al-Qawasmeh and Omar Abu

Aisha and Mahmoud al-Qawasmeh, who obtained the funding for the attack, among other accomplices. *Id*. at ¶¶ 35-52. Hussam al-Qawasmeh served in Israeli prison from 1995 to 2002 for Hamas activity, including affiliation with a Hamas terror cell, which had planned to kidnap a Jew from the Gush Etzion junction. *Id*. at ¶ 36. Following his release, Hussam al-Qawasmeh was detained several times for his continuing Hamas activities. *Id*. Hussam al-Qawasmeh's six brothers were also heavily involved in Hamas terrorist activities over the years. *Id*. at ¶ 37. After the kidnapping and murder, Hamas publicly identified Hussam al-Qawasmeh as an operative and has listed him on its website as a Hamas imprisoned operative. *Id*. at ¶ 38.

Spitzen testified that perpetrator Marwan al-Qawasmeh had a history of Hamas terrorist activities for years prior to the kidnapping and murder. *Id*. at ¶ 40. He had been arrested by Israel five times, served at least two terms in Israeli prison for security offenses and admitted in a 2010 interrogation that he had been working as a Hamas operative engaging in terrorist operations in the Hebron region since 2009. *Id*. His brother was also imprisoned for Hamas terror activity. *Id*. at ¶ 41. In addition, Marwan al-Qawasmeh's picture appears on the internet next to posters of Hamas leaders and Hamas emblems and insignias. *Id*. at ¶ 40.

Spitzen testified that perpetrator Omar Abu Aisha had been part of Hamas for nine years prior to the kidnapping and murder. *Id*. at ¶ 44. He was arrested and detained by Israel several times prior to the kidnapping and murder and his father and brother also had a history of involvement in Hamas terror activities. *Id*. at ¶ 45. Both Marwan al-Qawasmeh and Omar Abu Aisha were publicly dubbed Shahid Qassami (martyr of the Izz al-Din al-Qassam) after their deaths. *Id*. at ¶¶ 42; 46. At their funerals, the two were wrapped in shrouds with the symbol of the Izz al-Din al-Qassam Brigades. *Id*. And an obituary for the two was published on Twitter on behalf of Hamas and the Izz al-Din al-Qassam Brigades. *Id*.

Spitzen testified that Mahmoud al-Qawasmeh who obtained the funding for the attack, was Hussam al-Qawasmeh's brother, was a member of Hamas since 2001 and himself had carried out a deadly terror attack on a bus in Israel in 2004. *Id*. at ¶ 48.[1] He was sentenced to a prison term of more than 20 years for that attack, but was released to Gaza in 2011 as part of the Gilad Shalit prisoner exchange deal and went to work for Hamas's al-Nur Association. *Id*. at ¶¶ 47-48. Spitzen testified that other accomplices also had a history of involvement in Hamas terror activities. *Id*. at ¶¶ 50-52.

Financing for the attack, which came from the Hamas affiliated Al-Nur Association in the form of 150,000 NIS for purchase of weapons. Spitzen testified:

> Hussam al-Qawasmeh's brother, Mahmoud, who then was in Gaza (having been released there as part of the Shalit Deal), was working for the Al-Nur Association. In response to Marwan al-Qawasmeh's request for funding from the Al-Nur Association, Hussam al-Qawasmeh contacted Mahmoud al-Qawasmeh in Gaza and asked him for funding for what he termed "the families of prisoners and martyrs." Mahmoud al-Qawasmeh promised to check the request and several days later began transferring funds (totaling NIS 150,000, equivalent at the time to approximately USD $40,000) from the Al-Nur Association to the terrorists.

> This NIS 150,000 was transferred through couriers in five installments to Subhiya al-Qawasmeh (mother of Hussam and Mahmoud) who passed the money on to Hussam al-Qawasmeh. These funds were used to purchase the weapons (two M16 rifles and two pistols) employed by the terrorists – Marwan al-Qawasmeh and Amer Abu Aisheh.

*Id*. at ¶¶ 27-28.

Based on his many years of experience researching Hamas charitable associations, Spitzen explained that these associations keep meticulous records of their beneficiaries' identities and the reasons for the support. *Id*. at ¶ 29. Therefore, it would be highly unlikely for Hamas to transfer funds intended for the support of families of prisoners, martyrs and poor

---

[1] According to Berti, the Hamas leadership in Syria was responsible for this attack. DE 31-5 at ¶ 37.

people, in response to a general request, without knowing the identity of the beneficiary or the purpose of the funds and it is probable that the Al-Nur Association knew that the real purpose of these funds was unofficial, likely for terrorism. *Id*.

Spitzen testified that the history and activities of the Al-Nur Association demonstrate that it is a Hamas entity which has funded Hamas terror activities in the past. He testified that the Association was first founded in 1996 by a Hamas leader, but was soon shut down due to its Hamas connections. *Id*. at ¶ 58. It reopened again in 2000 with the involvement of known Hamas leaders as founders and board of directors members. *Id*. at ¶¶ 58-59; 64-77. Both Israel and the Palestinian Authority have taken action against the Al-Nur Association on the basis that it is a Hamas entity. Id. at ¶¶ 60-63. The Al-Nur Association is also publicly recognized as a Hamas entity, maintains cooperative relations with the Hamas government in Gaza and partners with other Hamas affiliated entities to host events and activities. *Id*. at ¶¶ 85-89.

Spitzen additionally testified about the Al-Nur Association's modes of operation and links to terrorism. Spitzen noted, *inter alia*: the involvement of the Association in Hamas terror financing under the guise of aiding prisoners and their families, which has been addressed in several Israeli court cases; its practice of employing convicted Hamas terrorists upon their release from prison; its contact with Hamas terrorists in the West Bank; and its use of couriers rather than traditional banking channels to transfer money. *Id*. at ¶¶ 78-84.

<u>Hamas claimed responsibility for the attack</u>. Spitzen testified:

> Saleh Muhammad al-Arouri, senior Hamas operative and member of the Hamas Political Bureau, publicly announced Hamas's responsibility for the terrorist murder on behalf of Khaled Mish'al of the Hamas Political Bureau. At an August 20, 2014 conference in Istanbul, al-Arouri, declared that Hamas's armed terrorist wing, the Izz al-Din al-Qassam Brigades, were responsible for the murder. He also described the attack as a "heroic" operation in which three "settlers" were captured in Hebron and stated that the operation was performed

for the sake of the Palestinian prisoners, who were hunger-striking in the prisons
at the time.

*Id.* at ¶ 30. Further in this regard, Spitzen pointed out that Palestinian Authority Chairman,
Mahmoud Abbas directly accused Hamas of responsibility for the attack. *Id.* at ¶¶ 31-32.

### B. <u>Testimony of Dr. Patrick L. Clawson</u>

Plaintiffs presented affidavit and live testimony of Dr. Patrick Clawson Ph.D, an expert
on the Islamic Republic of Iran, its sponsorship of terrorism and its politics. Declaration of Dr.
Patrick L. Clawson, DE 31-1. Dr. Clawson has over three decades of experience in Iranian
affairs and has spent thirty years consulting for U.S. governmental agencies such as the Central
Intelligence Agency, the Department of Defense, the State Department Bureau of Intelligence
and Research, the National Security Agency and the Defense Intelligence Agency. *Id.* at ¶¶ 2-5.
He has extensive academic experience and published 17 books and monographs dealing with the
Middle East and Iran. *Id.* at ¶ 9.

Dr. Clawson has testified as an expert before committees of the U.S. House of
Representatives and Senate and qualified as an expert witness in many terrorism trials in federal
courts. *Id.* at ¶¶ 6-7.[2] His detailed Declaration provides authoritative insight into the liability of
Iran and MOIS in this case and is based on a wide array of information including independent
scholarship and official U.S. Governmental statements and reports. Accordingly, the Court will
adopt Dr. Clawson's testimony and quote extensively from his affidavit:

<u>Iran's Support for Terrorism Generally</u>

---

[2] Dr. Clawson has been described as a "renowned scholar of Middle Eastern politics, who has
studied and written about Iran for years. <u>In over 20 cases Dr. Clawson has provided this Court with
reliable and credible testimony regarding the involvement of Iran, MOIS and IRGC in sponsoring and
organizing acts of terrorism carried out against citizens of the United States</u>." *Heiser v. Islamic Rep. of
Iran*, 466 F. Supp.2d 229, 265 (D.D.C. 2006) (emphasis added).

Iran is now, and since 1985, has been continuously listed on the U.S. State Department list of state sponsors of terrorism. The Secretary of State is required under U.S. law to provide Congress with an annual full and complete report on terrorism . . . The list is set forth in an annual report called "*Patterns of Global Terrorism*" or more recently "*Country Reports on Terrorism*" (referred to herein as "Patterns of Global Terrorism"). Patterns of Global Terrorism is highly respected by researchers on terrorism, since the State Department has access to reliable intelligence sources not available to the general public and puts considerable effort into the document, making sure to double check and verify all facts and weighing each word carefully. Patterns of Global Terrorism reports frequently refer to Iran's role as a sponsor of terrorism and to its support for Hamas.

Clawson quoted the following from the 2014 Patterns of Global Terrorism Report:

> Designated as a State Sponsor of Terrorism in 1984, Iran continued its terrorist-related activity in 2014, including support for Palestinian terrorist groups in Gaza....The IRGC-QF [Quds Force] is the regime's primary mechanism for cultivating and supporting terrorists abroad.... Iran has historically provided weapons, training, and funding to Hamas and other Palestinian terrorist groups, including Palestine Islamic Jihad (PIJ) and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC). These Palestinian terrorist groups have been behind a number of deaths from attacks originating in Gaza and the West Bank. Although Hamas's ties to Tehran have been strained due to the Syrian civil war, in a November 25 speech, Supreme Leader Khamenei highlighted Iran's military support to 'Palestinian brothers' in Gaza and called for the West Bank to be similarly armed. In December, Hamas Deputy Leader Moussa Abu Marzouk announced bilateral relations with Ira and Hamas were 'back on track.

*Id*. at ¶ 31.

The Iranian Ministry of Information and Security ("MOIS")

MOIS, Iran's foreign and domestic intelligence service, is one of the principal organizations Iran has used to carry out its terrorist support activities. MOIS is the successor agency to the respected spy agency called SAVAK, run by the Shah. After the 1979 revolution, that organization was not disbanded, but maintained in a secret manner, and then formed as a ministry openly (MOIS)

several years after the 1979 revolution. MOIS at one point had approximately 30,000 employees, making it the largest intelligence agency in the Middle East, and was considered in effectiveness second only to Israeli intelligence.

For some years, MOIS's role appears to have been downgraded as the IRGC [Iranian Revolutionary Guard Corps] took over more and more functions. Indeed, since the disputed presidential election in 2009 led to a considerable expansion in the IRGC's intelligence arm, that organization appeared to be eclipsing MOIS's role. However, after some serious operational missteps by the IRGC and IRGC/Qods in 2011-2012 – including getting caught red-handed at botched terror attacks in the United States (the planned attack on the Saudi Ambassador to the United States to which Mansour Arbabsiar pleaded guilty in federal court), India, Azerbaijan, Bulgaria, Cyprus, and Malaysia, among other places – MOIS appears to have made something of a comeback.

U.S. Department of State reports have frequently referred to Iranian intelligence services role in facilitating terrorist attacks, at a time when the only Iranian intelligence service of any size was MOIS.

In providing support to Hamas and other terrorist groups, MOIS is acting as a ministry of the Iranian government whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives. In sum, the terrorism training provided to Hamas and other terrorist groups by MOIS is an official policy of the Iranian government.

Iran's Use of Ostensibly Charitable Organizations to Conceal its Terror Financing

The Islamic Republic of Iran's political structure is bifurcated into two aspects: a formal governmental structure and a revolutionary structure.

As part of its revolutionary system parallel to ordinary state institutions, Iran has a number of large "foundations" which control extensive assets. In 2013, Judge Forrest of the U.S. District Court for the Southern District of New York found in *In re 650 Fifth Avenue and Related Properties (Alavi-Assa)* that the Alavi Foundation of New York was controlled by one of these foundations in Iran which in turn was under the control of the Iranian government.

Another such Iranian foundation is the Martyr's Foundation to use its original name . . . The director of this Foundation is appointed by the Supreme Leader, and the organization appears to be largely funded by direct grant from the Iranian government . . . In his book, *The Pasdaran: Inside Iran's Islamic Revolutionary Guard Corps*, noted scholar of Iran's IRGC Emanuele Ottolenghi describes the Martyrs Foundation as being controlled by the IRGC.

Reports appear in the Iranian press about senior officials from the Martyr's Foundation visiting Lebanon, with the implication being that the Foundation continues to be active there. The organization's website contains many statements of praise for Palestinian terrorist "martyrs" but is silent about the Martyr's Foundation's activities regarding Palestinians. It is noteworthy that Palestinian organizations including Hamas have long spoken about the support they provide to the families of those killed or imprisoned by Israel, both directly from government funds and indirectly through organizations like the Al Nur Prisoner's Society in Gaza, a Hamas charitable organization similar to the Iranian Martyr's Foundation.

The lack of detail from the Martyr's Foundation about its activities abroad is presumably related to the actions that the U.S. government has taken against the Martyr's Foundation for its support for terrorists, including Hamas terrorists. On July 24, 2007, the Treasury Department designated the Iranian Martyr's Foundation under Executive Order 13224, which is aimed at financially isolating terrorists and their support networks.

In sum, Iran provides state support to terrorism through ostensibly charitable organizations, including support to Hamas through Iran's Martyr's Foundation.

<u>Iran's Relationship with Hamas</u>

It has been well-documented for over thirty years that Iran has provided funding and training for terrorism operations that targeted United States and Israeli citizens.

Hamas is a terrorist organization established in 1987 by Palestinian Sunni Islamist militants opposing the establishment and existence of Israel. The founders of Hamas were close to and are ideologically aligned with the Egyptian Muslim Brotherhood organization. . . The organizing principle of Hamas was advocacy of terrorist attacks on Israeli civilians, which its members did not think that the predominant Palestinian organization (the Fatah movement long led by Yassir Arafat) was doing sufficiently.

While Iran's relationship with Hamas has waxed and waned over the years, Iran never cut off all its support for Hamas even during periods when the relation was cool, and when the relationship was warm, Iran provided substantial financial and military support.

*Id*. at ¶¶ 20-35. Clawson described the history of the relations between Iran and Hamas over the years from 1993 through 2014. *Id*. at ¶¶ 36-45. As to the 2011-2014 time period, Clawson testified:

The Iran-Hamas relationship waned again after 2011 as the IRGC provided arms and fighters to support the Assad regime in Syria in its battle against insurgents who included Sunni Islamists, but then the relationship improved after the Egyptian military's 2013 overthrow of the Morsi government which had been close to Hamas, leaving Hamas quite dependent on Iranian aid. In January 2014, Taher al-Nounou, an aide to Gaza's Prime Minister Ismail Haniyeh (one of the most important Hamas leaders), said "Relations between us [Iran and Hamas] are now almost back to how they were before. We believe we shall soon be back at that point." Asked if Iran had resumed its financial support, Nounou said, "We don't announce these things because there would be efforts to stop it." Bassam Naim, another senior Hamas official added "Ties [between Hamas and Tehran] had never been conclusively severed, but recently there have been a number of meetings that brought new blood back into our relationship with Iran"

In March 2014, Israel intercepted the Panamian-flagged *Klos C* ship in the Red Sea off the Sudan coast, finding on board 40 M-302 advanced surface-to-surface rockets, 181 mortar shells, and 400,000 rounds of 7.62mm caliber ammunition. A leaked report from the UN's Sanctions Committee charged with monitoring UN Security Council Resolution 1747's order banning Iran from exporting weapons found that the origin of the shipment was in Iran, based on the ship's manifest, statements by the captain, and the nature of the cargo. (C:\pschmidt\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\C0ZC0W03\That committee did not discuss to where the arms were headed that not being in their mandate), but Israeli officials provided details of the plans to smuggle the arms from Sudan across Egypt into Hamas-controlled Gaza. The State Department's Country Report on Terrorism 2014 describes the episode as, "In March 2014, Israel intercepted a weapons shipment containing rockets, mortars, and ammunition destined for Hamas and PIJ [a small pro-Iranian group in Gaza] in Gaza" In sum, there is strong reason to think that this arms shipment was organized by Iran.

Hamas-Iran relations were further strengthened in the course of 2014 as Hamas stepped up its terror activities. After Hamas's June 12 kidnap and murder of three teenagers including Naftali Fraenkel, Hamas rocket attacks and Israeli air strikes escalated into an Israeli invasion of Gaza on July 8 which continued until

August 26, with the deaths of 71 Israelis and over 2,000 Gazans. Iran issued statements strongly supporting Hamas' activities during this time and in the aftermath. On September 29, Major General Ghola Ali Rashid of the Iranian Armed Forces General Staff Headquarters said, "Today some of our commanders are providing advisory assistance to Iraq and its army, in addition to the resistance in Lebanon, Hezbollah, and the Palestinian resistance movement." Supreme Leader Khamenei said on November 25, "The Islamic Republic of Iran, with divine grace, has not become prisoner of sectarian limitations and divisions. Just as it aids Shi'a Hizbollah in Lebanon, it aids Hamas and Islamic Jihad [PIJ] and other Sunni groups in Palestine."

A Hamas high-level delegation visited Tehran on December 8, 2014 just ahead of the annual December 14 celebration of the organization's founding in Gaza. To quote the respected on-line news service Al-Monitor, "A senior Hamas official abroad, who spoke on condition of anonymity, told Al-Monitor, 'Hamas is aware that Iran is under a harsh economic blockade and its financial expenses are enormous in neighboring countries. We may not have great hopes that financial support will be generous as it was before, but the military support for the movement may not be harmed much, which is sufficient for us at this stage." On December 9, 2014, Mohammad Nasr, part of the Hamas delegation in Tehran, said, "The Islamic resistance in Gaza [*i.e.*, Hamas] defeated the Zionists because of the Islamic Republic's support." On December 14, Abu Obeida, the spokesman for Hamas' military wing called the Izz ad-Din al-Qassam Brigades, expressed his thanks to Iran for supporting Hamas with money and weapons and providing it with rockets and anti-tank missiles. That was an unusually blunt comment. Hamas' usual policy, as expressed by Hamas representative in Tehran, Khalid al-Qaddumi, is "Hamas does not have to reveal the mechanism and details of the support it receives from any party."

*Id*. at ¶¶ 42-45.

### C.  Testimony of Dr. Matthew Levitt

Plaintiffs also presented affidavit and trial testimony of Matthew Levitt, Ph.D. DE 31-4. Dr. Levitt is an expert in counterterrorism and terrorist finance in the Middle East with particular expertise in Hamas and Iranian state sponsorship of terrorism. *Id*. at ¶ 8. He holds a masters of law in diplomacy, MALD, from the Fletcher School of Law and Diplomacy at Tufts University, with concentrations in international security, conflict resolution and the Middle East. *Id*. at ¶ 2.

16

He also holds a Ph.D from the Fletcher School at Tufts, in international relations, where he wrote his dissertation on the impact of terrorist attacks on ongoing negotiations in the peace process in the context of the Oslo Accords, studying both cases of Islamic and Jewish extremism. *Id*. at ¶¶ 2-3.

After holding a Ph.D. fellowship at Harvard Law School, which enabled him to do his field research in Israel, Gaza and the West Bank, Dr. Levitt was employed as a counterterrorism intelligence analyst at the FBI, focusing on Palestinian terrorist groups and their activities in the United States. *Id*. at ¶¶ 3-4. Upon leaving the FBI in 2001 and for the next four years, Dr. Levitt held a position at the Washington Institute for Near East Policy founding a terrorism studies program. *Id*. at ¶ 5. From 2005 through 2007, Dr. Levitt also was employed by the United States Department of Treasury in the division of terrorism and financial intelligence as First Deputy to Undersecretary Stuart A. Levey, as well as Deputy Chief of a smaller U.S. intelligence agency. *Id*. at ¶ 6.

In 2007, Dr. Levitt returned to the Washington Institute where he currently is employed and directs the Stein Program on counterterrorism intelligence. *Id*. at ¶ 7. He is a frequent analyst and commentator on terrorism issues for major media outlets. *Id*. He has also taught a counterterrorism course at Johns Hopkins School of Advanced International Studies. Dr. Levitt additionally provides consulting, primarily on Middle East terrorism and terror financing. *Id*.

In addition, Dr. Levitt has testified on the topics of terrorism and terror financing before the U.S. Congress and has been qualified as an expert witness on these topics in many U.S. federal court cases. *Id*. at ¶ 14. His detailed Declaration provides authoritative insight into the liability of Iran and MOIS in this case and is based on a wide array of information and his long

career in counterterrorism intelligence.  Accordingly, the Court will adopt Dr. Levitt's testimony

and quote extensively from his affidavit:

<u>The Purpose of Hamas Attacks</u>

Hamas, both an acronym for *Harakat al-Muqawama al-Islamiya* (Islamic Resistance Movement) and an Arabic word meaning 'zeal', is a Palestinian Islamist group that emerged in 1987 as an outgrowth of the Palestinian branch of the Egypt-based Muslim Brotherhood. Hamas was founded in December of that year with the goal of eliminating the State of Israel and establishing in its place an Islamist state in all of what was once British Mandatory Palestine--a territory that today comprises Israel, the West Bank, and the Gaza Strip. Hamas employs a three-pronged strategy to achieve this goal: (1) social welfare activity that builds grassroots support for the organization, (2) political activity that competes with the secular Palestinian Authority (PA), and (3) guerilla and terrorist attacks that target Israeli soldiers and civilians. . . Hamas' slogan, as declared in Article 8 of the group's charter, reflects the centrality of violent *jihad*--religiously sanctioned resistance against perceived enemies of Islam--to these strategies: "Allah is its target, the Prophet is its model, the Koran its constitution: Jihad is its path and death for the sake of Allah is the loftiest of its wishes."

Since its founding in 1987, Hamas has committed countless acts of violence against both military and civilian targets, including bombings, rocket and mortar attacks, shooting attacks, stabbing attacks, kidnappings and attempted kidnappings and car ramming attacks. . . Hamas has purposely targeted many busy civilian venues including, buses, bus and light rail stops, discotheques, restaurants, markets, universities and even a hotel hosting a Passover Seder.

Hamas attacks are intended to terrorize, to instill fear in the civilians who comprise the local population so that they will either leave the land Hamas maintains belongs to the Palestinians or, at a minimum, pressure their leaders to give concessions to Hamas such as to obtain the release of Palestinian prisoners being held in Israeli prisons. For example, both before and after the so-called "Shalit deal" in which Israel released over 1,000 Palestinian security prisoners in exchange for one captured Israeli soldier in Gaza – Gilad Shalit, Hamas has ceaselessly engaged in kidnappings and attempted kidnappings in hopes of gaining a valuable bargaining chip to use in future negotiations with Israel.

Salah al-Arouri, a longtime Hamas operative from the West Bank, is considered by the US Department of Justice to be a high-ranking Hamas military leader. Arouri has a vast military career and has long been a proponent of

leveraging kidnapping operations as a means to secure the release of Hamas prisoners in Israel. In the wake of the Shalit deal, Al-Arouri highlighted the centrality of the Palestinian prisoners' problem and stressed the need to release prisoners by way of kidnapping Israelis. Specifically he argued that, "Israel's willingness to release so many people in exchange for one soldier, is a virtue. I say this to all our people inside Hamas. . ."

Arouri has since shifted his focus to operations in the West Bank, where according to Israel officials, Arouri "has urged West Bank operatives incessantly to set up terror cells and perpetrate kidnappings." He "financially sponsored these cells, which were trained and directed to abduct Israelis," often sending funds via charities serving as front organizations."

Hamas continues to carry out kidnapping operations for the express purpose of using the victim as leverage in prisoner swaps.

*Id.* at ¶¶ 19-28.

<u>The Importance of Iranian Funding for Hamas Operations</u>

The cost of running Hamas encompasses interdependent but separate operational, political, and social-service expenses. Without the significant funding it needs to carry out its terrorist, political, and social activities—which are interdependent and mutually reinforcing endeavors—Hamas could not function.

Iranian funding goes a long way towards helping Hamas bear the significant financial burden of underwriting its operations. Operational costs include entities like weapons and ammunition, explosive precursors, chemicals for bombs and poisoning, safe houses, communications, travel, transportation, bribes, intelligence payments, and training. They are contingent on political and social-service costs. These expenditures comprise propaganda, print collateral, and political campaigns in the political realm and salaries, overhead, payments to orphans and widows, education, health, and food in the social welfare service domain. These social-service costs are far more expensive than purely operational costs, accounting for large-scale and long-term infrastructure investments. This infrastructure forms the foundation not only for Hamas' social welfare but its political, guerilla, and terrorist activities as well. And, money being fungible, the funds raised by and for this social-service infrastructure benefit individuals, organizations, and activities throughout Hamas and its component parts. . .

As a U.S. General Accounting Office report found, the cost of funding an actual operation accounts for "a small portion of the assets that terrorist organizations require for their support infrastructure such as indoctrination,

recruitment, training, logistical support, the dissemination of propaganda, and other material support." When we fail to account for more than just bullets and explosives, we may well come to the mistaken conclusion that terrorism is an inexpensive business. Such an assumption may lead even concerned observers to conclude that most of the massive funds raised by Hamas go toward its political and public-service projects; in fact the social and political wings of Hamas play essential--and expensive--roles in maintaining the group's operational terrorist capacity. Iranian support for Hamas, therefore, is critical.

Estimates of Hamas' total annual budget range from $30 million to $90 million a year. . . Hamas receives an estimated $25 million to $30 million of foreign funding through its charitable *dawa* network each year. This money goes to terror activities, social welfare, and ambiguously overlapping areas such as money paid to the families of suicide bombers.

One of Hamas's Gaza based charities – The Al-Nur Prisoner Society – has been specifically linked in Israeli police and court documents to the June 2014 attack in which the three Israeli teens, including Naftali Fraenkel, were kidnapped and murdered. The Al-Nur Prisoner Society has a history of being involved in funding Hamas.

There is a range of opinion regarding what constitutes the cost of a Palestinian terror attack. . . According to the Israeli police and court records from the kidnapping of the three teens in June 2014, the cost of that attack was approximately $40,000 used to purchase weapons.

According to a US State Department report from 2003, Iranian state sponsorship of Hamas is critical not only in terms of providing the material and funds with which to carry out terrorist operations, but also the rhetorical support necessary to keep up the pace of such operations.

Iran's incendiary rhetoric has continued over the years. . . In January 2014, an aide of Gaza's Prime Minister, Taher al-Nounou blatantly remarked that "Relations between us are now almost back to how they were before [the crisis over Syria]. We believe we will soon be back at that point."

Aside from boasting about their continued support to Hamas, Iran and its Shiite proxy in Lebanon have gone so far as to incite violence against the state of Israel. In 2013, Hojateleslam Alireza Panahian, the advisor to Office of the Supreme Leader in Universities stated, "The day will come when the Islamic people in the region will destroy Israel and save the world from this Zionist base." Khamenei's representative to the IRGC similarly promised in 2013 that, "The

Zionist regime will soon be destroyed, and this generation will be witness to its destruction."

Supreme Leader Khamenei does nothing to conceal this anti-Israel rhetoric; on November 8, 2014, Khamenei himself stated via his twitter feed that "This barbaric, wolf like & infanticidal regime of #Israel which spares no crime has no cure but to be annihilated." . . .

According to a study released by the U.S. Institute for Peace, not only has Iran provided key aid to Hamas, but Hamas has publicly thanked Iran for said support, citing Iran as a "partner in victory," shortly after the conclusion of the December 2008 Gaza war. . .

In a 2012 video posted by Hezbollah's al-Manar television station, Hamas leader Khaled Mishal publicly acknowledged that "Iran has a role in arms and financial support."

In December 2014, Hamas marked its 27th anniversary with rallies and marches featuring Hamas leaders and Izz a-Din al-Qassam Brigades operatives. Qassam Brigades spokesman Abu Ubeida made it a point to single out Iran for special thanks:

> Since Allah graced us with this development [of the Al-Qassam Brigades], and with this victory and this humiliation of the enemy, we have only to thank those whom Allah enlisted to take part in this development... first and foremost the Islamic Republic of Iran, which did not withhold from us funds, weapons and other [forms of aid] and helped us in our resistance by supplying us with missiles that pulverized the Zionist strongholds during the attacks and battles we waged against the occupier, and also supplied us with quality anti-tank missiles that crushed the legendary Zionist Merkava [tank].

*Id*. at ¶¶ 31-47.

<u>Magnitude of Iranian Funding of Hamas Over the Years</u>

While estimates of Iran's financial assistance to Hamas vary, there is consensus that the sum is significant. . . According to Israeli estimates, Iran contributes around $3 million a year in direct aid to Hamas. Canadian intelligence cites assessments that Iran transfers somewhere between $3 million to $18 million a year to Hamas. According to the CSIS report, "in February 1999, it was reported that Palestinian police had discovered documents that attest to the transfer of $35 million to Hamas from the Iranian Intelligence Service (MOIS), money reportedly

meant to finance terrorist activities against Israeli targets." Palestinian sources estimate Iranian assistance to Hamas "at tens of millions of dollars."

Whatever the specific sum, it surely fluctuates given circumstances on the ground. Notwithstanding these fluctuations, there is no doubt that Iranian aid to Hamas has continued consistently over the years until today; Ahmed Yousef, a Hamas leader and former advisor to Palestinian Authority Prime Minister Haniyeh, confirmed this in January 2016, "the financial and military support Iran provides to the movement's military wing has never stopped, it has been reduced over the past five years.". . . Such support is necessary, Colin Clarke notes, to underwrite the costs of critical functions necessary for a militant terrorist group like Hamas. In the case of Hamas, he writes, the group's "generous operating budget" has enabled the group to grow "into a lethal hybrid group capable of attacking Israel kinetically, while also boasting robust levels of popular support amongst Palestinians and Muslims throughout the Middle East." . . .

Iran's provision of support to Hamas has continued over time. According to a 2010 U.S. Department of Defense report on Iran's military power, Iran provides Hezbollah and several Palestinian terrorist groups—including Hamas— "with funding, weapons, and training to oppose Israel and disrupt the Middle East Peace Process," noting that such assistance is smuggled into Gaza through tunnels in the Philadelphi corridor" (which runs along the Gaza-Egypt border).

Relations between Hamas and Iran have been rocky since their split over Hamas' decision not to back the regime of Bashar al-Assad in the Syrian civil war.

And yet, Iranian funding for Hamas never completely stopped. And while the group's rift with Tehran may have seriously affected funding for Hamas' political activities, the group's military wing was not as badly affected. Moreover, by early 2014, relations between Hamas and Iran started to get back on track.

The U.S. State Department's *Country Reports on Terrorism 2014* notes that Iran is not shy about its willingness to finance Hamas. "Since the conclusion of [Operation Protective Edge]," the report notes, "Iranian governmental officials have publicly stated their willingness to resume Iran's military support of Hamas." The report goes on to note that "historically, Hamas has received funding, weapons, and training from Iran."

Iranian officials themselves admit Tehran continues to support Hamas. In March 2014, the head of the Iranian Shura Council, Ali Larijani, said: "Iran is supporting Hamas on the grounds that it is a resistance movement…Our relationship with [Hamas] is good and has returned to what it was. We have no

problems with [Hamas]." Similarly, in August 2014, Mohsen Rezaei, Secretary of the Expediency Discernment Council and former commander of the Revolutionary Guards, was quoted as saying, "Palestinian resistance missiles are the blessings of Iran's transfer of technology. . . I've requested [President] Rouhani to provide air defense systems to Gaza so that Palestinians can defend themselves against invading planes." In August 2014, as the conflict between Hamas and Israel escalated, Brigadier General Mohammad Reza Naqdi, commander of Iran's volunteer Basij force, confirmed to Fars News Agency that, "Much of the arms Hamas deployed 'were the products of the Islamic Republic of Iran.'"

Officials from the Hamas government in Gaza have also gone on record about the resumption of their strategic relations with Tehran. In January 2014, Taher al-Nounou, aid to Gaza's Prime Minister Ismail Haniyeh, said that "Relations between us are now almost back to how they were before [the crisis over Syria]. We believe we will soon be back at that point." Another Hamas official, Bassem Naim, noted that ties with Iran had never been fully cut off: "Ties had never been conclusively severed, but recently there have been a number of meetings that brought new blood back into our relationship with Iran."

According to a November 2015 Congressional Research Service report on Iran's foreign policy, "Successive annual State Department reports on terrorism have stated that Iran gives Hamas funds, weapons, and training." That funding, the report notes, has ranged over time from as high as near $300 million per year mark to significantly lower sums during times when Iran-Hamas relations stagnated.

In the words of Alex Vatanka, a senior fellow at the Middle East Institute, and Mohammed Najib, a Palestinian journalist: "In reality, Tehran never entirely cut Hamas loose after the debacle over Syria." Citing a senior PA official, Vatanka and Najib explained: "Hamas' political contacts with Iran were largely frozen but the military relationship has continued throughout. Tehran never shut the door to the radical line of Hamas leaders, including Mahmoud al-Zahar in Gaza, and Imad al-Alami, the former representative to Iran." . . .

Indeed, according to the State Department's annual money laundering and financial crimes report, in 2013 Iran continued "to provide material support, including resources, guidance, and financial assistance to multiple terrorist organizations that undermine the stability of the Middle East and Central Asia, such as Hamas, Lebanese Hezbollah, the Taliban, and Iraqi Shia militias." Such support continued in 2014, according to the next year's report. "Hamas, Lebanese

Hezbollah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran," the State Department report noted, "in part to help coordinate Iranian financing and training." In a section of the report on actions taken against Iran under U.S. Executive Orders, the report noted actions taken against Iran's Martrys Foundation, "an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant," including Hamas.

A particularly clear cut case came with the September 2015 U.S. Treasury Department designation of Mahir Jawad Yunis Salah, a Hamas financier and dual British-Jordanian citizen who served as the head of the Hamas finance committee. "Since at least 2013," the Treasury Department reported, "Salah has led the Hamas Finance Committee in Saudi Arabia, the largest center of Hamas's financial activity." As head of the Hamas Finance Committee, the Treasury Department explained, Salah oversaw the transfer of tens of millions of dollars from Iran to Saudi Arabia to fund the Izz al-Din al-Qassam Brigades and Hamas activity in Gaza. Salah was in a position to know, since as of late 2014 he managed several front companies in Saudi Arabia that conducted money laundering activities for Hamas.

Also in September 2015, media reports revealed that over the previous two months "Iran has sent suitcases of cash—literally—to Hamas's military wing in Gaza." In retaliation for Hamas political leader Khaled Mishal's summer 2015 visit to Saudi Arabia, Iran bypassed Mishal and the Hamas political leadership and sent couriers to deliver the suitcases "directly to the leaders of the group's military wing in the Gaza Strip."

Over the course of many years, Iran has provided significant financial and material support to Hamas, without which Hamas could not have carried the kind of sophisticated and effective terrorist attacks for which it has become known. This support enables Hamas to carry out a wide range of attacks from kidnappings, attempted kidnappings, shooting and stabbing attacks, car rammings and rocket attacks, sometimes targeting soldiers but often civilians, in an effort to terrorize the Israeli population and seek the establishment of an Islamic state in the place of Israel. While Iranian support for Hamas has fluctuated, it has never fully ceased. In particular, even when the Hamas political wing was all but cut off from Iranian largesse, the group's military and terrorist wing continued to enjoy the support of Iran in terms of funding, equipment and training.

*Id.* at ¶¶ 49-70.

### D. **Testimony of Dr. Marius Deeb**

24

Plaintiffs also presented affidavit and live testimony for Marius Deeb, Ph.D. DE 31-2. Dr. Deeb is an expert in Middle East affairs, particularly Syrian sponsorship of terrorism of Palestinian terror groups such as Hamas, Hezbollah and Palestinian Islamic Jihad. *Id*. at ¶ 1.

Dr. Deeb obtained his Ph.D. in Arab and Islamic Studies at Oxford University in England. *Id*. He is now retired, but during his career, he taught extensively in academic settings, including at the School of Advanced International Studies at Johns Hopkins University, Indiana University, The American University of Beirut and Georgetown University. *Id*. at ¶ 2. He focused his studies and teachings on the topic of terrorism, in particular, the Syrian-Hamas, Hezbollah and Palestine Islamic Jihad terrorism against both Israel and other Western countries. *Id*. at ¶ 1. During his 40 year career, he has also lectured at academic conferences and in government settings, including by testifying before Congress, on these topics. *Id*. at ¶ 5. He has published numerous papers on the topic, as well as a book on Syria's terrorism entitled "Syria's Terrorist War on Lebanon and the Peace Process." *Id*. at ¶ 4.

Dr. Deeb has previously been designated and qualified by federal courts as an expert witness on issues relating to Syria and its support for terrorist organizations, including Hamas. *Id*. at ¶ 3. His detailed Declaration provides authoritative insight into the liability of Syria in this case. Accordingly, the Court will adopt Dr. Deeb's testimony and quote extensively from his affidavit:

> In the mid-1990's, Hamas's military wing, known as the Izz al-Din al-Qassam Brigades, established an operational headquarters in Damascus, Syria. Hamas military leaders in Syria worked closely with Syrian military intelligence. For many years prior to 2012, Damascus was a center for Hamas's terrorist functions – from strategic planning to command and control. Instructions for terrorist attacks were transmitted directly from Damascus to the terrorist cell that was to carry out the attack. In addition, the Hamas office in Damascus transferred funding directly to its operatives in the West Bank and Gaza. Syria's sponsorship and support for Hamas also enabled Hamas to operate freely in Syrian-controlled

25

Lebanon and to openly recruit Palestinian refugees there and to undergo joint training with Hezbollah.

Consistent with its founding ideology and charter, Hamas vehemently opposed the Oslo agreements signed between the Palestine Liberation Organization ("PLO") and Israel in 1993 and 1995 which created the Palestinian Authority (the "Oslo Accords"). Therefore, Hamas intensified its armed struggle in the wake of the Oslo Accords, carrying out several deadly suicide attacks in the mid-late 1990's, which resulted in death and injury to close to 150 Israelis and others.

Syria was aligned with Hamas in opposing the Oslo Accords. Thus, Syria intensified its support for Hamas, particularly for its engagement in terrorism, with the view that terrorism would help Syria fight the peace process and manipulate its own peace negotiations with Israel. The tactic of terrorism had the dual goal of harming Israel and its citizens and undermining the Palestinian Authority's influence among Palestinians.

Hamas's political leaders joined its military leaders in the organization's Damascus headquarters in 1999 after being expelled from Jordan. From that time until 2011, the Senior Hamas leadership was based in Damascus. Khalid Mash'al, the head of the Hamas political bureau, moved permanently to Damascus in 2003.

The support which Syria provided to Hamas, by giving the organization and its leaders safe haven, allowing it to operate its military headquarters in Damascus and giving it access to other resources such as unrestrained access to funding, weapons, travel, communications, military training, intelligence and strategy proved significant for the terror organization's overall operational infrastructure. Indeed, Hamas's external leadership based in Damascus grew so powerful that it was able to control and direct operational decisions, at times even going against the wishes of Hamas's leaders within Gaza. Furthermore, the resources provided by Syria enabled Hamas to develop into a more sophisticated organization with the ability to carry out large scale attacks designed to achieve maximum carnage.

Syria's support for Hamas, including the safe haven it provided and the unrestrained access to funding, weapons, travel, communications, military training, intelligence and strategy was a factor in the success of Hamas terrorist operations during the Second Intifada.

In the years after the end of the Second Intifada, Hamas decisions at the highest level, concerning both military and political activities were directed from its Damascus headquarters. For example:

a. On June 25, 2006, Hamas in Damascus orchestrated the kidnapping of Israeli soldier Gilad Schalit (another terrorist tactic borrowed from Hezbollah which employed a similar tactics during the summer of 2006).

b. In June 2007, Hamas in Damascus orchestrated the Hamas takeover of Gaza when it ousted the Palestinian Authority from Gaza.

c. Hamas in Damascus was behind the provocation which led to the December 2008-January 2009 conflict in Gaza. Throughout the duration of that war, which was conveniently timed close to the forthcoming Israeli elections, all Syrian cell-phones received continuous updates on the war, calling for their support as though it was a surrogate Syrian war! In January 2010, Hamas leader Khalid Mash'al delivered a speech in Beirut in which he stated that it was Syrian support in that 2008-2009 conflict that made it possible for Hamas to win that war.

In 2012, Hamas had a falling out with the Syrian regime over its support for rebel forces in the Syrian civil war. However, Hamas continues to benefit from the widespread support which it received from Syria prior to 2012.

Syria's extensive support for Hamas over the course of at least twenty years enabled it to transform itself into a leading terrorist group with a solid infrastructure and the power to wreak devastation against Israel and to disrupt the Israel-Palestinian peace process using a variety of tactics – from terrorism to politics. Syria was instrumental in propping up the Hamas leadership during these years and ensuring that it had access both to its own military strategists and to Hezbollah's resources in Lebanon, from which Hamas was able to learn terrorist strategies. The effects of this type of support continued to this day. Indeed, the Hamas organization continues to benefit from the strategies and training it acquired while in Damascus.

On the operational level, Syria provided Hamas with access to weapons, funding and military training. It continues to use these resources in carrying out new terrorist attacks. For example, the kidnapping tactic, which Hamas borrowed from Hezbollah under Syria's guidance and employed in the summer of 2006 with positive results in the form of the release of over 1,000 Palestinian terrorists from Israeli prisons, continues to be a critical weapon for Hamas. A major purpose of the Hamas terror tunnels on the Israel/Gaza border is to bring about another such kidnapping to use as a bargaining tool with Israel. Thus, the tactical know-how which Hamas gained while under Syrian protection is directly responsible for the

Hamas terrorist attacks we see today. This is particularly obvious in the example of the Hamas kidnapping of the three teens in June 2014.

In summary, it is my expert opinion that despite the falling out between Hamas and Syria in 2012, the essential safe haven and support which Syria provided to the organization over the course of many years, solidified Hamas's organizational structure and transformed it into a leading terrorist organization with the sophistication needed to carry out complex terror attacks. As noted, this support took the form of unrestrained access to funding, weapons, travel, communications, military training, intelligence and strategy. The organizations terror operations since 2012, including the attacks it carried out in 2014, were made possible because of Syria's massive support for the organization from the early to mid-1990's through 2012.

*Id.* at ¶¶ 15-25.

### E.  Testimony of Dr. Benedetta Berti

Plaintiffs also presented affidavit and live testimony for Benedetta Berti, Ph.D. DE 31-5. Dr. Berti is an expert in Middle East affairs, particularly the relationship between Syria and Hamas, which she has been researching for close to ten years. *Id*. at ¶ 2.

Dr. Berti obtained her Ph.D. and M.A. in International Relations with a focus on Middle Eastern Politics from the Fletcher School (Tufts University). *Id*. ¶ 1. She is currently a research fellow at the Institute for National Security Studies (INSS)—Tel Aviv University; a lecturer at Tel Aviv University and holds several other fellowships. *Id*. at ¶ 2. In addition, Dr. Berti lectures on the topics of Syria, Hamas and Palestinian politics at academic conferences and to government agencies, including security briefings to government officials in the U.S., Europe and Israel. *Id*. at ¶ 5. She has written extensively on Hamas, including a recently published book titled: "Hezbollah and Hamas: A Comparative Study," (with Joshua Gleis; Johns Hopkins University Press, September 2012). *Id*. at ¶ 3. Dr. Berti is also a frequent commentator on issues relating to Syria, Hamas and Palestinian politics in television, radio and print publications. *Id*. at

4. She has served as a consulting expert witness on these issues in several federal district court cases. *Id*. at ¶ 6.

Dr. Berti's detailed Declaration provides authoritative insight into the liability of Syria in this case and is based on a wide array of information, including both primary and secondary sources. Accordingly, the Court will adopt Dr. Berti's testimony and quote extensively from her affidavit:

Background Regarding Hamas

**Structure:** Hamas functions like a bureaucratic hierarchy, with the Shura Council (*Majlis al Shura*) at the top of its internal structure. The Shura Council is Hamas's legislative organ; it devises the group's policies and strategies. It is composed of Hamas representatives from Gaza, the West Bank, its leadership in the Diaspora and the Israeli prisons. The Shura Council has the power of issuing binding decisions and it is the final organizational decision-maker. Among its key responsibilities, it also elects the group's Political Bureau.

The second main organ is the Political Bureau (*al-Maktab al-Siyasi*). It serves as Hamas's executive apparatus and its main functions include overseeing the implementation of the Shura Council's decisions, representing Hamas internationally, and running internal security. The Bureau also monitors the group's military wing—the Qassam Brigades—and is heavily involved in fundraising, making it extremely powerful. Because of these executive, political, financial and diplomatic functions, the Political Bureau is incredibly central to Hamas; it is widely thought to be the second most important sub-organizational unit within the organization, second only to the Shura Council. Unlike the Shura Council, the bureau is not located within the Palestinian Territories, and, between 2000-2001 and 2012, the Political Bureau's headquarters were in Damascus, Syria. The historic leader of the Political Bureau, Khaled Mashal, is also one of Hamas's most prominent leaders. Mashal has been a member of the political bureau since the 1990s, serving as the chairman since 1995.

Hamas's armed wing is known as the *Izz al-Din al-Qassam Brigades* ("the Qassam Brigades") . . . The Qassam Brigades are a functionally separate wing that is officially subordinated to the Political Bureau; while retaining tactical flexibility and operational autonomy. The Qassam Brigades and a number of its

military leaders maintained an operational presence in Damascus since the mid-1990's.

Between 1994 and 2004, the Qassam Brigades' main tactic shifted to large-scale terrorist attacks, relying especially on suicide terrorism. Syria played a facilitating role in enabling Hamas to make this shift, as discussed below. During this time, the group also began to evolve and employ a range of different tools to pressure and attack Israel. Among these tools; the group began investing in kidnappings, showing a degree of increasing sophistication and planning.

Since 2005, Hamas's military power and sophistication increased further, and here again, Syria's significant support played a role in facilitating this trend, as discussed below. In the past decade, Hamas has acquired high-combat skills and has become capable of engaging its enemy through both classic guerrilla tactics such as ambushes, IEDs and suicide missions as well as by employing more conventional standoff tactics. . .

<u>Hamas and Syria</u>

Syria's involvement in the Israeli-Palestinian conflict after 1970 satisfied both ideology and pragmatism: by being seen as key champion of Palestinian rights, Syria was able to gain status and legitimacy regionally. Domestically, leveraging Pan-Arab and anti-Israeli sentiments also became especially important for Damascus, ruled by an Alawi minority and with a constant need to legitimize its power and role both internally and to the region's Sunni regimes. Syria's grievances towards Israel of course went beyond the absence of a Palestinian state: the two countries have been in a state of latent (and at times open) conflict since 1948. And since 1967 Syria has been demanding the return of the areas of the Golan Heights that have been under Israeli control as a result of Israel seizure in the Six-day war.

In this context, Damascus has long held the belief that becoming involved and having a strong influence on the dynamics of the Israeli-Palestinian conflict is an important foreign policy interest for Syria. . . Syria's interest in maintaining influence and control resulted in Syria sponsoring different Palestinian factions, at times against each other: for example, in 1983, Syria helped sponsor the creation of the rejectionist Palestinian National Salvation Front, composed of defecting Fatah members and other Palestinian factions. The main purpose of the Syrian-sponsored group was to challenge Yasser Arafat's leadership of the Palestine Liberation Organization (PLO) and the Palestinian national movement in general.

The relationship with Hamas developed in this broader context. Hamas has been in this sense incredibly useful for Syria to a) assert its role and influence over the Israeli-Palestinian conflict; and b) boost a domestic and regional reputation as the 'champion of Palestinian resistance.'

The relationship between Hamas and the Syrian government developed in the early 1990s, when the group opened an office in Damascus (at the time many Palestinian armed and political factions had a presence in the Syrian capital).

After 1993, Syria became the de facto political and communication base of all the main factions—secular and religious—that opposed Fatah and the Oslo Accords; including Hamas. . .

But the relationship really took off only towards the end of the 1990s, with Hamas gradually boosting its presence in Syria, a process that culminated in Hamas' decision to move its Political Bureau to Damascus in 2000. . . In Damascus, the failure of the Syrian-Israeli negotiations and the gradual erosion of the political process set in place by the Oslo Accords in 1993 offered the background for the Syrian decision to additionally increase its backing for the 'rejectionist camp,' and specifically for Hamas.

This resulted, firstly, in increasing the level of political visibility of Syria's support for 'resistance groups fighting Israel': concretely, in addition to hosting offices of groups like Hamas and the Palestinian Islamic Jihad, under Bashar al-Assad Hamas and Hezbollah leaders were, for the first time, given a public platform to speak in Damascus. Increasing presence in Syria also resulted in Hamas investing in social welfare activities and in boosting its presence within Palestinian refugee camps in Syria.

From Hamas's perspective, moving the Political Bureau to Damascus represented more than just a physical relocation: through the 1990s the group had sought to diversify its regional presence and support but, after being de facto ousted from Jordan in the late 1990s (the political bureau had been in Jordan between 1995 and 1999), Hamas's relationship with Syria deepened.

For over a decade (2000-2012), Syria provided Hamas and its senior leadership with a safe base from which to conduct its foreign relations, communicate to the world, host its military leaders and at times plan its violent operations and fundraise. In other words, it provided valuable and continuous support, strengthening Hamas as an organization.

31

Extent and Impact of Syrian Support for Hamas

Syria's support for Hamas over an extended period of time has been significant on a number of levels. This is in the context of Syria's broader support for non-state groups in the region, such as Hezbollah, with the country being on the United States' list of 'States Sponsors of Terrorism' since 1979 due principally to its function as 'safe haven.'

A safe base for the group. One of Hamas's problems, historically, has been how to prevent the group's infiltration by Israel and how to reduce the chances of its leaders being assassinated. This need, combined with Hamas's interest in representing Palestinians in the Diaspora, has made it very important for the group to establish a safe haven outside of Gaza and the West Bank. Damascus has represented such safe haven for many years. What is more, by hosting the Political Bureau and its leadership, Damascus became a key center of power for Hamas.

Indeed the Political Bureau has historically held great influence on the organization. The "external" leadership first shifted from being an auxiliary organ to occupying a central role within Hams as a result of the 1989 incarceration of the group's founder Sheikh Ahmed Yassin. . . After 2004, the Political Bureau, and especially its leaders, Khaled Mashal and deputy head Musa Abu Marzouq, played a key role in shaping Hamas's overall strategy.

In other words, Damascus provided safe operational space to central figures within Hamas. Specifically, Khaled Mashal, Musa Abu Marzouq and Imad al-Alami; another of Hamas's historical leaders who, from Damascus, oversaw Hamas's relationship with external allies, including Iran and Syria as well as military activities. To put this in perspective, these individuals were all designated as Specially Designated Global Terrorists (SDGTs) in 2003 by the United States Department of Treasury. The fact that out of the six-top Hamas figures designated in 2003, three of them were based in Damascus is powerful proof of how central Syria was in terms of proving a safe haven for Hamas. . . By hosting the group, Syria offered symbolic validation, political support, legitimacy and freedom of maneuver, all of which enabled the organization to grow and develop, to boost its regional status and credibility, as well as to increase its military capabilities and solidify itself as a major player in the Palestinian political and military arena.

A base through which to influence Hamas's actions and attacks in Gaza and the West Bank. From Damascus, the political bureau and its leadership shaped Hamas' overall strategy in key ways. Specifically, the bureau has been

important because of its access to funds and because of its influence over the Qassam Brigades (especially in the West Bank)—responsible for the group's armed activities.

Also, in the past decade, some of Hamas's more intransigent views have come from the Diaspora-based leadership, including rejections of ceasefire agreements, refusal to cooperate with the Palestinian Authority and opposition to relinquishing armed operations. For example, Damascus-based Khaled Mashal was among the most critical voices of the Oslo Accords, the subsequent creation of the Palestinian Authority (PA) and he was strongly against any collaboration with the newly-established political body in Ramallah. . .

In addition, the Syrian-based leadership has been held responsible for orchestrating armed operations back in the West Bank. For example, top-military commander Imad al-Alami relocated from Jordan (where he had taken residence after having been expelled from Gaza to Lebanon in the early 1990s) to Syria (via Iran) in the mid-1990s, elevating Damascus to a planning hub, with operational decisions taken in Syria implemented on the ground, especially in the West Bank. As a military leader in Damascus, al-Alami had power over the West Bank, with influence over movements of money and personnel and with direct involvement in military planning. Another military leader, Izz al-Din al-Sheikh Khalil, moved from Lebanon (where he had been deported by Israel from Gaza in 1992), to Syria in the mid-1990s and from there he was involved in orchestrating several of the group's attacks, especially in the West Bank. For example, Israel pointed the finger at Syria and at Khalil after a double suicide bombing attack in the town of Beersheba killed 16 people on August 31, 2004. Shortly after that operation, Khalil was killed in a reported Israeli targeted assassination.

On a separate occasion, in September 2001, the Israeli secret services arrested a ring of Hamas members in the West Bank involved in the planning of a series of violent attacks against Israeli targets, including suicide bombings. After the arrest it was revealed the cell was recruited and 'handled' by the Syrian leadership of Hamas and that some of the cell members had been trained in Syria. More recently, in 2006, after the abduction of IDF soldier Gilad Shalit, the responsibility and role of the Political Bureau came again under scrutiny: despite the murky information available with respect to the chain of command for the operation itself; what is known is that the Gaza-based political leaders had to go to Damascus to meet with the Political Bureau leaders when it came to discussing the terms of the Israeli-offer to release Shalit. The role and influence of the Damascus-based leadership was felt throughout the process leading to Shalit's release, between 2006 and 2011. This again stresses the central role played by the

Syrian-based Hamas leadership as well as its pivotal position when it comes to planning violent attacks, including suicide bombings and kidnappings.

What is more, the freedom of action provided by Damascus was not strictly limited to Syria. After the 1989 Taif Agreement that ended the bloody Lebanese civil war, Syria remained present in Lebanon for over 15 years, formally to act as 'security guarantor.' In that same period Syria had de facto control of Lebanon and, in that capacity, it granted Hamas the ability to be present in a limited manner in both Lebanon and Syria, and especially in the Bekaa Valley, including to recruit and train its members. This is significant to a terror organization like Hamas whose primary objective is "armed struggle" against Israel and, thus, requires that its operatives receive sophisticated military and weapons training to enable them to carry out successful attacks.

A Political and Operational Hub: Communication and Coordination. Damascus offered the premises where Hamas could conduct its foreign policy relations, setting up Damascus as a diplomatic and public relations base. In no other regional capital has the group had so much freedom of maneuver. As previously mentioned, the Syrian government also actively facilitated the group's political role. For example, in 1999, Hamas representatives in Damascus were invited to meet with Iranian President Mohammad Khatami during a high-profile meeting between him and the late Syrian President, Hafez al-Assad. In the following decade, Hamas continued to meet with high-level Iranian officials in Damascus. In addition, Hamas was able to organize political events from Damascus and to use that political stage to influence the Israeli-Palestinian process and Palestinian politics back home. An example here is the organization of a Hamas-led conference in November 2007 to discuss the rejection of the upcoming Annapolis peace process between Israel and the PLO. On that occasion, the Palestinian Authority sent three officials to Syria to ask the Syrian government not to host the conference; arguing it would divide the Palestinian camp and derail the peace process (the request was denied).

In Damascus, Hamas was also able to hold strategic discussions and to coordinate with other factions. For example, the Israeli security services alleged that through interrogations of senior PIJ members in the aftermath of the outbreak of the second intifada, they discovered how planning and coordination between Hamas, PIJ and other factions occurred in Damascus, then trickled down at the ground level in Gaza and the West Bank, with the objective of increasing the coordination of these groups' attacks and other armed activities.

Syria historically claimed that its support and backing for Hamas as well as for other Palestinian armed factions with offices in Syria was restricted to 'political activities.' But this claim is belied by evidence to the contrary that emerged over the years (as the next section will discuss) and as the link between armed attacks carried out in Israel and the Palestinian Territories and Hamas leaders in Damascus show. But it is important to emphasize how political visibility, public backing and freedom to conduct political, diplomatic, fundraising and foreign policy activities are all incredibly important for any political and military organization like Hamas. Hamas's popularity and public backing depend on both its military and terrorist operations as well as on its political and social activities. . .

Equipment, Funding and Logistical Support. [O]ver the years, consistent and reliable reports demonstrate that Damascus's support for Hamas enabled the organization's armed capabilities and activities as well.

A first link is financial support channeled through Syria to finance Hamas's military operations and terrorist attacks. For example Jamal Muhammad Farah al-Tawil—Hamas military commander in the West Bank—is reported to have received money for the group's attacks from Hamas leaders in Damascus and Beirut. These funds were reportedly transferred through the ad-hoc charity set up by al-Tawil, the Al-Islah Charitable Society. . . "Also, Syrian sponsorship and support has enabled Hamas to at times carry out military training in Syria and Lebanon where its operatives have acquired essential tactical skills and knowledge enabling them to carry out ever more sophisticated attacks.

Current State of Relationship Between Hamas and Syria

The relationship between Hamas and the Syrian government has become strained following the beginning of the Syrian civil war. When the popular protests first broke out in Syria, Hamas faced a dilemma. The group had a strong political connection with Assad and its main foreign backer, Iran. As such, Hamas was under pressure to publicly support the Bashar-al Assad regime. Yet, Hamas also had sectarian and religious ties to the Sunni majority protesting against the Alawite-dominated regime. As a result Hamas was initially weary of openly taking sides and preferred instead to assume a neutral stance, neither pro-Assad nor pro-opposition. But as the violence of the regime escalated, Hamas gradually took distance from the Syrian regime. This process eventually led the group to leave Damascus and, in 2012, to relocate the Political Bureau headquarters, along with its leaders, out of Syria. . .

Conclusion

35

Syria's support for Hamas has been essential for the organization's infrastructure, development and for its ability to carry out sophisticated terror attacks, including kidnappings. The substantial organizational support Syria provided to Hamas, especially between 2000-2012, strengthened and legitimized the group while helping it to develop into a major player in the Palestinian political and military scene. Indeed since its creation in 1987, the group has greatly evolved at the economic, political and military level, with Hamas now being the de facto uncontested ruler of the Gaza Strip since 2007.

Notwithstanding the cooling off in relations between Hamas and Syria in 2012; still over the previous decade Syrian support was a major force multiplier for the group, ultimately enabling to rise in status and sophistication. As such, the effects of Syria's support on Hamas will continue to be relevant even years to come. Hamas's military and terrorist capabilities as they stand today are certainly a product of the past support given to the group and this is certainly the case for the period of 2014, when the attack at issue took place. . .

Put simply: Hamas is what it is today also due to Syria's support and continuous backing.

*Id.* at ¶¶ 12-49.

**F.  Findings in Other Cases**

This Court has heard evidence from plaintiffs' liability experts demonstrating that Hamas received massive material support and resources from Iran, MOIS and Syria to carry out terrorist attacks, such as the kidnapping and murder attack in this case. Further, numerous courts, including this Court, have found in the past that Iran regularly provides material support and resources to Hamas and is liable for Hamas terror attacks. *See, e.g., Roth*, 78 F. Supp. 3d at 389; *Bodoff*, 907 F. Supp. 2d at 95; *Beer*, 2010 WL 5105174, at *2; *Belkin*, 667 F. Supp. 2d at 17; *Weinstein*, 184 F. Supp. 2d at 19; *see also Buonocore*, 2013 WL 351546, at *3 (noting Syria's support for Hamas).

## FINDINGS OF FACT REGARDING DAMAGES

On the matter of damages, plaintiffs presented affidavit and live testimony from three of the plaintiffs – Abraham Ron Fraenkel and Rachelle Devora Sprecher Fraenkel, parents of

decedent Yaakov Naftali Fraenkel, who also testified about their children's injuries, and Tzvi Amitay Fraenkel, older brother of decedent Yaakov Naftali Fraenkel. Plaintiffs also presented live testimony from the following minor siblings of Yaakov Naftali Fraenkel: A.H.H.F., A.L.F., N.E.F. and N.S.F.

Plaintiffs presented affidavit and live testimony from Arieh Spitzen, Israel Defense Forces Colonel (retired) regarding the conscious pain and suffering of Yaakov Naftali Fraenkel during the course of the kidnapping ordeal and in the moments before he was murdered. This testimony is based on Arieh Spitzen's review of the court and police files related to the kidnapping and murder.

In addition, plaintiffs presented expert medical affidavit and live testimony from Dr. Rael Strous regarding each of the plaintiff's psychological and emotional injuries.

Dr. Strous is a Medical Doctor specializing in psychiatry. He is currently employed as Director of the Chronic Inpatient Unit of the Be'er Yaakov Mental Health Center located in Be'er Yaakov, Israel. He also currently serves as an Associate Professor of Psychiatry at the Sackler Faculty of Medicine at the Tel Aviv University.

Dr. Strous received his medical degree in 1989 from the University of Witwatersrand in Johannesburg, South Africa. Between 1992 and 1996, he performed his residency in psychiatry at the Albert Einstein College of Medicine in the Bronx, New York. In 1996, Dr. Strous served as Chief Resident at the Bronx Psychiatric State Hospital. From 1996 through 1998, he performed a clinical research fellowship in psychopharmacology at the Commonwealth Research Center of the Harvard Medical School.

Before embarking on his career in psychiatry, Dr. Strous served as an emergency room doctor and as a general physician in pediatrics in trauma.

Dr. Strous has over 100 peer reviewed research publications, including several in the field of chronic post traumatic stress disorder ("PTSD").

Based on his education and experience, Dr. Strous has provided expert testimony in numerous United States federal court cases on behalf of terror victims.

In order to better understand the psychological evaluations and diagnoses set forth by Dr. Strous below, he has summarized for the Court four types of psychiatric disorders suffered by the plaintiffs, as follows:

Persistent Complex Bereavement Disorder

Persistent Complex Bereavement Disorder (also known as Pathological or Complicated Grief or Complicated Mourning) refers to a description of the normal mourning process that leads to chronic or ongoing mourning. The term "Pathological Grief" is applied to people who are unable to get over their grief despite the passage of time. It can take most people up to several years to get past a serious loss especially when the loss is associated with a violent and unexpected death. The person may experience intrusive distressing preoccupation with the deceased and wish to be reunited with the deceased. They may feel a sense of futility about the future, difficulty acknowledging the death, excessive irritability, bitterness or anger about the unfairness of the death and most significantly impaired social/occupational functioning. A pathological grief reaction is usually diagnosed after a long time (one or more years) have passed and the grieving person is not improving as expected.

Post-Traumatic Stress Disorder

Post-Traumatic Stress Disorder ("PTSD") is a condition which develops from having been exposed to, or witnessing, life-threatening events. In addition, the traumatic event may be indirect, by hearing of a relative or close friend who has experienced the life threatening event.

Indirectly experienced death must be accidental or violent. PTSD is characterized by distinct types of symptoms. These symptoms include avoidance, re-experiencing the event, and hyper-vigilance. Avoidance is the active escape from situations that the PTSD victim associates with the event. Re-experiencing is reliving the memory of the event. Hypervigilance is a cluster of symptoms that includes exaggerated startle response, inability to fall asleep and inability to stay asleep.

The disorder is also characterized by negative alterations in mood or cognitions which indicates a decline in someone's mood or thought patterns. This can include memory problems that are exclusive to the event, negative thoughts or beliefs about one's self or the world, distorted sense of blame for one's self or others, related to the event, being stuck in severe emotions related to the trauma (e.g. horror, shame, sadness), severely reduced interest in pre-trauma activities and feeling detached, isolated or disconnected from other people.

Due to their suffering and symptoms, educational and employment prospects for PTSD victims are often lowered. Some have difficulty interacting with others.

Younger victims and females may be more likely to be susceptible to PTSD.

Overall effects on PTSD patients from this illness are severe. Patients are easily distractible due to their exaggerated response to stimuli. Individuals face considerably lowered employment prospects and increased likelihood of difficulty in forming and maintaining interpersonal relationships. For those who are married or who are able to marry and have children the stress of childrearing will be compounded. The inability to relax and have a good time is extremely common with PTSD patients.

Persistent Depressive Disorder (Dysthymic Disorder)

39

Persistent Depressive Disorder (previously known as Dysthymic Disorder) is a chronic (long-lasting), mild form of depression. However, calling it "mild" is misleading; because it can last for years and it can be just as debilitating as a more acute episode of major depression (clinical depression)**, e**ven leading to thoughts of, or attempts at, suicide. Many of the symptoms of dysthymia are the same as those of major depression; however, they may be less severe or intense. Dysthymia also has some symptoms that may not occur with major depression. The hallmark of dysthymia is the length of time that it persists. In adults, dysthymia is diagnosed when the symptoms continue for two or more years; in children or teens, the symptoms last for a year or more. Dysthymia is a serious condition that needs to be treated. Dysthymia may include the experience of the following symptoms: sad mood, difficulty falling sleeping (or sleeping too much), increased or decreased appetite or weight, feelings of worthlessness, feelings of hopelessness, thoughts of suicide, anxiety, decreased motivation, loss of interest (anhedonia), irritability or anger, restlessness (especially in children) and vague physical symptoms.

Anxiety Disorder

The essential feature of anxiety disorder is excessive anxiety and worry (apprehensive expectation) about a number of events or activities. The intensity, duration, or frequency of the anxiety and worry is out of proportion to the actual likelihood or impact of the anticipated event. The individual finds it difficult to control the worry and to keep worrisome thoughts from interfering with attention to tasks at hand. During the course of the disorder, the focus of worry may shift from one concern to another. The worries are excessive and typically interfere significantly with functioning. Individuals with anxiety disorder report distress due to constant worry and related impairment in social, occupational, or other important areas of functioning.

**A.  Abraham Ron Fraenkel**

40

Abraham Ron Fraenkel is a citizen of Israel and resides in the town of Nof Ayalon. DE 31-6 at ¶ 2. He and his wife, Rachelle, had seven children. *Id*. at ¶ 4.

In June 2014, their second son, decedent Yaakov Naftali Fraenkel ("Naftali"), was studying at a boarding high school called Mekor Chaim located in Gush Etzion. *Id*. at ¶ 5. He lived at school during the week and came home for the weekends. *Id*.

On Thursday night June 12, 2014 at around 9:30 pm, Naftali sent his parents a text message that he was coming home for the night. *Id*. at ¶ 6. But because Abraham and Rachelle went to sleep early that night, Abraham saw and responded to the message only at around 10:30 pm, around the time Naftali was murdered. *Id*. at ¶ 7.

In the middle of the night (technically already the next morning), at approximately 3:30 am, the Fraenkel's were woken up by police pounding on their door looking for Naftali's friend, Gilad Shaer, with whom Naftali was traveling. *Id*. at ¶ 8. Abraham did not find Naftali either in his room or in the basement. *Id*. at ¶ 9. He then called Naftali on his cell phone, but there was no answer. *Id*. at ¶ 10. He and Rachelle understood that something was terribly wrong. *Id*. at ¶ 11. Some hours later, they learned that Naftali's cell phone had been traced to an area near Hebron where Naftali and his friend would not have gone voluntarily. *Id*. at ¶ 13. Naftali's body was not discovered until June 30, 2014, 18 agonizing days later. *Id*. at ¶¶ 18, 26.

Abraham testified that it was extremely difficult being in the dark about the fate of his son and that he and Rachelle struggled with the heavy burden and responsibility of having to tell each of their children and other close relatives that Naftali was missing and likely in terrible danger. *Id*. at ¶¶ 14-15. These feelings were exacerbated by the heavy media attention the story was receiving with journalists and photographers stationed outside the family's home. *Id*. at ¶ 16.

Abraham testified that he was overcome with concern about the welfare and whereabouts of his son Naftali, plagued by questions about his wellbeing like, was he hurt or being hurt, was he receiving necessary treatment, was he being fed, was he alone, and more. *Id*. at 17.

On the Tuesday after the kidnapping, Abraham heard the recording of the call made by Gilad Shaer to police shortly after the kidnapping. *Id*. at ¶ 19. He heard the clear sounds of gunshots followed by terrible grunts and moans. *Id*. This intensified his suffering and sense of foreboding, particularly since Naftali was still missing. *Id*. at ¶¶ 19-20.

During the eighteen days of uncertainty before Naftali's body was found, it was extremely difficult for Abraham and Rachelle to care for and maintain daily routine and structure for the rest of their children, each of whom was dealing with the situation differently. *Id*. at ¶ 21. It was also difficult to coordinate with the other two families because each family saw the situation differently. *Id*. at ¶ 23. During this time, they had a "war room" set up in their home, where a special Israeli army unit worked day and night to find the boys and to keep the family updated. They also held meetings with various public officials from around the world, including the Israeli prime minister, the head of Israel's FBI and the IDF Chief of Staff. *Id*. at ¶ 22. During this time, Rachelle also traveled to Geneva to meet with politicians and to speak at the United Nations, pleading for the return of the boys. *Id*.

During the eighteen day period that Naftali was missing, Abraham began seeing a psychologist because he felt constant distress, felt he lacked the tools to care for his family, had difficulty eating and was unable to sleep without the aid of sleeping medications. *Id*. at ¶ 24. These feelings of mental and emotional anguish were accompanied by physical chest pains brought about by the stress. *Id*. at ¶ 25.

On the evening of June 20, 2014, while on his way with his family to a meeting with a strategist concerning their desperate search for Naftali, Abraham received a telephone call instructing the family to return home. *Id*. at ¶ 26. The caller informed him that bodies had been found and the next morning it was confirmed that these were the bodies of the three kidnapped boys. *Id*.

Abraham testified that he and Rachelle struggled with telling each of their children, separately, the terrible news, while they themselves were experiencing shock and pain. *Id*. at ¶¶ 27-28. They were also immediately faced with the terrible task of making funeral arrangements, having to give up their desire for a private ceremony and agree with the other to families about technical matters, such as who the speakers would be and where the burial would take place. *Id*. at ¶¶ 29-30. They had just a few moments before the funeral began to say their private goodbyes to Naftali. *Id*. at ¶ 31. The family had no privacy during the *Shiv'a* (traditional seven day mourning period) with thousands of people visiting them to mourn with them. *Id.* at ¶¶ 32-33.

For the first two to three months after the *Shiv'a*, Abraham was only able to work part time. *Id*. at ¶¶ 34-35. He continued to receive his salary, but was passed over for a promotion during this time which would have resulted in a salary increase; he believes he was passed over because he was not fully available during these months. *Id*.

Abraham testified that since the funeral, he and Rachelle have experienced strain and tension in their relationship due to their inability to agree about their schedules at home. Abraham feels that they should both be physically and emotionally present for their children, while Rachelle often travels to give lectures and speeches about the kidnapping and murder. Id. at ¶ 37. He has been seeing a mental health specialist for himself and he and Rachelle have also seen a marriage and family therapist together. *Id*. at ¶¶ 38-41.

Abraham testified that he is constantly being reminded of the loss of his son, during his daily prayers, at family gatherings, at the weekly Sabbath table when the family sings and Naftali's voice is missing, when there is news of a terror attack or even sometimes without any trigger. *Id*. at ¶¶ 42-44. Abraham often cries when these memories surface. *Id*. at ¶ 44. He also has difficulty engaging in Jewish textual study as he used to and has issues in general with concentration to this day. *Id*. at ¶ 45. The family was forced to delay their daughter's Bat-Mitzvah celebration which was supposed to take place the spring after the murder because they lacked the physical and mental energy to plan a celebratory party. *Id*. at ¶ 46. It has also been extremely difficult for Abraham to watch his children's suffering in the wake of Naftali's murder. *Id*. at ¶ 47.

Since the kidnapping and murder of Naftali, the family goes out much less often together as a family than they did previously. *Id*. at ¶ 48.

Abraham was personally evaluated by Dr. Strous who provided a detailed evaluation. DE 31-9. Dr. Strous administered to Abraham a Post-Traumatic Diagnostic Scale test, a Hamilton Depression Rating Scale test a structured interview and questionnaire to assess grief. *Id.* at 11-15. The results of these tests indicated that Abraham suffers from Persistent Complex Bereavement Disorder (moderate to severe), PTSD (partial); and Persistent Depressive Disorder; mild severity, late onset with pure dysthymic syndrome. *Id*. at 15.

Dr. Strous found that during the eighteen day period that Naftali was missing:

While his worry for his son's wellbeing and personal anxiety was strong, he felt he needed to be committed to the task and do the responsible thing. However this was accompanied by intense worry, frustration, despair, guilt, pain and fear. He reports that it was especially difficulty to inform his wife and children about what was going on. While he had to deal with his powerful emotions, he also had to deal with all the organization going on around him in his house as well as with the police and security forces. Thus he reports 18 days of utter pain and chaos which

were very difficult for him. He describes the time as a roller coaster of emotions ranging between pain and hope. He knew that it was critical to maintain focus however the unknown was very powerful. He reports that a tape existed of one of the boys calling. However this did not help him at the time with all the uncertainty since he did not know for sure that the sounds that were heard on the tape were gunshots.

*Id*. at 9. Dr. Strous further found that event had a long term impact on Abraham:

After the initial few weeks of mourning at the loss of his son, Mr. Fraenkel reports that he slowly started returning to work, initially for a few hours a day. His work though was affected since the loss was on his mind all the time. He nevertheless tried to heal. He did report though that he had days when he needed to close off the world due to feeling overwhelmed with the ongoing pain. This he reports could be noted in his "withdrawing due to the pain and suffering." He felt though that he had to continue on with his life for the sake of his other children and thus be responsible despite the despair. Thus he and his wife felt that they had to keep some balance for the sake of their children. In order to cope with the aftermath and void following the loss, they considered having another child in order to cope and continue in some manner. However this was not successful.

*Id*. at 11. Dr. Strous concluded:

Abraham Fraenkel suffered remarkable pain in light of losing his son to a kidnapping and murder terror event in 2014. He reports a close relationship with him and therefore indicates how his life has been irreversibly affected in light of his loss. It is not expected that his deep feelings of grief affecting many areas of his personal and interpersonal functioning will resolve in the short term, and they will continue to affect him in the future.

*Id*. at 15.

## B.  <u>Rachelle Devora Sprecher Fraenkel</u>

Rachelle Devora Sprecher Fraenkel is a United States citizen and resides in the town of Nof Ayalon. DE 31-7 at ¶ 1.

Rachelle testified that Naftali was finishing 11th grade at the time of his murder. *Id.* at ¶ 6. He was extremely intelligent, having studied in a one day a week program for gifted students since Second Grade. *Id*. at ¶ 10. He loved sports and had a good relationship with his siblings. *Id*.

at ¶¶ 11-12. He had matured a lot in the last year before his death, both intellectually and socially. *Id*. at ¶ 7-9. During that year, he exhibited independence and responsibility by teaching himself music and music theory and working hard to prepare for his math matriculation exams. *Id*. at ¶¶ 7-8. He also befriended a new boy in school and was always looking out and caring for his friends. *Id*. at ¶ 9.

Rachelle testified that Naftali usually came home on Fridays for the weekend. *Id*. at ¶ 13. The week he was kidnapped and murdered, he had been on a class trip and so came home on Thursday instead, but he did not make it home. *Id*. She recalls seeing a text from him when she checked her phone after 10:00 pm that he was on his way home and replying "Oh, great" before going to sleep. *Id*. at ¶ 14. Rachelle explained that Naftali was responsible and independent and there was no need to wait up for him. *Id*. At around 3:00 am, Rachelle was awakened by her daughter who said that the police were banging on the door. *Id*. at ¶ 15. The police informed Rachelle that they were looking for Naftali's friend Gilad, who had left school with Naftali and had not arrived home. *Id*. Rachelle described this as her "last blissful moment on earth." *Id*. at ¶ 16. She was expecting to find Naftali already in his bed, but when she looked she found he was not there and calls to his cell phone went unanswered. Id. at ¶¶ 16-17. At that point, she knew something terrible had happened. *Id*. at ¶ 17.

While she and Abraham were waiting to hear the results of a trace on the boys' cell phones, Abraham went with Gilad's father to drive along the road where the boys would have been to see what they could find. *Id*. at ¶ 20. At first, the police told her that the cell phones were located in the Jewish city of Kiryat Arba, but at around 5:30 am, Abraham called to inform her that the last actual location of the cell phones was in the Hebron area, an area where Naftali

would not have traveled voluntarily. *Id*. at ¶ 20-21. She immediately understood that this was an act of terrorism. *Id*. at ¶ 21.

While waiting for further news from Abraham, who had gone to the boys' school and to the local army base, she awoke her other children and sent them off to school without saying a word about Naftali. *Id*. at ¶¶ 22-23. She recalls feeling extremely anxious. *Id*. at ¶ 23. Rachelle testified that within a couple of hours a friend called to see if everything was okay and then she understood that the story with the names of the boys was being broadcast on the news. *Id*. at ¶ 24.

She immediately attempted to reach her oldest son, Tzvi, to tell him to come home. *Id*. at ¶ 25. Then, she went to her daughters' school to tell them the news. *Id*. at ¶ 26. She took great care to ensure that they would not hear about it from someone else. *Id*. When she arrived, the girls were in the middle of a celebration, Rachelle stood nearby to make sure no one else would approach them, then she took them to a quiet place to break the news. *Id*. at ¶¶ 26-28. But before Rachelle had a chance to say anything, the girls went to get their schoolbags and their friends started telling them the terrible news. *Id*. at ¶ 28. It was extremely difficult for her to maintain her composure while telling her daughters that Naftali was missing and trying to reassure them when she herself was not reassured. *Id*. at ¶ 29.

Around mid-day on Friday, an Israeli army team arrived at the Fraenkel's home to question the family about Naftali to understand why he would have gone into an Arab village, even though Rachelle knew that he would not have gone there voluntarily. *Id*. at ¶ 32. A few hours later, rumors began to spread on WhatsApp that the boys were found, but Rachelle knew from the army that this was not true and had to respond to a wave of congratulatory messages that it wasn't so. *Id*. at ¶ 33.

Rachelle testified that during the eighteen day period while the family was waiting for news of Naftali, the extended family and neighbors provided a great deal of support. *Id.* at ¶ 37. In addition, the wider Jewish community took up the cause praying for the boys and demanding their return. *Id.* at ¶ 38. But, Rachelle felt terrible anxiety, fear and loneliness. *Id.* She rarely saw her other children during that time. *Id.* at ¶ 39. She had to make a great effort to control her thoughts and not to fall apart so that she could continue to function. *Id.* at ¶¶ 39-40. She constantly worried about Naftali's wellbeing, where he was, how he was being treated, if he was being fed or hurt. *Id.* at ¶ 40.

Rachelle testified that she did not sleep at all for the first few nights. She did not want to take sleeping pills because she did not want to feel a loss of control. She lost 22 pounds in a few weeks. *Id.* at ¶ 41. Rachelle testified that she and Abraham were unable to sleep for any solid hours until after the funeral. *Id.*

While Rachelle takes comfort in her belief that Naftali was killed instantly by a gunshot to the head, she testified that she knows that he knew he had been kidnapped at least for a few minutes before he was killed. *Id.* at ¶ 42. Rachelle listened to the recording of telephone call to Israeli police made by Gilad from inside the car, where he said he had been kidnapped. *Id.* at ¶¶ 44-45. She heard the radio in the background and the terrorists saying put your head down followed by the gunshot sounds and then a terrible wail which she described as the sound of a "wounded animal." *Id.* She said that she feels physically ill when she thinks about the fear and panic Naftali must have felt during these minutes and she speculates as to the terrorists motives for murdering her son. *Id.* at ¶¶ 42; 46-49.

Rachelle testified that even after she heard the recording of the police call, she believed Naftali might still be found alive. *Id.* at ¶ 50. But, on June 30, 2014, while she and Abraham

were on their way to a meeting in Tel Aviv, they received a telephone call instructing them to return home. *Id*. at ¶ 52. She knew it was bad news because instead of telling them right away on the phone, they made the family wait for the official person to notify them in person that the bodies had been found. *Id*. at ¶¶ 52-53. She could not bear to wait so she asked Abraham to contact someone he knew in the police to get the information. *Id*. at ¶ 53. Rachelle testified that she felt physically ill when they received that call and she still feels physically ill every time she thinks about that day. *Id*. at ¶ 52.

Rachelle testified that that hardest thing she has ever done was take each of her remaining children, one by one, to tell them the terrible news of their brother's murder. *Id*. at ¶ 54. They each took it differently, but very hard. *Id*. at ¶¶ 55-59. The funeral was also extremely difficult – the hardest experience of Rachelle's life. *Id*. at ¶ 54. They had only a few moments alone with the body before the ceremony, attended by 100,000 people. *Id*. at ¶ 60. She saw her son's form, but felt it was not really him – just his body – and thought how everything was cut short. *Id*. The Shiva was also difficult with thousands of strangers coming to visit the family. *Id*. at 62.

Rachelle testified that since the murder she has to work hard to live a normal life and be happy, something that was natural before. *Id*. at ¶ 64. The family will never again be complete. *Id*. at ¶ 65. She often spends time alone weeping. *Id*. She feels terrible pain with anything that has to do with Sabbath and holidays because those were musical times and Naftali was very musical. *Id*. at ¶ 66. It is difficult for her to see Naftali's friends reach milestones that she knows Naftali will never reach. *Id*. at ¶ 67. She has also lost her anonymity and become known in public as the mother whose son was kidnapped and murdered. *Id*. at ¶ 69.

Since the funeral, Rachelle is often invited to lecture about the experience. *Id*. at ¶ 70. The travel is hard on the family and this sometimes causes tension in her marriage. *Id*. at ¶¶ 70-71. She and Abraham have been to marital therapy. *Id*. at ¶ 72. They also attempted to have another baby because of Naftali's murder. Id. at ¶ 73. Rachelle testified that she underwent infertility treatments and got pregnant, but had a miscarriage at 9 weeks. *Id*.

Rachelle was personally evaluated by Dr. Strous who provided a detailed evaluation. DE 31-10. Based on the results of the Post-Traumatic Diagnostic Scale test and the structured interview and questionnaire to assess grief, Dr. Strous diagnosed Rachelle with Persistent Complex Bereavement Disorder; (severe) with traumatic bereavement and PTSD (partial). *Id*. at 12-15.

Dr. Strous found that during the eighteen day period that Naftali was missing:

She recalls experiencing intense anxiety right from the beginning which never abated for the entire two and a half weeks until Naftali's body was found. The anxiety then turned to profound pain at the loss of her "special son" to whom she was extremely close. The anxiety and distress was also expressed in pain in her back. There were days when the anxiety and pain was so intense that she could not sleep. This was a marked change from before the kidnapping. She tried to take sleep medications however suffered from side effects.

* * *

When the bodies of the 3 kidnapped boys were found, she reports her response was nothing short of catastrophic. She remembers the time clearly when she was contacted and told to return home. Her stomach turned upside down and she felt physical pain throughout her body. It took 10 hours to complete the DNA testing before it could be confirmed that the bodies were those of the 3 kidnapped boys. She reports that telling each child of hers (separately) was the hardest thing that she has ever had to do in her life.

*Id*. at 8. Dr. Strous noted Rachelle's close relationship with her son Naftali:

She indicates that she was very close to Naftali. He was the one with whom she would have many close and open conversations about teenagerhood and adolescence. She was very comfortable talking with him. She reports that in some

ways this connection has developed even more after he died since she feels that her son is "always with her." He was the one that was often at home and they would speak in depth. He felt very free at home with her and would speak often. Thus they were particularly close.

*Id*. at 9. Dr. Strous further found that event had a long term impact on Rachelle:

After the initial distress over the kidnapping and subsequent murder of her son, followed by the trauma of the funeral and initial period of mourning, Mrs. Fraenkel reports great distress and painful emotions regarding the loss of her son. Her anguish over the past year and a half or so has not abated as per her report. She reports that she still cries on numerous occasions especially gatherings especially when alone. At times she has to leave gatherings and cries to herself. This includes family.

*Id*. at 10. Dr. Strous concluded:

Rachelle Fraenkel suffered overwhelming pain and devastation following the loss of her son in a notorious kidnapping and murder in 2014. Ms. Fraenkel appeared to be especially close with Naftali, describing their relationship as very special and close. She clearly expresses how her life has been irreversibly affected in light of her loss. It is not expected that her deep feelings of grief affecting many areas of her personal and interpersonal functioning will resolve in the short term, and they will continue to affect her indefinitely.

*Id*. at 14.

## C. **Tzvi Amitay Fraenkel**

Tzvi Amitay Fraenkel is the oldest child of Rachelle and Abraham Fraenkel, older brother to Naftali. DE 31-8 at ¶ 3; DE 31-7 at ¶ 4; DE 31-6 at ¶ 4. He is an American citizen. DE 31-8 at ¶ 1. Tzvi is around two years older than Naftali and was nineteen at the time of the kidnapping and murder. *Id*.

Tzvi describes a close relationship with Naftali growing up, often being paired together due to their both being boys and close in age. *Id*. at ¶¶ 4-5; see also DE 31-7 at ¶ 75. They went through the same academic track and shared hobbies like basketball and singing. DE 31-8 at ¶ 5.

Tzvi testified that he feels Naftali's absence especially on the Sabbath, a time when they would sing together. *Id.*

Tzvi learned of his brother's kidnapping at around 9:00 am on Friday, June 13, 2014 when a yeshiva classmate relayed a message that his parents were trying to reach him and he was to call home immediately. *Id.* at ¶ 6. He had a bad feeling, but could not imagine the horrifying news he was about to hear. *Id.* He called home and his mother told him that Naftali had gone missing the night before with a friend and that their cell phones had been traced to the Hebron area. *Id.* at ¶ 7. She said that the police and the family feared the boys had been kidnapped. *Id.* While Tzvi heard his mother's words, he was unable to process the information and suggested that he remain at school for the Sabbath instead of coming home. *Id.* at ¶ 8.

That day, Tzvi felt extremely anxious and that events around him were out of control. *Id.* at ¶ 9. He posted a note with the two missing boys' names on the communal bulletin board at his yeshiva so that his classmates would pray for their safety. *Id.* Tzvi also felt physically ill, thinking that at any moment the police might notify the family that Naftali's body had been found. *Id.* at ¶ 10. He recalled the image of a soldier whose body had been found at the bottom of a cistern after having been kidnapped a few months earlier. *Id.* Ultimately, Tzvi understood that he had to go home and be with his family. *Id.* at ¶ 11.

After Tzvi arrived home, a negotiation unit from the IDF arrived at the home. Id. at ¶ 12. Tzvi testified that the presence of the IDF in his home provided a sense of relief, although it was only imaginary. *Id.* Tzvi recalls the eighteen day waiting period before his brother's body was found as a difficult time of uncertainty and anxiety. Id. at ¶¶ 11-12. He attempted to maintain a routine by studying at the local yeshiva and visiting with friends. *Id.* at ¶ 14. But his home became a revolving door of visitors constantly coming and going, which Tzvi felt was often

more to satisfy the visitors' personal needs than to help the family. *Id.* at ¶ 15. This was extremely draining for Tzvi, both physically and emotionally, and he did his best to avoid people during that period. *Id.* During that time, the family lost all sense of privacy and anonymity due to journalists being camped outside the house. Id. at ¶ 16.

Tzvi testified that his anxiety grew more severe as the days passed, particularly after he learned that gunshots were heard on the recording of the emergency call to police. *Id.* at ¶ 17. While the family was told to assume Naftali was alive, as time passed, Tzvi understood that this was not likely. *Id.* He felt that finding the body would be better than continuing to live with the uncertainty. *Id.* While he had feared the worst, Tzvi was devastated when Naftali's body was finally found. *Id.* at ¶ 18. His mother testified that he was having a very difficult time when she broke the news and was unable to cry. DE 31-7 at ¶ 56.

Tzvi feels that since the kidnapping and murder, he is living in the shadow of his brother and parents, as he is often referred to as the "brother of" or "son of." *Id.* at ¶ 19. This has affected his self esteem and mental state. *Id.* He describes being anxious about the welfare of his family members since the event, worrying when they don't answer his phone calls. *Id.* at ¶ 20. He also finds it extremely difficult to hear news of other terror attacks, particularly if the attack involves a kidnapping as this triggers thoughts of Naftali. *Id.* at ¶ 21. Tzvi has ceased participating in activities that he shared with Naftali, like basketball. *Id.* at ¶ 22. Tzvi testified that his sister, A.H.'s anxiety in needing to know exactly where he is at all times intensifies his own anxiety. *Id.* at ¶ 23. He reports that the entire family is drastically changed. *Id.* at ¶ 24.

Rachelle testified that because Tzvi is introverted, she does not always know what he is feeling, but that the first year after the murder was extremely difficult for Tzvi. DE 31-7 at ¶ 76. She testified that during the mourning period, Tzvi felt guilty that he did not know his brother

better, but that this is not rational as the two grew up together from the time Tzvi was two years old. *Id*. at ¶ 77. Rachelle testified that it is difficult for Tzvi to come home on weekends to his empty room without his brother to hang out and do chores with. *Id*.

Tzvi was personally evaluated by Dr. Strous who provided a detailed evaluation. DE 31-11. Based on the results of the structured interview and questionnaire to assess grief and the Hamilton Depression Rating scale, Dr. Strous diagnosed Tzvi with Persistent Complex Bereavement Disorder; (moderate) with traumatic bereavement and Persistent Depressive Disorder; mild severity, early onset, with pure dysthymic syndrome. *Id*. at 11-13.

Dr. Strous noted the close relationship between Tzvi and Naftali Fraenkel:

They were the two boys of the family along with 4 sisters (there is a third brother, but he is the baby of the family). They both studied in the same school (*Mekor Chaim*) and had a great deal of common friends and activities. Thus they were close with very infrequent clashes between them.

*Id*. at 8-9. Dr. Strous described Tzvi's long term symptoms, explaining that, among other things, Tzvi feels chronic guilt, is anxious about the welfare of family members, feels he lost his identity, has a chronic low mood and his relationships with his parents and siblings have changed. *Id*. at 9. Dr. Strous concluded:

The loss took a heavy toll on him at an emotional level and dramatically affected many aspects of his life including behavior and general mood status to a significant extent for the past year and a half. Due to this, it is clear that he has not achieved many aspects of his potential in his social and academic life.

* * *

Tzvi Fraenkel suffered significant effects on mood and function in light of losing his younger brother to kidnapping and murder in 2014. He feels that his life has been significantly affected in light of his underachieving (academic and social function) and subsequent mood issues in light of the loss. It is not expected that these issues in mood and behavior will resolve in the short term, and they will continue to affect him for a long period of time.

*Id*. at 12-13.

###   D. **A.H. Fraenkel**

A.H. Fraenkel is the third child and the oldest daughter of Abraham and Rachelle Fraenkel. DE 31-6 at ¶ 4; DE 31-7 at ¶ 4. She was between two and three years younger than Naftali, 14 years old when he was kidnapped and murdered. DE 31-7 at ¶ 78. She shared common interests with Naftali, including basketball and playing guitar. *Id*. Rachelle testified that the two grew very close in the year before Naftali was killed and that losing Naftali was a major crisis for A.H. *Id*. Abraham testified that A.H. has been the most impacted by Naftali's murder. DE 31-6 at ¶ 47(4). A.H. suffers from extreme anxiety and panic attacks. DE 31-7 at ¶ 80; DE 31-6 at ¶ 47(4). She has a need to know where everyone is at all times and cannot sleep until everyone has returned home. DE 31-6 at ¶ 47(4). While she continues her activities, she expends a great deal of energy trying to avoid situations that might bring on anxiety. DE 31-7 at ¶ 80.

A.H. was personally evaluated by Dr. Strous who provided a detailed evaluation. DE 31-12. Based on the results of the Hamilton Anxiety Rating scale, the Post-Traumatic Stress Diagnostic Scale and the structured interview and questionnaire to assess grief, Dr. Strous diagnosed A.H. with Persistent Complex Bereavement Disorder; (moderate) with traumatic bereavement, PTSD (partial), and Other Specified Anxiety Disorder (generalized anxiety not occurring more days than not in all 3 of 6 core symptoms). *Id*. at 13-15.

Based on his interview with A.H., Dr. Strous testified that A.H. was close with Naftali and suffered some kind of breakdown when she learned he had been kidnapped:

> She recalls being in total shock and froze and felt like she was going to faint. She reports that her whole body was shaking and that she experienced heart palpitations. She had no strength and had to lie down when she came home as she was shivering from the shock, unable to eat.
>
> * * *

55

For the first few days after his kidnapping, she had nightmares. She was constantly on edge during the days without any energy and was not able to attend school for one and a half weeks. She recalls being extremely anxious even though there were many people around to give support if needed.

*Id*. at 8-9. During the waiting period, before Naftali's body was found, A.H. recalled that she "suffered intensely, crying every day . . ." *Id*. at 9. On hearing the news that Naftali's body was found, A.H. "again started shivering and shaking." *Id*. Dr. Strous found that:

The pain of the loss of her brother was very deep and intense since their relationship as brother and sister was unusually close. There was only 3 years difference between them in age. As siblings, they were always paired off. They used to speak a great deal together and did a lot together. This ranged from several social activities, including common friends, as well as playing basketball together. She indicates that they had a strong bond and that the loss of this sibling relationship is devastating for her.

*Id*. at 9-10. The long term effects on A.H. include: pervasive anxiety; need to know where family members are at all times and inability to sleep until they are all home; difficulty dealing with stress; weight loss; mood changes; changed relationships with friends, many of whom have distanced themselves from her; and inability to be happy. *Id*. at 10-11. Dr. Strous concluded:

A.H. Fraenkel suffered tremendous pain following the loss of her brother in a kidnapping and murder in 2014. She indicated that had a very close sibling relationship with Naftali, and that she misses him very much. She clearly believes that her life has not been and never will be the same after the event. It is expected that her deep feelings of grief and anxiety affecting many areas of her personal and interpersonal functioning will not resolve in the short term, and they will continue to affect her for a long period to come.

*Id*. at 15.

### E.  A.L. Fraenkel

A.L. is the fourth child of Abraham and Rachelle Fraenkel. DE 31-7 at ¶ 4; DE 31-6 at ¶ 4. She was at 11 years old at the time of the kidnapping and murder. DE 31-7 at ¶ 81. She is

introverted, like Tzvi. *Id*. When the family received news that the bodies had been found, A.L. was called home from a friend's house. *Id*. at ¶ 58. She did not want to hear the news right away and waited outside for a long time. *Id*. Both Abraham and Rachelle Fraenkel testified that A.L. does not show emotion easily. *Id*.; DE 31-6 at ¶ 47(3). Rachelle testified that she is more scared and emotional now than she was before the murder. DE 31-7 at ¶ 81. Abraham testified that she is distant and acts angry towards him and Rachelle. DE 31-6 at ¶ 47(3). While she appears outwardly to have ignored what happened, her emotions tend to surface unexpectedly in an explosive way. *Id*.

Plaintiffs provided an expert psychiatric evaluation by Dr. Strous for A.L. Fraenkel. DE 31-13. This evaluation is based on Dr. Strous's interview with Abraham Fraenkel and his review of the report of A.L.'s guided imagery therapist, Ms. Vered Malachi. *Id*. at 7-9. Dr. Strous concluded that A.L. suffers from Unspecified Anxiety Disorder. *Id*. at 13. Since the event, A.L. has closed herself off emotionally, becoming distant, not revealing her internal struggles and making herself appear outwardly mature. *Id*. at 8. Behaviorally, she is more prone to get into conflicts with her parents than before the kidnapping and murder. *Id*. Dr. Strous explained that due to A.L.'s young age, "it is expected that many aspects of the trauma and its repercussions will continue to affect [her] for a significant period of time." *Id*. at 12.

### F. **N.E. Fraenkel**

N.E. is the fifth child of Abraham and Rachelle Fraenkel. DE 31-7 at ¶ 4; DE 31-6 at ¶ 4. She was 9 years old at the time of the kidnapping and murder. Rachelle describes her as very sensitive. DE 31-7 at ¶ 82. She began shivering when her parents told her that Naftali's body had been found. *Id*. at ¶ 59. Abraham testified that N.E. suffers from anxiety and has lost her innocence as a result of what happened. DE 31-6 at ¶ 47(2).

Plaintiffs provided an expert psychiatric evaluation by Dr. Strous for N.E. Fraenkel. DE 31-13. This evaluation is based on Dr. Strous's interview with Abraham Fraenkel and his review of the report of N.E.'s guided imagery therapist, Ms. Vered Malachi. *Id.* at 7; 9-10. Dr. Strous concluded that N.E. suffers from Unspecified Anxiety Disorder and elements of complicated grief and Persistent Complex Bereavement Disorder. *Id.* at 13. N.E. was very close to Naftali. *Id.* at 9. Since the event, N.E. has closed up and become very sensitive. *Id.* She is now more restless, impatient and argumentative and has suffered academically. *Id.* Dr. Strous explained that due to N.E.'s young age, "it is expected that many aspects of the trauma and its repercussions will continue to affect [her] for a significant period of time." *Id.* at 12.

## G. **N.S. Fraenkel**

N.S. is the sixth child of Abraham and Rachelle Fraenkel. DE 31-7 at ¶ 4; DE 31-6 at ¶ 4. She was 6 years old at the time of the time of the kidnapping and murder. DE 31-7 at ¶ 83. Rachelle testified that Naftali's death is a dominant part of N.S.'s life and she is busy with it all the time. *Id.* She includes him in her prayers and never makes a wish without mentioning him. *Id.* Abraham testified that N.S. suffers from severe anxiety, fear of abandonment and the constant need for attention, even negative. DE 31-6 at ¶ 47(1). She often gets into fights and resists her parents' requests. *Id.* He said that N.S. has been unable to move past her brother's murder. *Id.*

Plaintiffs provided an expert psychiatric evaluation by Dr. Strous for N.S. Fraenkel. DE 31-13. This evaluation is based on Dr. Strous's interview with Abraham Fraenkel and his review of the report of N.S.'s guided imagery therapist, Ms. Vered Malachi. *Id.* at 7; 10-11. Dr. Strous concluded that N.S. suffers from Unspecified Anxiety Disorder and elements of complicated grief and Persistent Complex Bereavement Disorder. *Id.* at 13. Since the event, N.S. has suffered severe anxiety, with constant thoughts of terror attacks manifested as fear of all Arabs, frequent

talking about the event and about Naftali. *Id*. at 10. She has become an underachiever in school, is clingy with her parents and siblings, has a constant need for attention and is fearful of being left alone. *Id*. Dr. Strous explained that due to N.S.'s young age, "it is expected that many aspects of the trauma and its repercussions will continue to affect [her] for a significant period of time." *Id*. at 12.

### H.  S.R. Fraenkel

S.R. is the seventh and youngest child of Abraham and Rachelle Fraenkel. DE 31-7 at ¶ 4; DE 31-6 at ¶ 4. He was 4 years old at the time of the kidnapping and murder. DE 31-7 at ¶ 86. Rachelle and Abraham both testified that S.R. and Naftali were very close. *Id*. DE 31-6 at ¶ 47(5). Rachelle testified that S.R. talks about Naftali all the time, even claiming to have spoken to Naftali on the telephone. DE 31-7 at ¶ 86. Abraham testified that S.R.'s world fell apart when Naftali was murdered. DE 31-6 at ¶ 47(5).

Plaintiffs provided an expert psychiatric evaluation by Dr. Strous for S.R. Fraenkel. DE 31-13. This evaluation is based on Dr. Strous's interview with Abraham Fraenkel and his review of the report of N.S.'s guided imagery therapist, Ms. Vered Malachi. *Id*. at 7; 11-12. While Dr, Strous did not diagnose S.R. with any psychological disorders due to his very young age, he concluded that "the stress and emotions of all around him must have affected him as well even though it is not clear how this will play out in the future." *Id*. at 11. Further the report of Ms. Vered Malachi reflects that S.R. was affected by the event, as S.R. would a light a candle for Naftali at the beginning of each session, share stories and draw pictures about the event and Naftali. *Id*. at 12.

### G.  **Estate of Yaakov Naftali Fraenkel**

Based on his review of the relevant Israeli court and police files, Arieh Spitzen testified that decedent Yaakov Naftali Fraenkel was in the custody of the kidnappers for up to 20 minutes before he was murdered at 10:33 pm on the night of June 12, 2014. Supplemental Spitzen Decl. at ¶ 2. The last eyewitnesses saw them waiting at the hitchhiking stop at around 10:12-10:15pm that night. *Id*. at ¶¶ 4-5. The terrorists disguised themselves as Jews by shaving their beards, driving a car with Israeli license plates and making sure the radio was tuned to a Hebrew language station and offering the boys a ride the Israeli city of Ashkelon, using the Hebrew name for the city. *Id*. at ¶ 6. As soon as the boys got into the car, the terrorists threatened them at gunpoint, informing them they had been kidnapped and warning them to keep quiet. *Id*. at ¶ 7. In the audio from the emergency call made by one of the boys to Israeli police at 10:33 pm, the obviously terrified boy says in a whisper, "they kidnapped me." *Id*. at ¶ 8. This is followed by the terrorists shouting "head down" in Hebrew. *Id*. After this, the sound of approximately ten gunshots are heard and a scream of pain in the background. *Id*. This is followed by shouts of joy from the terrorists, all the while the Hebrew radio station continues to play in the background. *Id*. at ¶ 9. The forensic lab tests show that the boys were shot by two different pistols and that they were shot at close range from both the front driver's seat and the front passenger's seat, while they were sitting in the back seat of the car. *Id*. at ¶ 10. The decedent was killed by a bullet to the head with a top to bottom and left to right entry/exit angle. *Id*. Thus, while it appears that the decedent died immediately, it is not known whether he was the first to be shot or whether the others were shot first. Moreover, he most certainly suffered extreme fear and terror during his last moments alive for up to twenty minutes, knowing he was kidnapped and in the custody of armed terrorists aiming a gun at him and threatening his life.

## CONCLUSIONS OF LAW

This Court has original subject matter jurisdiction over suits under the FSIA against foreign states which are not entitled to immunity. 28 U.S.C. §1330(a), *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989). Although a foreign state is generally immune from jurisdiction in U.S. courts, the FSIA establishes certain exceptions. *Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d 43, at 50 (D.D.C. 2009). When the requirements of one of these exceptions are met and the foreign state is properly served, the FSIA provides both subject-matter jurisdiction over the action and personal jurisdiction over the foreign state. *Id.* Here, plaintiffs' have satisfied the requirements of the FSIA's terrorism exception and have properly served the Iranian and Syrian defendants.

### A.   Personal Jurisdiction

"A foreign state . . . must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). The Court finds that Iran and MOIS were served via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4) and that Syria was served via DHL pursuant to 28 U.S.C. § 1608(a)(3). Accordingly, this court has personal jurisdiction over Iran and Syria if plaintiffs are able to establish that Iran and Syria are covered by immunity exceptions within the FSIA. *See Brewer*, 664 F. Supp. 2d at 51.

### B.   Subject Matter Jurisdiction

In 2008, Congress enacted a comprehensive terrorism exception to the FSIA that was meant to waive sovereign immunity and provide terrorism victims with a cause of action in cases involving certain types of state sponsored terrorism. *See Brewer*, 664 F. Supp. 2d at 51. This terrorism exception is now codified as 28 U.S.C. § 1605A, and it has previously been applied to both Iran and Syria because they supported terrorist attacks that harmed American nationals. *See,*

Case 1:15-cv-01080-RMC   Document 36   Filed 11/29/16   Page 63 of 82

*e.g.*, *Valore v. Islamic Rep. of Iran,* 700 F. Supp. 2d 52 (D.D.C. 2010); *Gates v. Syrian Arab Rep.,* 646 F.3d 1 (D.C. Cir. 2011); *Wyatt v. Syrian Arab Rep.,* 736 F. Supp. 2d 106 (D.D.C. 2010). *See also Calderon-Cardona v. Dem. People's Rep. of Korea*, 723 F. Supp. 2d 441, 457 (D.P.R. 2010).

Section 1605A provides, in relevant part, that a foreign state shall be liable for providing material support or resources to a terrorist attack that injures or kills an American national provided that money damages are sought and that (1) the foreign state "was designated as a state sponsor of terrorism at the time of the act," and (2) "either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section." § 1605A(a)(2)(A)(I).

In this case, plaintiffs' claims against the Iranian and Syrian defendants meet these requirements for purposes of subject-matter jurisdiction and liability. *See Kilburn v. Islamic Rep. of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (noting "the elements of immunity and liability under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action"). *See also Gates*, 580 F. Supp. 2d at 65 (same).[3]

First, both Iran and Syria "were designated as a state sponsor of terrorism at the time of the act" that caused plaintiffs' harm. Section 1605A(h)(6) defines a "state sponsor of terrorism" as "a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405 (j))…is a government that has repeatedly provided support for acts of international terrorism." Iran has

---

[3] The fact that liability arises once sponsorship of terrorist activities is demonstrated for jurisdictional purposes is unsurprising since "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks. As a coconspirator, both with its own agents, officials and employees, and with others, such as the terrorist organization and the ultimate perpetrators, the foreign state is also a joint tortfeasor." *Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998).

been so designated continuously since 1984 and Syria has been so designated continuously since 1979.

In addition, defendant MOIS is within the FSIA's definition of foreign state. 28 U.S.C. § 1603(a) ("foreign state" includes political subdivision and agency or instrumentality). The D.C. Circuit applies a categorical approach to foreign government related entities – "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Worley v. Islamic Rep. of Iran*, 75 F. Supp. 3d 311, 324 (D.D.C. 2014) (citations and internal quotations omitted); *see also Murphy v. Islamic Rep. of Iran*, 740 F. Supp.2d 51, 62 (D.D.C. 2010). Applying this analysis, numerous courts have found that Iran's Ministry of Information and Security Services (MOIS) is "a political subdivision" of Iran. *See, e.g.*, *Bodoff*, 907 F. Supp. 2d at 100; *Valore*, 700 F. Supp. 2d at 65; *Bennett v. Islamic Rep. of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007); *see also Salazar v. Islamic Rep. of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005) (like MOIS, the Iran Revolutionary Guard Corps (IRGC) is under the ultimate leadership and command of the Iranian government and is a political subdivision of Iran).

The other requirements of § 1605A are also met because the victim and all but one of the plaintiffs are American nationals seeking money damages for personal injuries or death that occurred from terrorist attacks that were materially supported by Iran and Syria. The Court has jurisdiction over the claims of the non-American plaintiff, Abraham Ron Fraenkel, because he is seeking damages for his injuries resulting from the kidnapping and murder of his son, Naftali, the victim, who was a U.S. national. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I). *See, e.g., Leibovitch v. Islamic Rep. of Iran*, 697 F.3d 561, 568-573 (7th Cir. 2012) (finding FSIA subject matter jurisdiction over claims of non-U.S. citizen family members of victim who was a U.S. citizen);

*Acosta v. The Islamic Rep. of Iran*, 574 F. Supp. 2d 15, 26 (D.D.C. 2008) (Under the FSIA, immunity is abrogated and subject matter jurisdiction is conferred for claims under the FSIA if "either the plaintiff *or* the victim [was] a U.S. national at the time the act of terrorism occurred.").

FSIA Section 1605A(h)(3) defines "material support or resources" as having the same meaning as in 18 U.S.C. § 2339A, which defines it broadly to include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (one or more individuals who may be or include oneself), and transportation, except medicine or religious materials." Section 2339A(b) further defines "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge" and "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge." Based on the allegations in plaintiffs' complaint and the evidence presented by plaintiffs, there can be no doubt that the Iranian and Syrian defendants provided material support to Hamas. Among other things, Iran provided Hamas with funding and Syria provided Hamas with safe haven, training, communications and transportation. The Iranian and Syrian defendants are jointly and severable liable for the injuries caused to plaintiffs.

Likewise, plaintiffs' injuries were caused by "an act of . . . extrajudicial killing" within the meaning of 28 U.S.C. §1605(A)(a)(1). Section § 1605A(h)(7) adopts the definition of extrajudicial killing contained in the Torture Victims Protection Act, *i.e.*, "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples." The kidnapping

and murder of Yaakov Naftali Fraenkel carried out by Hamas on June 12, 2014, was an act of extrajudicial killing within the meaning of §1605(A)(a)(1). Congress specifically permitted actions for "*personal injury . . . that was caused by an act of . . . extrajudicial killing.*" §1605A(a)(1) (emphasis added). Thus, §1605A(a)(1) does not require that the plaintiff be killed or that injury to a plaintiff result from the actual "extrajudicial killing" (*e.g.* that a bullet pass through and kill one person and strike and injure another) but rather from an "act of extrajudicial killing." *See Campuzano*, 281 F. Supp.2d at 270-71 (holding that injuries suffered by plaintiffs who were injured in a bombing in which nonplaintiffs were killed were caused by an act of extrajudicial killing within the meaning of FSIA§ 1605(a)(7)).

Therefore, this Court has jurisdiction over, and defendants are not immune from, this action.[4]

## C. Findings Regarding Liability

### 1. American Citizen Plaintiffs

Section 1605A(c) of the FSIA expressly creates a federal statutory cause of action for American citizen plaintiffs in an action brought under § 1605A. Because the elements of a claim under § 1605A(c) must also be established in order to waive the foreign state's immunity and vest the court with subject-matter jurisdiction under § 1605A, liability under § 1605A(c) will exist whenever the jurisdictional requirements of § 1605A are met. *See Kilburn*, 699 F. Supp. 2d 136, at 155 ("[T]he § 1605A(c) cause of action is fulfilled by demonstrating that the foreign sovereign performed acts described in subsection (a)(1) of § 1605A, which addresses immunity and subject matter jurisdiction . . . Although an analysis of a foreign sovereign's potential immunity and liability should be conducted separately, the elements of immunity and liability

---

[4] Because the attack did not occur within Iranian territory, plaintiffs are not required to offer defendants an opportunity to arbitrate.

under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action."). *See also Gates*, 580 F. Supp. 2d at 64 (same).

Accordingly, since, as discussed *supra*, defendants' immunity is waived under § 1605A due to their provision of material support and resources to Hamas, defendants are liable to plaintiffs Rachelle Devora Sprecher Fraenkel, Tzvi Amitay Fraenkel, A.H.H.F., A.L.F., N.E.F., N.S.F. and S.R.F. under § 1605A(c).

2.  Non-American Plaintiff – Abraham Ron Fraenkel

In addition, defendants' immunity is waived under § 1605A for the non-American plaintiff, Abraham Ron Fraenkel, because the victim, decedent Yaakov Naftali Fraenkel was a U.S. national when he was kidnapped and murdered by Hamas terrorists. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii)(I); *Leibovitch*, 697 F.3d at 568-73. Because plaintiff Abraham Ron Fraenkel does not have a private right of action under § 1605A(c), the Court must apply District of Columbia choice of law rules to determine which jurisdiction's substantive law governs.

> The FSIA does not contain an express choice-of-law provision. FSIA § 1606 does, however, provide that a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. This section ensures that, if an FSIA exception abrogates immunity, plaintiffs may bring state law claims that they could have brought if the defendant were a private individual.

*Oveissi v. Islamic Rep. of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009) citing 28 U.S.C. § 1606 (applying D.C. choice of law principles); s*ee also Thuneibat v. Syrian Arab Rep.*, 167 F. Supp. 3d 22, 42-44 (D.D.C. 2016) (discussing D.C. conflict of law rules.). The District of Columbia applies a blend of "governmental interests analysis" (*i.e.*, which jurisdiction's policies would be most advanced by having its law applied) and the "most significant relationship test" (looking to the factors in the Restatement (Second) of Conflict of Laws). *Oveissi*, 573 F.3d at 842.

> The four Restatement factors are: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered.

*Id.* citing Restatement (Second) of Conflict of Laws § 145(2)(1971). In *Oveissi*, the court concluded that French law applied to the claims of the American citizen grandchild of an Iranian citizen assassinated in France. *Id.* In *Thuneibat* the court held that Jordanian law applied to the claims of non-American family members of an American citizen killed in a suicide bombing in Jordan. *See Thuneibat,* 167 F. Supp. 3d at 42.

Here, the injury occurred in Israel, the conduct causing the injury occurred in Israel, the Palestinian territories, Iran and Syria, Abraham Ron Fraenkel is and always has been an Israeli citizen and there is no legal relationship between Abraham Ron Fraenkel and any of the defendants or Hamas. Accordingly, the Restatement factors point to Israel as having the most significant relationship here.

3. <u>Israeli Tort Law</u>

Questions of foreign law are governed by Fed. R. Civ. P. 44.1, which provides that when determining the law of a foreign jurisdiction, a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. *See also Thuneibat*, 167 F.3d at 44.

Plaintiffs submitted a declaration from Boaz Shnoor (the "Shnoor Decl."), an Israeli attorney, which explains that Israeli law recognizes the torts of negligence and theories of concerted-action liability and *respondeat superior* substantively analogous to those generally recognized under state and federal common law in the United States. *See* Shnoor Decl. at ¶ 9. Moreover, in *Wultz*, this Court discussed Israeli tort law, including the Israeli torts of negligence

67

and vicarious liability, at length. *See Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 57-81 (D.D.C. 2010).

Both Shnoor and the *Wultz* court detailed the elements of negligence under Israeli law – duty, breach, causation and injury. *Id*. at 57; Shnoor Decl. at ¶¶ 12-22; 43. Duty depends on foreseeability, *i.e.* that the defendant both could have and should have foreseen that its acts would result in injury to plaintiffs. Certainly, the state sponsors of terrorism here, Iran (and MOIS) and Syria, could and should have foreseen that their material support for Hamas, a terrorist organization whose purpose is to use Jihad to replace Israel with an Islamic state, would result in terror attacks against Israelis of the type that occurred here and the consequent injury to the plaintiff. Shnoor Decl. at ¶¶ 44-50. *Wultz* at 57-62 (discussing duty with respect to Bank of China's provision of financial services to Hamas); *See also* Expert Declarations of Dr. Levitt (DE 31-4), Dr. Clawson (DE 31-1), Dr. Deeb (DE 31-2) and Dr. Berti (DE 31-5). Breach is assessed, based on a reasonable person standard, *i.e.*, whether the tortfeasor took reasonable precautionary measures with respect to his actions. *Wultz* at 62. Here, the defendants knowingly provided material support over a period of many years to a terrorist organization whose express purpose is to target Israel. *See also* Expert Declarations of Dr. Levitt (DE 31-4), Dr. Clawson (DE 31-1), Dr. Deeb (DE 31-2) and Dr. Berti (DE 31-5). Clearly, the duty was breached. Shnoor Decl. at ¶ 51. The element of causation, which in Israeli law includes both factual and legal causation, is present here for the same reasons it was present in *Wultz*. The defendants' provision of material support to Hamas enabled Hamas to carry out terror attacks against Israelis like the kidnapping and murder in this case. Shnoor Decl. at ¶¶ 53-55; *Wultz*, 755 F. Supp. 2d at 64-65 (discussing factual causation); *see also* Expert Declarations of Dr. Levitt (DE 31-4), Dr. Clawson (DE 31-1), Dr. Deeb (DE 31-2) and Dr. Berti (DE 31-5). Additionally, the harm was foreseeable.

*Wultz*, 755 F. supp. 2d at 65-67 (discussing legal causation); s*ee also* Expert Declarations of Dr. Levitt (DE 31-4), Dr. Clawson (DE 31-1), Dr. Deeb (DE 31-2) and Dr. Berti (DE 31-5). Finally, there is no doubt that Abraham Ron Fraenkel was injured by defendants' actions. Shnoor Decl. at ¶ 52.

In addition, the defendants' are liable under Israeli law for vicarious liability and aiding and abetting the underlying torts of Hamas, including negligence, battery and assault and breach of statutory duty. As Shnoor explained, a principal is strictly liable for the underlying torts of its agent under CWO Article 14 – vicarious liability. Shnoor Decl. at ¶ 33. Furthermore, as the *Wultz* court recognized that it is not necessary that the person who inflicted the loss (in this case Hamas and its terrorists) be personally liable for the tort. *Wultz*, 755 F. Supp. 2d at 80. As the *Wultz* court also explained, under Israeli law, the defendant is only required to have knowledge of the injurious nature of the act of another, not subjective intent to commit that act. *Id*. Indeed, mere negligent provision of assistance to a wrongdoer has been sufficient establish such liability. *Id*. Therefore, because Hamas is an agent of Iran (and MOIS) and Syria for the purpose of carrying out terror attacks against Israelis, they are liable under Israeli law for Hamas's kidnapping and murder in this case. Shnoor Decl. at ¶¶ 33-36.

Likewise, Iran (and MOIS) and Syria would be liable under Israeli law for aiding and abetting pursuant to CWO Article 12 because they provided Hamas with the means to commit the terrorist attack and/or it was foreseeable that the assistance they provided to Hamas would enable Hamas to commit terror attacks. Shnoor Decl. at ¶ 38. Iran (and MOIS) has consistently provided critical funding to Hamas over many years, including in the months just before the kidnapping and murder. Furthermore, Syria provided safe haven, training, logistical and tactical support to Hamas over a period of many years. This enabled Hamas to develop and become the

respected, established and sophisticated terrorist organization it is today with the capability of carrying out complex and risky attacks requiring tactical planning and military training, such as kidnapping and killing Israelis and concealing their bodies for almost three weeks. Furthermore, given the Iran's open hostility to Israel and Syria's anti-Israel agenda, it is clear that these state sponsors of terror foresaw (and even knew and intended) that their assistance to Hamas would lead to terror attacks against Israeli civilians. Shnoor Decl. at ¶¶ 39-41.

Thus, as explained by Shnoor, under Israeli law, Iran (and MOIS) and Syria are liable for the underlying torts of Hamas, including: battery and assault, false imprisonment, negligence and breach of statutory duty. Shnoor Decl. at ¶¶ 8-10. Shnoor explained the elements of each of these underlying torts and how Hamas is liable to plaintiffs under Israeli law. Shnoor Decl. at ¶¶ 11-32.

Based on the facts set forth above, plaintiffs' expert opines, and the court agrees, that the defendants are liable Israeli law for negligence, vicarious liability and/or aiding and abetting for the attack at issue in this case. Shnoor Decl. at ¶¶ 8-10; 57.

Shnoor also explains that Abraham Ron Fraenkel is entitled to damages for his psychological and emotional injuries under Israeli law. Shnoor Decl. at ¶¶ 58-65.

### D.  Compensatory Damages

In actions brought under § 1605A, plaintiffs are entitled to "economic damages, solatium, pain, and suffering, and punitive damages." § 1605A(c).

On the matter of damages, the Court received testimony from each of the plaintiffs. However, quantifying the multiple layers of harm which plaintiffs suffer is difficult. As guidance for determining the quantum of damages, the Court is aided by the dozens of civil terrorism decisions under the FSIA. In determining the appropriate amount of compensatory damages, the

Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium. *Haim v. Islamic Rep. of Iran,* 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, *J.*). This Court has developed a commonly accepted standardized framework for awarding solatium damages to family members of deceased victims, known as the *Heiser* damages framework. *See Estate of Heiser v. Islamic Rep. of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *See also, e.g.*, *Acosta*, 574 F. Supp. 2d at 29 ("This Court has previously set out a general framework for compensatory awards for family members of victims who were killed as a result of terrorist activity consisting of $8 million to spouses of deceased victims, $5 million to parents and children of deceased victims, and $2.5 million to siblings of deceased victims."); *Thuneibat*, 167 F. Supp. 3d at 51 (applying *Heiser* damages framework).

> These numbers serve only as a baseline from which the Court may deviate in order to compensate for specific circumstances. For example, enhancements may be awarded where "'evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is present]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing.' " *Roth*, 78 F.Supp.3d at 403 (quoting *Oveissi*, 768 F.Supp.2d at 26–27) (alterations in the original).

*Id*.

Since the kidnapping and murder of Yaakov Naftali Fraenkel, his parents and siblings have suffered ongoing anguish and suffering, by reason of the kidnapping and murder and their concomitant loss of Naftali's society, guidance and company. From the moment Naftali was kidnapped and his parents learned that his cell phone had been located to the Hebron area, the family was plunged into a horrifying period of uncertainty, not knowing whether their son and brother was dead or alive, and if he was alive, the treatment he was receiving. For 18 interminable days, until his body was discovered, they feared for his safety and security,

imagining the worst possible scenarios. Plaintiffs' pain and suffering is obviously enormous, has been with them constantly since the day of the kidnapping and they will continue to experience the effects of the tragedy for the remainder of their lives.

While, as noted, the typical award in FSIA terrorism cases for the loss of a child is $5 million and for the loss of a sibling is $2.5 million, that is a baseline from which the Court may deviate depending on the circumstances. *Thuneibat*, 167 F. Supp. 3d at 51. The Court is not aware of another analogous case, involving a kidnapping and murder, where the family was left in limbo about the fate of their loved one for 18 days.

1. Rachelle Devora Sprecher Fraenkel

Rachelle Fraenkel has a direct cause of action under 28 U.S.C. § 1605A(c). Rachelle testified about her deep fear and anguish during the eighteen days that Naftali was missing, saying that she had a terrible fear that he was bound and she worried whether he was being hurt and getting proper care. DE 31-7 at ¶ 40. She said she lost 22 pounds during this period, did not sleep for the first few nights at all and did not have any solid sleep until after the funeral. *Id*. at ¶ 41. Rachelle further testified that she listed to the emergency police call made by Gilad Shaer from the car and she heard the terrorists shouting for the boys to put their heads down and then the sounds of gunshots and "a few seconds of an awful wail," which sounded like a wounded animal. *Id*. at ¶¶ 43-44. She testified that she feels "physically ill" when she thinks about the fear and panic her son felt knowing that he had been kidnapped and was in the custody of armed terrorists. *Id*. at ¶ 42. Rachelle also testified about how difficult the publicity surrounding the case was for her and the family, especially during the mourning period when thousands of people came to the house and her friends could not always get into the house. *Id*. at ¶ 62. Due to the publicity, she has lost her anonymity which exacerbates her struggle to recover from the loss. *Id*.

at ¶ 69. In the aftermath of Naftali's kidnapping and murder, Rachelle and Abraham tried to have another baby, but she had a miscarriage at 9 weeks. *Id.* at ¶ 73. She explained that she still often weeps when memories of Naftali are triggered. *Id.* at ¶¶ 65-67.

Courts have made upward adjustments to the *Heiser* framework for parents suffering extreme mental distress at the loss of a child. For example, in *Thuneibat*, the court made an upward adjustment of 25%, awarding the parents of two victims in a suicide bombing, $6,250,000 each. *Thuneibat*, 167 F. Supp. 3d at 51; 53. In *Oveissi*, the court explained that when a death is "sudden and unexpected" in the sense that the victim was not in the army or in some other situation where they are inherently exposed to some level of risk, it can render the shock and grief more intense. *Oveissi*, 768 F. Supp. 2d at 28.

In light of the extreme emotional suffering that Rachelle has experienced due to the sudden an unexpected loss of her child, an award of $7,500,000 is appropriate here, representing an upward departure of 50% from the *Heiser* framework.

## 2.  Abraham Ron Fraenkel

Because Abraham Ron Fraenkel does not have a direct cause of action under 28 U.S.C. § 1605A(c), his entitlement to compensatory damages depends on Israeli law. As Shnoor explains, Israeli law provides that an immediate family member of a principal tort victim is entitled to compensatory damages for psychological and emotional harm resulting from the tort to the primary victim. Shnoor Decl. at ¶ 59. Such harm is compensable if the family member witnessed the event or its consequences, there is a time and space proximity between the two harms (this is flexibly interpreted) and the secondary victim (the family member) suffers severe harm. *Id.*

The kidnapping and murder here presents a unique situation even under Israeli law. While Abraham Fraenkel did not witness the kidnapping and murder itself, he certainly witnessed and personally experienced the consequences of the event. His son, Naftali, was missing for 18 days. During that time, the entire country of Israel waited anxiously along with Abraham Fraenkel for the return of the three boys, and the Israeli military engaged in an intensive search and rescue operation to find the boys. The Fraenkel family lost all privacy as it was plagued by journalists desiring to report on the heartbreaking story that captured the nation. DE 31-6 at ¶ 16. Moreover, while Abraham Fraenkel did not witness the kidnapping and murder with his own eyes, he heard the recording of the emergency police call made by Gilad Shaer, in which he testified "you could clearly hear gunshots, followed by terrible grunts and moans." DE 31-6 at ¶ 19. This intensified Abraham's suffering and sense of foreboding. *Id.* Until Naftali's body was found, Abraham Fraenkel was beset with thoughts of his son's wellbeing, whether he was being harmed, receiving proper treatment, being fed, alone – "all the possible, and worst, speculations raced through our heads." *Id.* at ¶ 17.

Furthermore, Abraham Fraenkel's emotional and psychological injuries manifested themselves immediately, satisfying the time/space proximity requirement and his symptoms were severe. He testified that during the eighteen day period, he was in constant distress and felt unable to care for his family. *Id.* at ¶ 24. During the first few days, he could not sleep without the aid of sleeping medications and was barely able to eat. *Id.* He also experienced physical symptoms in the form of chest pains resulting from the stress, which caused him to see a doctor. Id. at ¶ 25. Abraham was unable to work at all for the first month after the kidnapping, while the boys were still missing and during the mourning period. He testified that when he returned to work, he was only able to work very part time, sometimes only 2-3 hours per day, and was

passed over for a promotion during that time. *Id*. at ¶¶ 34-35. Abraham Fraenkel has been under continuous psychological treatment from a few days after the kidnapping until today and suffers from depression, PTSD and complex bereavement disorder. *Id*. at ¶ 38; DE 31-9 at 15. Dr. Strous concluded that Abraham Fraenkel's life was irreversibly affected by the loss of his son and that his symptoms would not resolve in the short term, but would continue to affect him in the future.

Since plaintiffs have established that Abraham Ron Fraenkel would be entitled to recover solatium damages under Israeli law, the Court will calculate the damages under the federal §1605A framework. *Thuneibat*, 167 F. Supp. 3d at 47 (collecting cases where courts assessed liability under foreign or state law, but applied federal standard to damage calculation). Under the *Heiser* framework, Abraham Fraenkel would be entitled to a damage award of $5 million, but due to the egregious nature of the kidnapping, the 18 days of uncertainty before his son's body was found and the severity of his psychological and emotional trauma, Abraham Fraenkel is entitled to a 50% upward adjustment, for a total award of $7,500,000.

### 3. Tzvi Amitay Fraenkel

The siblings of decedent Yaakov Naftali Fraenkel each have a direct cause of action under 28 U.S.C. § 1605A(c). Each of the decedent's siblings had a special relationship with him. As the oldest brother and the closest boy in age to decedent Yaakov Naftali Fraenkel, Tzvi Amitay Fraenkel (19 years old at the time of the kidnapping and murder) testified that he had a close relationship with Naftali and shared a room and many activities with him, including singing at the Sabbath table. DE 31-8 at ¶ 5. He testified that the eighteen day waiting period was extremely difficult, particularly after he learned that gunshots were heard on the emergency call. *Id*. at ¶ 17. Tzvi said that since the kidnapping and murder he has stopped participating in activities that the two used to do together. *Id*. at ¶ 22. He has also become more anxious about

the welfare of his family and suffers from reduced self-esteem due to being constantly referred to as the brother of Naftali. *Id.* at ¶¶ 19-21.

A.H. Fraenkel was also close in age to the decedent (14 years old at the time of his kidnapping and murder) and shared many activities with him. DE 31-12 at 9-10. Rachelle testified that A.H. saw Naftali as her best friend. DE 31-7 at ¶ 79. She went into shock when she learned the news that her brother was missing and likely kidnapped by terrorists. Her entire body froze and she was shivering and felt as if she would faint. DE 31-12 at 9. During the eighteen day waiting period she suffered from nightmares and intense crying every day. *Id.* She again went into shock on hearing that Naftali's body was found. *Id.* A.H. suffers from severe anxiety since her brother's kidnapping and murder, which affects all spheres of her life, including her social relationships with family and friends and her ability to succeed academically. *Id.* at 10-11. At times she even feels she wants to die to be with her brother. *Id.* Rachelle testified that A.H. spends a lot of energy trying to avoid anything that might trigger her anxiety and she gets an anxiety attack, "it is agony." DE 31-7 at ¶ 80.

A.L. Fraenkel (11 years old at the time of the kidnapping and murder) has become the most closed since her brother's kidnapping and murder. DE 31-13 at 8. She has shut off her emotional life as a defense against the pain and has become very distant. *Id.*

N.E. Fraenkel (9 years old at the time of the kidnapping and murder) has also closed up in response to the tragedy. *Id.* at 9. She became very sensitive, keeping to herself and is often restless, impatient or argumentative. *Id.* Her academics have also suffered. *Id.*

N.S. Fraenkel (6 years old at the time of the kidnapping and murder) suffers severe anxiety in the aftermath of the kidnapping and murder. *Id.* at 10. She has a constant fear of terror attacks and a fear of all Arabs. *Id.* She is also afraid to be left alone, including for sleeping, and

has a need to know where her parents are at all times. *Id*. According to her parents, she speaks about the event constantly and sometimes refers to his brother as if he is still here. DE 31-7 at ¶ 83; DE 31-6 at ¶ 47(1).

S.R. Fraenkel (4 years old at the time of the kidnapping and murder), as the youngest and a boy after four girls, was close to his older brother Naftali and still talks about him all the time. DE 31-13 at 11; DE 31-7 at ¶ 84. He also lost the enjoyment and support that would have come from growing up with Naftali as his brother, and will necessarily forever be affected by the devastation that has been caused to his parents and siblings.

Courts have made upward adjustments to the *Heiser* damages framework for siblings suffering extreme psychological and emotional trauma as a result of the tragedy. For example, in *Thuneibat*, the court made an upward adjustment of 25% for siblings due to their young age the lasting impact of the tragedy on their development. *Thuneibat*, 167 F. Supp. 3d at 52-53. Likewise, in *Valore*, the court made an upward adjustment of 25% for the sister of a surviving terror victim who suffered a nervous breakdown following the attack. *Valore*, 700 F. Supp. 2d at 86. The closeness of the relationship is also a factor. *See Oveissi*, 768 F. Supp.2d at 26-27.

Each of the decedent's siblings suffered immensely due to the kidnapping and murder of their brother, particularly during the 18 day period of uncertainty before his body was found. Each was close to Naftali in different ways, depending on their age and placement in the family order. While each copes with the loss differently, the trauma has clearly affected them very deeply with marked changes in their personalities and interpersonal relationships. Particularly taking into consideration the young age of the decedent and his siblings, I find it appropriate to make an upward departure of 50% from the *Heiser* framework for an award of $3,750,000 to each sibling.

### 4. Estate of Yaakov Naftali Fraenkel

Furthermore, the Estate of Yaakov Naftali Fraenkel is entitled to an award for the pain and suffering he endured during the course of the kidnapping. Arieh Spitzen testified based on his review of the relevant police and court documents that Naftali—a 16 year old high school student—knew he had been kidnapped for a period of up to 20 minutes before he was shot to death and point blank range. Supplemental Spitzen Decl. at ¶¶ 2; 11. The kidnappers immediately informed the boys that they had been kidnapped and ordered them to keep quiet. *Id.* at ¶ 7. In the audio recording of the police call, the kidnappers are heard shouting "head down, head down" just before the gunshots are heard followed by a cry of pain. *Id.* at ¶ 8. The forensic reports reflect that both kidnappers shot at the boys from the front seat of the car using two different weapons. *Id.* at ¶ 10. It is not known whether Yaakov Naftali Fraenkel was the first to be shot or whether he witnessed the others being shot. One can only imagine the intense fear and mental anguish experienced by decedent Yaakov Naftali Fraenkel during these moments. Yaakov Naftali Fraenkel's estate is entitled to an award for this pain and suffering.

Courts have awarded damages to the estates of other kidnapping and hostage victims who were killed by their abductors. In *Wachsman*, the court awarded $2 million to the estate of a victim who was held hostage for six days and killed during the course of an attempted rescue. *Wachsman*, 603 F. Supp.2d at 161. In *Stethem*, the court awarded $1.5 million to the estate of a victim who was beaten and then killed during the course of a hijacking. *Stethem v. Islamic Rep. of Iran*, 201 F. Supp. 2d 78, 80, 89 (D.D.C. 2002). In another airplane hijacking case, the court awarded $1 million to the estate of the murdered victim for her fear and mental anguish. *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 82 (D.D.C. 2011).

In light of the egregious nature of the kidnapping and murder and the decedent's young age, an award of $2 million, as well as prejudgment interest, for pain and suffering is appropriate here.

### E.  Punitive Damages

In numerous previous civil terrorism cases tried under FSIA, judges have awarded punitive damages to punish defendants and to deter future acts of terrorism. Typically, courts have imposed punitive damage of three times of a state sponsor's annual budget for the export of terrorism. *Acosta*, 574 F. Supp. 2d at 31; *Bodoff v. Islamic Rep. of Iran,* 424 F. Supp. 2d 74, 89 (D.D.C. 2006); *Stern v. Islamic Rep. of Iran,* 271 F. Supp. 2d 286, 301 (D.D.C. 2003); *Cronin v. Islamic Rep. of Iran,* 238 F. Supp. 2d 222, 235-36 (D.D.C. 2002) (abrogated on other grounds by *Cicippio-Puleo v. Islamic Rep. of Iran,* 353 F.3d 1024 (D.C. Cir. 2004)); *Eisenfeld v. Islamic Rep. of Iran,* 172 F. Supp. 2d 1, 9 (D.D.C. 2000). Even when the amount of the annual budget is not known or cannot be determined the courts have followed the format set out in the FSIA cases against Iran. *See* also *Calderon-Cardona*, 723 F. Supp. 2d at 485.

Both the Iranian and Syrian defendants' demonstrated and well known policy to encourage, support and direct a campaign of murder against civilians amply justifies the imposition of punitive damages against them. This Court will adopt the "typical punitive damages award of $300,000.00" as "[t]here is no reason to depart from settled case law regarding the amount of punitive damages in terrorism cases." *Wultz v. Islamic Rep. of Iran*, 864 F. Supp. 2d 24, 41-42 (D.D.C. 2012); *Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d at 58-59; *see also Acosta*, 574 F. Supp. 2d at 31.

Accordingly, the Court will award punitive damages against the Iranian defendants in the amount of $300,000,000 to plaintiffs collectively and in the amount of $300,000,000 against the Syrian defendants collectively.

## CONCLUSION

This Court possesses subject matter jurisdiction over this action and personal jurisdiction over the Iranian and Syrian defendants. Plaintiffs have established to this Court's satisfaction, pursuant to 28 U.S.C. § 1608(e), that Iran and Syria are liable for damages because it provided material support, resources and assistance to Hamas in connection with the terrorist kidnapping and murder of Yaakov Naftali Fraenkel, which resulted in grievous harm to the decedent's estate, parents and siblings. Accordingly, plaintiffs' motion for default judgment shall be granted and judgment shall be entered in the amounts described above.

The Clerk is directed to enter judgment as follows:

Compensatory damages in favor of plaintiff Rachelle Devora Sprecher Fraenkel, and against all defendants, in the amount of $7,500,000.

Compensatory damages in favor of plaintiff Abraham Ron Fraenkel, and against all defendants, in the amount of $7,500,000.

Compensatory damages in favor of plaintiff Tzvi Amitay Fraenkel, and against all defendants, in the amount of $3,750,000.

Compensatory damages in favor of plaintiff A.H. Fraenkel, and against all defendants, in the amount of $3,750,000.

Compensatory damages in favor of plaintiff A.L. Fraenkel, and against all defendants, in the amount of $3,750,000.

Compensatory damages in favor of plaintiff N.E., and against all defendants, in the amount of $3,750,000.

Compensatory damages in favor of plaintiff N.S. Fraenkel, and against all defendants, in the amount of $3,750,000.

Compensatory damages in favor of plaintiff S.R. Fraenkel, and against all defendants, in the amount of $3,750,000.

Compensatory damages in favor of plaintiff Estate of Yaakov Naftali Fraenkel, and against all defendants, in the amount of $2,000,000.

Punitive damages in favor of all the plaintiffs and against the Iranian defendants in the amount of $300,000,000.

Punitive damages in favor of all the plaintiffs and against the Syrian defendants in the amount of $300,000,000.

_____
Rosemary Collyer
U.S.D.J.

81