# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Abraham Ron Fraenkel, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-1080 (RMC) |
| | ) | |
| Islamic Republic of Iran, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

On a Thursday evening in June 2014 three young men, Yaakov Naftali Fraenkel, Gilad Michael Shaer, and Eyal Yifrach waited at a junction in Alon Shvut, Israel, to find a ride home.  A car stopped to offer a ride and all three young men got in, expecting to be home soon.  The vehicle's driver and other passenger had a different idea:  they were members of Hamas looking for Israeli hostages to use as leverage with Israel to obtain the release of jailed Hamas members.  But nothing went as planned that night and all three young men were not saved for ransom, but were almost immediately killed and buried by the Hamas kidnappers.

The question raised by this lawsuit is whether any or all of The Islamic Republic of Iran, The Iranian Ministry of Information and Security, and The Syrian Arab Republic can be held liable for money damages to the family of Yaakov Naftali Fraenkel under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 *et seq* (2012).

## I.  PROCEDURAL POSTURE

Plaintiffs are Abraham Ron Fraenkel, Rachel Devora Sprecher Fraenkel, the parents of Yaakov Naftali Fraenkel, and his siblings Tzvi Amitay Fraenkel, A.H.F., A.L.F., N.E.F., N.S.F., and S.R.F.  Plaintiffs filed this action on July 9, 2015 against Defendants The

Islamic Republic of Iran (Iran), The Iranian Ministry of Information and Security (MOIS), and The Syrian Arab Republic (Syria).  Plaintiffs advance a cause of action under the FSIA, 28 U.S.C. § 1605A(c), as well as the following causes of action under state law:  wrongful death, survival damages, intentional infliction of emotional distress, negligent infliction of emotional distress, civil conspiracy, and aiding and abetting.  As between Iran and MOIS, Plaintiffs allege vicarious liability or respondeat superior liability.

None of the Defendants filed an answer or otherwise appeared.  The Court proceeded to a default setting as provided by § 1608(e), which requires a court to enter default judgment against a non-responding foreign state only where "the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  The Court held a two-day hearing on liability and damages beginning on December 6, 2016.[1]  Plaintiffs presented evidence in the form of live testimony, affidavit, and original documentary and recorded evidence.  Plaintiffs presented credible expert testimony from two experts concerning the assistance to Hamas[2] from Iran and MOIS; two experts concerning Syria's assistance to Hamas; a retired member of the Israel Defense Forces concerning the investigation into the kidnapping and death of Naftali Fraenkel, Gilad Shaer, and Eyal Yifrach; and a psychiatrist concerning the mental and physical effects of Naftali Fraenkel's death on his parents and siblings.  From the entire record, the Court makes the following findings of fact and conclusions of law.

---

[1] The hearing transcript is set forth in two volumes, one for each day of the hearing.  Citations to the transcript are identified as "name T-#-page," *i.e.*, witness name, transcript volume, and page number.

[2] Hamas is an acronym for Harakat al-Muqawamah al-Islamiyya, or the Islamic Resistance Movement.  *See* Ex. 36, Declaration of Marius Deeb (Deeb Decl.) ¶ 11.

## II. FINDINGS OF FACT

### A. The Kidnapping and Murder of Naftali Fraenkel

1.   Yaakov Naftali Fraenkel was sixteen years old in June 2014 and attended boarding
     school at Mekor Chaim in Gush Etzion.  His family lived in the Nofa Ayalon settlement.
     Ex. 12, Declaration of Abraham Ron Fraenkel ¶¶ 2, 5 (A. Fraenkel Decl.).

2.   Naftali is survived by his parents and six siblings.  A. Fraenkel T-1-90.

3.   Naftali was a talented student, taking advanced courses in sciences and other subjects.  R.
     Fraenkel T-1-32-34; A. Fraenkel T-1-106.  He was also a skilled musician and played the
     guitar and sang for his family, especially on the Sabbath.  R. Fraenkel T-1-32-33, 36, 40;
     *see also* Exs. 9-A16 and 9-B (photograph and video of Naftali); A. Fraenkel Decl. ¶ 42.

4.   Naftali traveled home to Nofa Ayalon from school on the weekends and at the end of
     every term.  R. Fraenkel T-1-10.

5.   On Thursday, June 12, 2014, Naftali sent his parents a text telling them he was coming
     home a day early from school.  *Id*. at 10; A. Fraenkel T-1-90-91.  Naftali waited with a
     friend from school, Gilad Shaer, and another young man, Eyal Yifrach, at a junction in
     Alon Shvut to hitch a ride to his home in Nofa Ayalon.  Spitzen T-2-9-10; Ex. 21,
     Declaration of Arieh Dan Spitzen (Spitzen Decl.) ¶ 21; *see also* A. Fraenkel T-1-92.  It
     was common for students and other individuals to wait for rides at that junction.

6.   A car picked up Naftali, Gilad, and Eyal around 10:00 p.m. from the hitchhiking post in
     Alon Shvut.  Spitzen T-2-9-10.  There were two men already in the car, the driver and a
     passenger.  *Id*. at 10.

7.   Immediately after the three young men entered the car, one of the terrorists brandished a
     gun and told them they were kidnapped, but to be calm and they would not be hurt.  *Id*.

8.      Around 10:30 p.m. emergency services received a phone call from Gilad.  The police

were able to match Gilad's phone number with the record of the emergency call.  *Id.*  On

the call a voice is audible, most likely Gilad, saying the young men had been kidnapped;

a voice could also be heard speaking in Arabic and Hebrew and saying "put your head

down"; there was music in the background; and then sounds like muffled gunshots and a

person moaning in physical pain.  *Id.* at 10-11; R. Fraenkel T-1-17; A. Fraenkel T-1-96-

99; Ex. 26 (audio-recording of emergency call).

9.      The Fraenkels expected Naftali to arrive home late, which was not unusual.  R. Fraenkel

T-1-10-11.  Around 3:30 a.m., Mr. and Mrs. Fraenkel were awakened by their daughter

A.L., because someone was banging on the front door.  *Id.* at 11.  They opened the door

to find the police, who were looking for Gilad, Naftali's classmate, because Gilad had

never come home that night and his parents thought he might have stayed with the

Fraenkels.  *Id.*  After looking in Naftali's room, the parents discovered that Naftali was

also missing.  *Id.*

10.     Within hours of learning the young men were missing, the Israeli police became aware of

the phone call made by Gilad to emergency services.  *Id.* at 16; *see also* Ex. 26.

11.     The police were able to trace the cell phone belonging to Gilad to its last known location

in the Hebron region.  R. Fraenkel T-1-12.  Hebron is an area "populated mostly by

Arabs and some of which are very hostile to Israeli citizens."  *Id.* at 13.

12.     Eighteen days of massive searching for the three young men ensued.  On June 30, 2014

their bodies were found in a parcel of land called Hirbet Aranbeh, which belonged to

Hussam Ali Hasan al-Qawasmeh.  Spitzen T-2-13-14; A. Fraenkel T-1-93.  Hussam al-

Qawasmeh was the head of a Hamas cell within the Izz al-Din al-Qassam Brigades called the Hussam Qawasmeh Brigade.  *See* Spitzen Decl. ¶¶ 35-38.

13.  Also around the time of the kidnapping, the families of two known Hamas members went to the Palestinian police to inform them that the two Hamas members were missing: Marwan Sa'di Abd al-Afu al-Qawasmeh and Amer Omar Abd al-Qadar Abu Aisha. Spitzen T-2-16-17, 19-20.

14.  Hamas "is an arm of the Muslin Brotherhood" that believes "the land of Palestine[,] which is for all purposes [] where Israel sits and also where the Palestine authority sits[,] is a Muslim land that needs to be under Muslim rule, and a fundamentalist, Muslim rule, from the Muslim Brotherhood."  Spitzen T-1-125.

15.  Hamas "believe[s] in the elimination of Israel," *Id*. at 125-26, and to achieve that goal engages in education, indoctrination, and terrorism.  Acts of terror are normally conducted through the operative branch of Hamas known as the Izz al-Din al-Qassam Brigades.  *Id*. at 126.

16.  Hamas also engages in charitable outreach through an entity called the Al-Nur Prisoner Society.  Al-Nur provides charitable funds to support the families of Hamas members in prison as a consequence of their participation in Hamas, as well as "the families of terrorist[s] who were killed during actions."  *Id*. at 128.

17.  The owner of the land where the bodies were found, Hussam Ali Hasan al-Qawasmeh, was the head of the cell that planned and carried out the kidnapping and murder of Naftali, Gilad, and Eyal.  Spitzen T-2-7-8.  Hussam al-Qawasmeh was apprehended by the Israeli police and interrogated about the crimes.  Hussam al-Qawasmeh provided a statement to the police.  In his statement he told the police that the intention was to

kidnap a single person and hold that person for ransom to secure the release of Hamas

sympathizers, but the young men were killed because they resisted. *Id*. at 11, 18, 22-23.

18.     Hussam al-Qawasmeh also informed police that Abu Aisha was the driver of the vehicle

that picked up the three young men in Alon Shvut. *Id*. at 20.   Marwan al-Qawasmeh was

the other individual in the car. *Id*. at 20-21.

19.     Funding for the kidnapping was provided by Hussam al-Qawasmeh's brother, Mahmoud

Ali Hasan al-Qawasmeh. *Id*. at 21-22.

20.     The weapons used were purchased by Hussam al-Qawasmeh from Adnar Muhammed

Eid Izzat Zaru. *Id*. at 25.

21.     Immediately after the kidnapping and murder of the three young men, Abu Aisha and

Marwan al-Qawasmeh sought shelter from Hussam al-Qawasmeh and requested his

assistance in burying the bodies. *Id*. at 26-27.   Hussam al-Qawasmeh and Marwan al-

Qawasmeh loaded the bodies into another car and Hussam al-Qawasmeh drove them to

his land in Hirbet Aranbeh for burial. *Id*. at 27.   Marwan al-Qawasmeh and Abu Aisha

then went into hiding in Hebron. *Id*.   One of the locations where the two men hid was

owned by Arafat Ibrahim Muhamad al-Qawasmeh. *Id*. at 28.

22.     On August 20, 2014, Hamas officially took responsibility for the kidnapping and murder

of Naftali, Gilad, and Eyal by way of a press conference in Istanbul.   The spokesperson

for Hamas was Saleh Muhamed Suleiman al-Arouri. *Id*. at 28-29; *see also* Ex. 23

(recording of Hamas press conference).

### B.  Iran and MOIS's Role in Assisting Hamas in Israel

23.     Plaintiffs presented expert witness testimony concerning the assistance of Iran and MOIS

to Hamas in Israel.   From this evidence, certain conclusions are clear.   Iran and MOIS

supported Hamas by: (1) facilitating recruitment, training, and safe haven and (2) providing financial assistance.

24. "The Iranian regime loudly proclaims its right to support what they describe as resistance acts and what the governments in the region and government[]s in Europe and the U.S. government describe as terrorism because it involve[s] attacks on unarmed civilians." Clawson T-2-123-24.

25. "Iran has been described in the U.S. Government for more than 20 years as the principal state sponsor of terrorism globally and Iran has provided generous financial assistance and is providing training and provided a lot of different types of weapons." *Id*. at 124.

26. Since 1984, Iran has been on the U.S. State Department's list of state sponsors of terrorism. *See* Ex. 40, Declaration of Patrick L. Clawson (Clawson Decl.) ¶ 31.

27. Iranian support for Hamas began to wane in 2012, but did not stop completely. Levitt T-2-116-117. Iranian support for terrorism by Hamas increased again in 2013 and 2014. Clawson T-2-125; *see also* Ex. 34, Declaration of Dr. Matthew Levitt (Levitt Decl.) ¶¶ 41, 60 ("The U.S. State Department's *Country Report on Terrorism 2014* notes that Iran is not shy about its willingness to finance Hamas. 'Since the conclusion of [Operation Protective Edge],' the report notes, 'Iranian governmental officials have publicly stated their willingness to resume Iran's military support of Hamas.' The report goes on to note that 'historically, Hamas has received funding, weapons, and training from Iran.'") (quoting *Country Reports on Terrorism 2014*, United States Department of State, Bureau of Counterterrorism (June 2015), *available at* https://www.state.gov/documents/organization/239631.pdf (last visited Mar. 29, 2017)).

*1. Facilitating in the recruitment, training, and safe haven of Hamas members*

28.   Iranian support for Hamas includes training, intelligence support, and safe haven of

individuals through political cover.  Levitt T-2-115.

29.   Political cover comes in the form of public affirmation of the goals and ideology of

Hamas.  *Id.*  "Iran is very vocal about it[s] belief that Hamas is in the right and because it

is in its terminology fighting occupation, all means of fighting said occupation are

legitimate[;] and [Iran] tries to build up support for [Hamas] within the region and within

Muslim countries and to protect it from opposition of political circles."  *Id.*

30.   Iran and its leaders are very vocal about their support for Hamas and its anti-Israel

activities.  Levitt Decl. ¶¶ 41-43, 61.  Hamas is also vocal in recognizing and thanking

Iran for its support.  *Id.* ¶¶ 45-47, 62.

31.   As early as 2007, Israeli security officers noted the importance of Iran in training Hamas

operatives.  Clawson Decl. ¶ 41 (noting Hamas dispatched people to Iran for months or

years of training).

*2. Providing financial support to Hamas*

32.   Iran's primary mode of financial support to Hamas has come through the provision of

funds and weapons.  Levitt T-2-115.  It is estimated that Iran has most likely provided

hundreds of millions of dollars to Hamas.  *Id.*; *see also* Levitt Decl. ¶ 39.

33.   Hamas has received much of its revenue through state sponsorship, including from Iran.

Levitt T-2-111.  Iran provides funds to Hamas's charitable organizations, such as the Al-

Nur Prisoner Society, as a means to launder and process the money to Hamas for use in

the West Bank and the Gaza Strip.  *Id.* at 111-13; *see also* Levitt Decl. ¶ 36.

34. Based on a 2015 State Department report, Iran was funding Hamas in 2013 and 2014. Levitt T-2-118; *see also* Levitt Decl. ¶¶ 63, 67. Additionally, in March 2014, the Israeli Navy seized a ship, the Klos-C, that was smuggling weapons from Iran to the Gaza Strip for use by Hamas. Levitt T-2-118-19; *see also* Clawson Decl. ¶ 43.

35. Monetary support from Iran is also forwarded directly by MOIS. Levitt Decl. ¶ 49. MOIS is "the successor agency to [Iran's] respected spy agency called SAVAK, run by the Shah." Clawson Decl. ¶ 21.

36. Iran has used MOIS to facilitate and conduct terrorist attacks and funnel weapons and finances to terrorist groups through diplomatic pouches. *Id*. ¶ 24 (citing *Patterns of Global Terrorism 1990*, United States Department of State, Office of the Coordinator for Counterterrorism (April 29, 1991), *available at* https://fas.org/irp/threat/ terror_90/ (last visited Mar. 29, 2017)).

37. A Canadian Secret Intelligence Service report from 2002 noted that the Palestinian police discovered a direct transfer of $35 million to Hamas from MOIS. *See* Levitt Decl. ¶ 49 (citing *Terrorist Group Profiler*, Canadian Secret Intelligence Service (June 2002)).

**C. Syria's Role in Assisting Hamas in Israel**

38. Plaintiffs presented expert witness testimony concerning Syria's assistance to Hamas in Israel. From this evidence, certain conclusions can be drawn. Syria has supported Hamas by: (1) facilitating the recruitment and training of Hamas members and providing a safe haven and (2) providing financial support.

39. Syria has supported Hamas because they have a common goal of "disrupting and undermining the Arab Israeli peace process." Deeb T-2-87. Syria supports terrorist organizations when it helps to undermine rivals to the Syrian government, especially those countries which recognize Israel. *Id*. at 87-88. Since Hamas's rise in the 1990s,

Syria has viewed Hamas as a direct partner in the context of the Israeli-Palestinian conflict.  Berti T-2-133-34.

40.    Syria began supporting Hamas in the early 1990s, but its support waned starting in 2012. Deeb T-2-87.  The Syrian civil war in 2012 caused a rift between Hamas and Syria, because Hamas had strong ties "with Assad and its main foreign backer, Iran," but also "sectarian and religious ties to the Sunni majority protesting against the . . . regime."  Ex. 38, Declaration of Benedetta Berti (Berti Decl.) ¶ 45.  Hamas's reluctance to take sides led it to distance itself from the Syrian regime.  *Id.*  As a result, Syrian direct support for Hamas ended in 2012.  *Id.*; *see also* Deeb T-2-91-92.

41.    Despite the falling out in 2012, Hamas continues to enjoy the benefits of Syria's past support through the use of Syrian training models and methods of terrorism.  Deeb T-2-94-95; *see also* Berti T-2-136 ("Syria's support throughout the 2000[s] has been instrumental for the organization to grow, to gain political support, to fund raise, to carry out, to plan its operation, to coordinate with other groups and at times also to gain funding and weapon[s] and training.").  Without Syria's support from the early 1990s to 2012, Hamas would not be as strong or organized as it is today.  Deeb T-2-95, 98; Berti T-2-136.

*1.   Facilitating in the recruitment, training, and safe haven of Hamas*

42.    Until 2012 Syria provided Hamas with a safe place for its headquarters.  Deeb T-2-88. The political bureau of Hamas, its "executive and decision making organ," was located in Damascus, Syria prior to 2012.  Berti T-2-132-33.  "Instructions for terrorist attacks were transmitted directly from Damascus to the terrorist cell that was to carry out the attack." Deeb Decl. ¶ 15.

43.   Specifically, Syrian military intelligence assisted Hamas through training its members on how to use terrorism on a large scale.  Hamas complied with Syrian requests and worked closely with Syrian military intelligence to develop a strategy for its terrorist activities. Deeb T-2-88-89, 92.  Because of the location of Hamas's headquarters, it was able to recruit Palestinian refugees located in Syria openly.  Deeb Decl. ¶ 15.

44.   The safe haven from prosecution and arrest provided by Syria allowed Hamas to solidify its organizational structure from the mid-1990s to 2012.  Deeb T-2-95; *see also* Berti Decl. ¶¶ 31-33.  Hamas leaders have publically claimed that their actions during the war in Gaza have only been possible due to Syria's support.  Deeb T-2-95.

45.   "From the 2000[s,] [Syria] has been the center, the hub, the safe haven where [Hamas's] leadership has been able to have a shelter, to regroup, to strategize, to plan and to coordinate."  Berti T-2-134.  "Syria has been a political platform.  It has allowed Hamas to have international visibility . . . [and] legitimacy within the . . . Arab world."  *Id*.

46.   The leader of Hamas, Khalid Mash'Al, was located in Syria and protected until 2012. Deeb T-2-90-91.

### 2.   *Providing financial support to Hamas*

47.   Syria also provided funds and arms, and facilitated the transport of funds from other countries through Syria to Hamas's headquarters.  *Id*. at 90.  From its Damascus headquarters, Hamas then transmitted funds directly to the terrorist cells responsible for attacks.  Deeb Decl. ¶ 15.

48.   In addition to providing funds, Syria operated as a "hub for fundraising."  Berti T-2-134. When officials from other countries visited Syria, they were also able to have one-on-one meetings with the leaders of Hamas to discuss funding Hamas's efforts.  *Id*. at 135.

49.     Weapons shipments have also been funneled through Syria to Hamas.  Berti Decl. ¶ 44

## III.  CONCLUSIONS OF LAW

### A.  Burden of Proof

The FSIA specifies that a court cannot enter a default judgment against a foreign state, or a political subdivision thereof, "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *see Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief.").[3]  Section 1608(e) provides protection to foreign states from unfounded default judgments rendered solely upon a procedural default.  *See Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 950-51 (11th Cir. 1996).

For a plaintiff to prevail in a FSIA default proceeding, the plaintiff must present a legally sufficient *prima facie* case, *i.e.*, "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff."  *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98 (D.D.C. 2002).  Although a court receives evidence from only the plaintiff when a foreign sovereign defendant has defaulted, § 1608(e) does not require a court to demand more or different evidence than it would ordinarily receive in order to render a decision.  *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994).  In evaluating the plaintiff's proofs, a court may "accept as true the plaintiff's uncontroverted evidence," *Estate of Botvin v. Islamic Republic of*

---

[3] This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(d).  Fed. R. Civ. P. 55(d) ("A default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfied the court."); *see also Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (a FSIA default winner must prove damages like any other default winner).

*Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007); *see also Elahi v. Islamic Republic of Iran*, 124 F.

Supp. 2d 97, 100 (D.D.C. 2000), and a plaintiff may establish proof by affidavit. *See Weinstein*

*v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).  While a plaintiff needs to

demonstrate a *prima facie* case to obtain a judgment of liability in a FSIA case, a plaintiff must

show entitlement to punitive damages by clear and convincing evidence.  *See Peterson v. Islamic*

*Republic of Iran*, 264 F. Supp. 2d 46, 48 (D.D.C. 2003).

Thus, to prevail on their FSIA claims, Plaintiffs must demonstrate a *prima facie*

case of liability.  With regard to their claims for punitive damages, Plaintiffs must present clear

and convincing evidence.  By their failure to appear and defend themselves, Iran, MOIS, and

Syria put themselves at risk that the Plaintiffs' uncontroverted evidence would be satisfactory to

the Court to prove its allegations.  In fact, the Court finds that Plaintiffs have presented

satisfactory evidence to prove liability and damages, including punitive damages against all three

Defendants.

### B.  Service

Service under the FSIA is governed by 28 U.S.C. § 1608.  Subsection (a) provides

for service on a foreign state and subsection (b) provides for service on an agency or

instrumentality of a foreign state.  To determine whether a foreign entity should be treated as the

state itself or as an agency or instrumentality, courts apply the core functions test:  if the core

functions of the entity are governmental, it is treated as the state itself; and if the core functions

are commercial, it is treated as an agency or instrumentality.  *Roeder*, 333 F.3d at 234.

In this case, service upon all Defendants was perfected under § 1608(a), which

governs service on foreign states.[4]  Obviously, Iran and Syria are foreign states.  MOIS is

---

[4] Service upon Syria was accomplished via 28 U.S.C. § 1608(a)(3) through delivery of the
required documents (translated into Arabic) to its agent via international courier service,

considered to be the foreign state itself because its core functions are governmental, not commercial. *See Roeder*, 333 F.3d at 234. Because MOIS is treated as the state itself under the FSIA, Iran and Syria are the only Defendants in this case against whom damages can be sought.

### C. Jurisdiction

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Accordingly, this Court lacks jurisdiction over Iran, MOIS, and Syria unless one of the FSIA's enumerated exceptions applies. Here, the state-sponsored terrorism exception to sovereign immunity applies. 28 U.S.C. § 1605A(a). Additionally, the FSIA was amended in 2008 to provide a private cause of action by which a foreign state that sponsors terrorism can be held liable for certain enumerated damages arising from terrorist activities: economic damages, solatium, pain and suffering, and punitive damages. *Id.* § 1605A(c).

Section 1605A(a) provides that a foreign state shall not be immune from the jurisdiction of U.S. courts in cases where plaintiffs seek money damages for personal injury or death that:

> was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). A U.S. court will hear a claim under FSIA if: (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred, or was so

---

evidenced by a return-receipt dated November 29, 2015. *See* Pls.' Response to Order to Show Cause re Service on Syria, filed Feb. 29, 2016 [Dkt. 26]; *see also* Return Receipt [Dkt. 26-4]. Service upon Iran and MOIS was accomplished via 28 U.S.C. § 1608(a)(4) through diplomatic channels. *See* Pls.' Affidavit in Support of Default, filed March 23, 2016 [Dkt. 28].

designated as a result of such act"; (2) "the claimant or the victim was, at the time the act . . .

occurred" a national of the United States, a member of the armed forces, or "otherwise an

employee of the Government of the United States, or of an individual performing a contract

awarded by the United States Government, acting within the scope of the employee's

employment"; and (3) if the act occurred in the foreign state against which the claim has been

brought, the foreign state has been afforded "a reasonable opportunity to arbitrate the claim in

accordance with the accepted international rules of arbitration." *Id.* § 1605A(a)(2)(A).

Section 1605A(c) also provides a private right of action to recover damages for state-sponsored

terrorism:

> Private Right of Action.—A foreign state that is or was a state
> sponsor of terrorism . . . shall be liable to—
>
> (1) a national of the United States,
>
> (2) a member of the armed forces,
>
> (3) an employee of the Government of the United States, or of an
> individual performing a contract awarded by the United States
> Government, acting within the scope of the employee's
> employment, or
>
> (4) the legal representative of a person described in paragraph (1),
> (2), or (3),
>
> for personal injury or death caused by acts described in subsection
> (a)(1) [i.e., the provision of material support or resources for hostage
> taking, torture, or extrajudicial killing] . . . . In any such action,
> damages may include economic damages, solatium, pain and
> suffering, and punitive damages. In any such action, a foreign state
> shall be vicariously liable for the acts of its officials, employees, or
> agents.

28 U.S.C. § 1605A(c). For persons covered by the private right of action in § 1605A(c) state law

claims are not actionable.

Under § 1605A(c), U.S. citizens who are victims of state-sponsored terrorism can sue a responsible foreign state directly. Significantly, the law of a plaintiff's U.S. state no longer controls the nature of the liability and damages that may be sought when a foreign government is sued: Congress has provided the "specific source of law" for recovery. *See Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004).[5] By providing for a private right of action and precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in cases decided under state law. *Compare Jackovich v. Gen. Adjustment Bureau, Inc.*, 326 N.W.2d 458, 464 (Mich. Ct. App. 1982) (under Michigan law, exemplary damages are available but punitive damages are not) *with Todd v. Byrd*, 640 S.E.2d 652, 661 (Ga. Ct. App. 2006) (citing OCGA § 51-12-5.1(b), noting that punitive damages are available under Georgia law); *compare* 28 U.S.C. § 1605A(c) (providing for solatium damages under the FSIA) *and* Mich. Comp. Laws Ann. § 600.2922(6) (wrongful death damages under Michigan law include damages for loss of society and companionship of the deceased) *with Young Men's Christian Ass'n v. Bailey*, 146 S.E.2d 324, 341 (Ga. Ct. App. 1965) (wrongful death action under Georgia law does not provide damages for grief of survivors) *and Runyon v. District of Columbia*, 463 F.2d 1319, 1322 (D.C. Cir. 1972) (under D.C. law, a plaintiff in a wrongful death action may not recover for grief); *see Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29-30 (D.D.C. 1998) (noting many differences in the law of solatium among the states).

Because the victim, Naftali Fraenkel, was a United States national, § 1605A(a)(2)(A)(ii)(I) provides that the sovereign immunity of Iran and Syria is waived and his

---

[5] Further, federal courts look to the Restatement (Second) of Torts, and not state law, to provide content to Congress's express intentions. *See, e.g., Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (accepting the Restatement (Second) of Torts as "delineat[ing] the controlling substantive law" for intentional infliction of emotional distress "as a proxy for state common law").

family's claims can be heard.  *See* Ex. 2, Yaakov Naftali Fraenkel Certificate of U.S.

Citizenship.  Plaintiffs Rachel Fraenkel, Tzvi Fraenkel, A.H.F., A.L.F., N.E.F., N.S.F., and

S.R.F. are also United States citizens and, therefore, liability and damages are assessed under

§ 1605A(c), providing a private right of action for U.S. nationals.[6]  *See* Exs. 1, 3-8, Certificates

of U.S. Citizenship for Fraenkel Children; Ex. 9, Rachelle Sprecher's U.S. Passport.  Plaintiff

Abraham Fraenkel is not a U.S. national and, therefore, he does not have a private right of action

under § 1605A(c); however, jurisdiction and waiver of sovereign immunity are satisfied as to

Mr. Fraenkel because Naftali Fraenkel was a U.S. citizen as required under

§ 1605(a)(2)(A)(ii)(I).

### D.  Liability to U.S. Citizen Plaintiffs

The five elements necessary to establish liability under FSIA's state-sponsored

terrorism exception are:

> (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or agent of the foreign state, and the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."

*Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 101 (D.D.C. 2012) (quoting 28 U.S.C.

§ 1605A(a)(1), (c).  The third and fourth elements are satisfied when a plaintiff proves a theory

of liability and justifies the damages s/he seeks, generally "through the lens of civil tort liability."

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 176 (D.D.C. 2010); *see also Roth v.*

*Islamic Republic of Iran*, 78 F. Supp. 3d 379, 399-401 (D.D.C. 2015).

---

[6] Under the FSIA, a U.S. national is defined as "a citizen of the United States."  *See* 28 U.S.C.
§ 1605A(h)(5) (citing 8 U.S.C. § 1101(a)(22)).

Section 1605A(h)(3) defines "material support or resources" to have "the meaning given that term in section 2339A of title 18."  Section 2339A provides:

> "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  To determine whether a defendant sovereign has provided material support to terrorism, courts consider first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act.  *See e.g., Ben Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 46 (D.D.C. 2008).  The types of support that have been identified as "material" have included, for example, financing and running camps that provided military and other training to terrorist operatives, *see, e.g., Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 537 F. Supp. 2d 85, 90 (D.D.C. 2008); *Sisso v. Islamic Republic of Iran*, No. 05-0394, 2007 WL 2007582, at *5-6 (D.D.C. July 5, 2007); allowing terrorist groups to use its banking institutions to launder money, *see, e.g., Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549-50 (E.D. Va. 2007); and allowing terrorist groups to use its territory as a meeting place and safe haven,[7] *see, e.g., id.*  Such support has been found to have contributed to the actual terrorist act that resulted in a plaintiff's damages when experts testify that the terrorist acts could not have occurred without such support, *see, e.g., Ben-Rafael*, 540 F. Supp. 2d at 47; that a particular act exhibited a level of sophistication in planning and

---

[7] *See Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006) (finding that insofar as the Sudan "affirmatively allowed and/or encouraged al Qaeda and Hizbollah to operate their terrorist enterprises within its borders," it provided a safe haven).

execution that was consistent with the advanced training that had been supplied by the defendant state, *see, e.g., Sisso*, 2007 WL 2007582, at *6; or when the support facilitated the terrorist group's development of the expertise, networks, military training, munitions, and/or financial resources necessary to plan and carry out the attack, *see, e.g., Rux*, 495 F. Supp. 2d at 553 (expert testimony that the "attack might have been possible, but it would not have been as easy" without defendant's support).[8]

---

[8] In cases regarding the state-sponsored terrorism exception to the FSIA such as this one, courts rely extensively on expert testimony. *See, e.g., Ben-Rafael*, 540 F. Supp. 2d at 44 (in a FSIA case against Iran concerning a bombing at the Israeli embassy in Argentina by the terrorist group Hezbollah, the court relied on the testimony of an expert from the Washington Institute for Near East Policy and found that "Iran exercised control over Hezbollah through its intelligence agency"); *Wachsman*, 537 F. Supp. 2d at 90 (in a suit against Iran concerning the execution of a U.S. citizen in Israel by Hamas, the court relied on the testimony of an "expert in Islamic terrorism" and found that Iran provided military and terrorist training for approximately 400 Hamas operatives through its Revolutionary Guard); *Sisso*, 2007 WL 2007582, at *5 (in a suit against Iran concerning a Hamas suicide bombing in Israel, the court relied on testimony from two experts associated with the Washington Institute for Near East Policy in finding, "Iran has financed and run camps that provide military and other training to Hamas operatives," and "Iran further supports Hamas's terrorist activities with direct funding"); *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 105 (D.D.C. 2007) (in a case against Iran regarding a Hezbollah bombing of a U.S. military barracks in Lebanon, the court relied on testimony of "a renowned expert on Iranian affairs" and an expert working for the Project for the Research of Islamist Movements and The International Policy Institute for Counterterrorism, finding that "Hezbollah was a creature of the Iranian government, acting almost entirely under the order of the Iranians and being financed almost entirely by the Iranians"). This Court notes and accepts those findings as consistent with, and supportive of, the findings in this matter.

Plaintiffs have presented evidence satisfactory to the Court in support of all elements of a claim under § 1605A against Iran and Syria. Iran[9] and Syria[10] are state-sponsors of terrorism, Ms. Fraenkel and her children are U.S. citizens, and the decedent was a U.S. citizen. The critical issue in this case is whether Iran and Syria, and its officials acting within the scope of their employment, provided material support and resources to Hamas in Israel.

Iran and Syria did provide material support and resources to Hamas in Israel, which contributed to the hostage taking and murder of Naftali Fraenkel. Plaintiffs provided satisfactory evidence that Defendants are legally responsible for the kidnapping and murder of Naftali Fraenkel due to the longstanding material support provided by Iran and Syria to Hamas that allowed that group to grow and flourish into a terrorist organization. The evidence

---

[9] The term "state sponsor of terrorism" is defined in § 1605A as:

> a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. [§] 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. [§] 2371), section 40 of the Arms Export Control Act (22 U.S.C. [§] 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.

28 U.S.C. § 1605A(h)(6). Iran has been designated by the U.S. Department of State as a state sponsor of terrorism continuously since January 19, 1984, *see* U.S. Department of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm (last visited Mar. 28, 2017), and its continued designation as such was noted in the State Department's annual Country Reports on Terrorism in 2015, *see* U.S. Department of State, State Sponsors of Terrorism Overview, *available at* https://www.state.gov/j/ct/rls/crt/2015/257520.htm (last visited Mar. 28, 2017).

[10] Syria has been designated by the U.S. Department of State as a state sponsor of terrorism continuously since December 29, 1979, *see* U.S. Department of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm (last visited Mar. 28, 2017), and its continued designation as such was noted in the State Department's annual Country Reports on Terrorism in 2015, *see* U.S. Department of State, State Sponsors of Terrorism Overview, *available at* https://www.state.gov/j/ct/rls/crt/2015/257520.htm (last visited Mar. 28, 2017).

demonstrated that Naftali Fraenkel was kidnapped and murdered as part of an intentional Hamas plan to abduct Israeli citizens, hold them captive as hostages, and negotiate for their release in return for the release of Hamas members in Israeli jails.

Further, Hamas is an agent of Iran and Syria due to the material support provided by Iran in furtherance of Hamas's mission to disrupt the Israeli-Palestinian peace process. The evidence demonstrates that during the time leading up to the kidnapping and murder, Iran supported Hamas by:

(1) Providing political and ideological support for Hamas through public statements in support of its mission and terrorist activities, specifically with respect to Israel;

(2) Providing monetary support totaling hundreds of millions of dollars;

(3) Providing support in the form of weapons intended for use in the West Bank and Gaza Strip. One attempted delivery of weapons was the on the Klos-C ship, which was intercepted by the Israeli Navy; and

(4) Providing support through weapons smuggled to Hamas in MOIS diplomatic pouches.

The evidence also demonstrates that during the time leading up to the kidnapping and murder, Syria supported Hamas by:

(1) Providing a safe haven for Hamas and a location for its headquarters in Damascus, where it can engage in open meetings and fundraising;

(2) Training Hamas members in the use of terrorist tactics;

(3) Providing a location where Hamas could openly recruit members;

(4) Providing a public political platform and legitimacy due to Hamas's presence in Damascus;

(5) Providing financial support directly through funds transmitted to the Hamas headquarters in Damascus; and

(6) Assisting in funneling weapons shipments by allowing them to be transported through Syria.

The foreign policy of both the Iranian and Syrian governments has been to support Hamas in Israel in order to disrupt the Israeli-Palestinian peace process. Both Iran and Syria supported Hamas due to its animosity toward Israel and provided funds and weapons to allow Hamas to carry out its mission. It was foreseeable, therefore, that Hamas would use the training, money, and weapons provided by Iran and Syria to carry out terrorist attacks against Jews in Israel, such as Naftali Fraenkel. Although no evidence has been provided directly linking a weapon or dollar provided by Iran and Syria to the kidnapping and murder of Naftali Fraenkel, both Iran and Syria knew of Hamas's tactics and ideological goals and supported those efforts. The kidnapping and murder of Naftali Fraenkel was a foreseeable consequence of Iran and Syria's aid and support to Hamas in Israel.

In sum, jurisdiction over Iran and Syria is consistent with § 1605A(a), the state-sponsored terrorism exception to sovereign immunity, and U.S. citizen Plaintiffs have provided evidence satisfactory to the Court in support of their private cause of action for damages under § 1605A(c).

### E.  Liability to Abraham Fraenkel

The Court must apply District of Columbia choice of law rules to determine which jurisdiction's substantive law governs.

> The FSIA does not contain an express choice-of-law provision [for plaintiffs not covered by § 1605A(c)]. FSIA § 1606 does, however, provide that a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. This section ensures that, if an FSIA exception abrogates immunity, plaintiffs [not covered by § 1605A(c)] may bring state [or foreign] law claims that they could have brought if the defendant were a private individual.

*Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009) (applying D.C. choice of law principles); *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 42-44 (D.D.C.

2016) (discussing D.C. conflict of law rules).  The District of Columbia applies a blend of

"governmental interests analysis" (*i.e.*, which jurisdiction's policies would be most advanced by

having its law applied) and the "most significant relationship test" (looking to the factors in the

Restatement (Second) of Conflict of Laws).  *Oveissi*, 573 F.3d at 842.

> The four Restatement factors are:  (1) "the place where the injury
> occurred"; (2) "the place where the conduct causing the injury
> occurred"; (3) "the domicil[e], residence, nationality, place of
> incorporation and place of business of the parties"; and (4) "the
> place where the relationship, if any, between the parties is centered.

*Id*. (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)).  In *Oveissi*, the court

concluded that French law applied to the claims of the American-citizen grandchild of an Iranian

citizen assassinated in France.  *Id*.  In *Thuneibat* the court held that Jordanian law applied to the

claims of non-American family members of an American citizen killed in a suicide bombing in

Jordan.  167 F. Supp. 3d at 44.

Here, the injury occurred in Israel; the conduct causing the injury occurred in

Israel, the Palestinian territories, Iran, and Syria; Abraham Fraenkel is and always has been an

Israeli citizen; and there is no legal relationship between Abraham Fraenkel and any of the

defendants or Hamas.  Accordingly, the Court finds that Israel has the greatest interest in having

its laws apply and the most significant relationship to the events.  Israeli law will apply to the

claims of Abraham Fraenkel.

In determining the scope of applicable foreign tort law, a court may "consider any

relevant material or source, including testimony, whether or not submitted by a party or

admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1; *see also Thuneibat*, 167

F.3d at 44.  Plaintiffs submitted the Declaration of Dr. Boaz Shnoor, an attorney and law

professor in Israel.  *See* Ex. 41, Declaration of Boaz Shnoor (Shnoor Decl.).  Additionally,

another court in this district has evaluated the requirements for negligence under Israeli law.  *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010).

The Israeli civil tort of negligence is codified in the Civil Wrongs Ordinance (CWO) at § 35, 2 LSI (New Version) 14-15 (1972); *see also Wultz*, 755 F. Supp. 2d at 57-58. Negligence requires a finding of the same elements as U.S. law:  duty, breach, causation, and injury.  Shnoor Decl. ¶ 14; *Wultz*, 755 F. Supp. 2d at 57-58.  Duty under Israeli law is divided into "duty in fact and notional duty."  *Wultz*, 755 F. Supp. 2d at 58.  "[E]very person owes a duty to all persons whom . . . a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act."  CWO § 36, 2 LSI (New Version) 15 (1972).  A court asks if a reasonable person could have foreseen the likelihood of damage when determining duty-in-fact.  *See Wultz*, 755 F. Supp. 2d at 58. Furthermore, if a duty-in-fact exists but the risk of harm as it occurred was already "taken into account by normal society when engaged in a particular action," a defendant will not be liable under the tort of negligence.  *Id*. at 58-59.  Normative duty considers "whether a reasonable person ought, as a matter of policy, to have foreseen the occurrence of the particular damage." CA 145/80 *Vaknin v. Beit Shemesh Local Council* 37(1) PD 113, 125-26 (1982) (Isr.); *see also Wultz*, 755 F. Supp. 2d at 59.

The Court finds that Mr. Fraenkel has demonstrated Defendants were under a duty to Naftali Fraenkel because, as discussed above, his kidnapping and murder were foreseeable consequences of providing material support for Hamas and supporting Hamas's efforts to disrupt the Israeli-Palestinian peace process.  For the same reasons that the Court finds sufficient evidence to tie Iran and Syria to terrorist actions by Hamas above, it finds that a duty

existed between Iran and Syria and the Fraenkel family because their injuries were foreseeable consequences of the aid and support.

A breach of the duty of care occurs when a party with a duty fails to take "reasonable precautionary measures." *Vaknin*, 37(1) PD at 131.  Reasonable precautions are determined by balancing the interests of the plaintiff with that of the tortfeaser and considering the public interest in the continuation or cessation of the alleged tortious actions. *See Wultz*, 755 F. Supp. 2d at 62.  The Court finds Iran and Syria beached their duty of care to the Plaintiffs by engaging in the continuous support and financing of Hamas, despite knowledge of Hamas's terrorist actions in Israel.

Mr. Fraenkel has adequately demonstrated that but for the support provided by Iran and Syria, Hamas would not have been able to develop into the cohesive, organized, and deadly organization that it is today.  And, as discussed with duty, the kidnapping and murder of Naftali Fraenkel was a foreseeable consequence of the provision of support by Iran and Syria. Mr. Fraenkel has established negligence by Iran and Syria under Israeli law.

### F. Damages for U.S. Citizen Plaintiffs

Damages for a private action for proven acts of terrorism by foreign states under FSIA § 1605A(c) may include economic damages, pain and suffering, solatium, and punitive damages.  28 U.S.C. § 1605A(c).  Plaintiffs do not seek economic damages.

#### 1. *Pain and Suffering*

Determining the appropriate amount of pain and suffering damages depends upon a myriad of factors, such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012). Courts do not award pain and suffering damages for Plaintiffs who were killed in an attack if

their death was instantaneous.  *Elahi*, 124 F. Supp. 2d at 112.  It is the Plaintiffs' burden to prove that the decedent consciously experienced time between an attack and his or her death, or else a court must deny pain and suffering damages.  *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 244 (D.D.C. 2012); *see also Thuneibat*, 167 F. Supp. 3d at 39 n.4 (declining to award survival damages where the plaintiffs "submitted no evidence . . . showing that either of the [v]ictims suffered any pain and suffering prior to their deaths in the suicide bombings"); *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 42-43 (D.D.C. 2014) (declining to award survival damages where "[n]o one testified that any of the deceased victims survived the blast itself for any period of time, and the evidence indicates that they likely did not").  Courts have awarded varying amounts of pain and suffering damages, depending upon the length of the suffering.  *See, e.g., Braun v. Islamic Republic of Iran*, No. 15-1136, 2017 WL 79937, at *12 (D.D.C. Jan. 9, 2017) (awarding $1,000,000 for pain and suffering lasting two hours); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003) (citing authorities awarding $1,000,000 for pain and suffering lasting between thirty seconds and several hours).

Plaintiffs presented the testimony of Mr. Spitzen regarding the sequence of the kidnapping and murder and the likely pain and suffering of Naftali Fraenkel.  Based on Mr. Spitzen's testimony and the audio-recording of the telephone call from Gilad, it is evident that the young men were aware they were kidnapped upon entering the vehicle.  Additionally, Hussam al-Qawasmeh told the police that the kidnappers threatened the young men with a gun and shot them after they resisted.  Finally, the recorded emergency call ends with multiple short bursts that Mr. Spitzen identified as gun shots and quiet moaning from an unknown individual as if he were in pain.

The Court finds that it is clear from the evidence Naftali Fraenkel suffered from the moment he was taken hostage up until his death. Naftali was, at least for a period, aware that he was kidnapped and in imminent danger of losing his life due to the weapons used by the terrorists. Mr. Spitzen's testimony estimates the time that elapsed from the moment the young men were picked up to the gunshots heard on the emergency call to be around 30 minutes. *See* Spitzen T-2-9-10. Thirty minutes for a 16-year-old facing the fear of death would be an eternity. The estate of Naftali Fraenkel will be awarded $1,000,000 for his pain and suffering.

   *2. Solatium*

   The legal term "solatium" is a Latin word for "solace" and is defined as "[c]ompensation; esp. damages for hurt feelings or grief, as distinguished from damages for physical injury." Black's Law Dictionary 1426 (8th ed. 2004). "Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society." *Flatow*, 999 F. Supp. at 29. Damages for solatium are awarded to close family members. *Id.* at 30-31. "[M]ental anguish, bereavement and grief resulting from the fact of decedent's death constitute the preponderant element of a claim for solatium." *Id.* at 30. The family members claiming solatium are Naftali Fraenkel's mother, Rachel Fraenkel, and his brothers and sisters, Tzvi Amitay Fraenkel, A.H.F., A.L.F., N.E.F., N.S.F., and S.R.F. Mrs. Fraenkel and all of the children except S.R.F. testified at the hearing. *See* R. Fraenkel T-1-7-41; T. Fraenkel T-1-42-54; A.H.F. T-1-58-67; A.L.F. T-1-69-78; N.E.F. T-1-79-83; N.S.F. T-1-84-89. Additionally, Abraham Fraenkel and Dr. Rael Strous testified about the effects of Naftali's death on the family and Dr. Strous provided a psychiatric evaluation for each family member. *See* A. Fraenkel T-1-89-113; Strous T-2-32-81; Exs. 15-19 (psychiatric evaluations prepared by Dr. Strous).

The Fraenkel family is obviously very close.  Each member testified in detail about Naftali's role in the family (second oldest and second son) and what he meant in their lives specifically.  The testimony provided a picture of a loving family, wherein Naftali played a central role in their spiritual and personal lives.  Multiple family members testified about Naftali's musical ability and how it enriched their celebrations on the Sabbath and other holy days.  Without question, the lives of each member of the family will be forever altered because Naftali is not with them.

The Court finds the evidence of the Plaintiffs' entitlement to solatium compensation fully satisfactory.  As a result, the Court awards Rachel Fraenkel and her children $3,100,000 in solatium damages.

   *3. Punitive*

The FSIA specifically allows an award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism.  28 U.S.C. § 1605A(c).  Four factors are relevant in deciding the level of punitive damages appropriate in a given case:  "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Bodoff*, 907 F. Supp. 2d at 105; *see also* Restatement (Second) Torts § 908(1)-(2) (1977).  The purpose of punitive damages is two-fold:  to punish those who engage in outrageous conduct and to deter others from similar conduct in the future.  *See Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000).  "This cost functions both as a direct deterrent, and also as a disabling mechanism:  if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed."  *Flatow*, 999 F. Supp. at 33.

Considering these factors, the Court finds an award of punitive damages is warranted.  First, support for Hamas's terrorist activities is horrific and condemnable.  Second, Defendants clearly intended to cause significant harm in multiple ways when they provided material support to Hamas, a known terrorist organization that routinely carries out brutal attacks on innocent civilians.  Third, prior damages have been awarded to deter Iran and Syria from related actions against civilians.

Different courts calculate punitive damages using a variety of methods.  One approach is to multiply a defendant's annual contributions to terrorism by a factor of between three and five.  *See Roth*, 78 F. Supp. 3d at 406.  Other courts award punitive damages based on a ratio between punitive and compensatory damages, *see, e.g., Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 31 (D.D.C. 2014), while others simply award a fixed amount per victim.  *See, e.g., Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (awarding $150 million each to the estates of two victims).

Plaintiffs offered expert testimony that Iran provides between $3 million and $300 million in aid a year to Hamas, *see* Levitt Decl. ¶¶ 49, 63; Clawson Decl. ¶ 40, but did not provide specific figures with respect to Syria.  Other courts in this jurisdiction have also found that the average support Iran provides to Hamas is between approximately $25 million and $50 million a year, *see Roth*, 78 F. Supp. 3d at 406, and that Syria spends between $500 million and $700 million annually on terrorism.  *See Thuneibat*, 167 F. Supp. 3d at 54 (citing *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011)).

The death here was that of a sterling young man on the cusp of his life.  He committed no offense except to be Jewish and Israeli.  He was kidnapped and killed without

regard to his individual personhood.  In that sense, his murder was senseless.  The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Iran and Syria.

### G.  Damages for Abraham Fraenkel

Because Abraham Ron Fraenkel does not have a direct cause of action under 28 U.S.C. § 1605A(c), his entitlement to compensatory damages depends on Israeli law.  As Dr. Shnoor explains, Israeli law provides that an immediate family member of a principal tort victim is entitled to compensatory damages for psychological and emotional harm resulting from the tort to the primary victim.  *See* Shnoor Decl. at ¶ 59.  The harm suffered by a secondary victim, such as Mr. Fraenkel, is compensable if (1) the family member witnessed the event or its consequences, (2) there is a time and space proximity between the two harms, and (3) the secondary victim suffers severe harm that disrupts daily function.  *Id*.

While Mr. Fraenkel did not witness the kidnapping and murder of his son Naftali, he did experience the immediate panic and anxiety associated with the 18 days of not knowing what had happened.  During that 2.5 weeks, Mr. Fraenkel heard the recording of Gilad's emergency telephone call and listened to speculation from police and the community about Naftali's whereabouts.  Until Naftali's body was found, Mr. Fraenkel suffered from the fear of the unknown.  Additionally, Mr. Fraenkel experienced the consequences of his son's funeral where he was unable to view Naftali's body unshrouded.

The remaining question is whether Mr. Fraenkel's injury is severe enough to warrant damages under Israeli law.  As described by Plaintiffs' expert, Dr. Shnoor, and understood by the Court, Israeli law does not allow damages to secondary victims unless the harm is so severe that is disrupts daily function.  Shnoor Decl. ¶ 59; *see also Estate of Botvin*, 873 F. Supp. 2d at 245; *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009) ("Under Israeli law emotional injury suffered as a result of the death of a loved one is generally

not compensable unless it manifests as a psychiatric illness."). Dr. Strous declared that due to Naftali's death Mr. Fraenkel "goes out much less," "engages in much less extracurricular activities," "does not attend any movies, shows and attends significantly less social activities," is withdrawn, is less focused on his spiritual growth, and often "feel[s] a sense of resignation" or "that he would be better off if he were to be dead." Ex. 16, Psychiatric Evaluation of Abraham Fraenkel at 4. Dr. Strous also opines that the effects on Mr. Fraenkel are continuous and will remain in the future. *Id.* at 8.

The Court finds that Mr. Fraenkel has demonstrated harm which affects his daily life; therefore, Israeli law allows him to be awarded damages. The Court will award $1,000,000 in solatium damages to Abraham Fraenkel.

## IV.  CONCLUSION

The death of Naftali Fraenkel was a tragic event for which money can never compensate his family. Iran and Syria provided material support to Hamas and facilitated the kidnapping and murder of Naftali Fraenkel. Default judgment will be entered in favor of Plaintiffs, and against all Defendants, in the following amounts:

Pain and Suffering to the Estate of Naftali Fraenkel – $1,000,000

Solatium to U.S. Citizen Plaintiffs – $3,100,000

Solatium to Abraham Fraenkel – $1,000,000

Punitive Damages to the Estate of Naftali Fraenkel – $50,000,000

A memorializing Order accompanies this Opinion.

Date: March 31, 2017

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge