**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------------X

ABRAHAM RON FRAENKEL, *et al.*,

                        Plaintiff,

               -against-

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

                      Defendants.

Docket No:
1:15-CV-01080 (RMC)

-------------------------------------------------------------------X

**PLAINIFFS' MOTION TO AMEND AND MAKE NEW FINDINGS OF
FACT PURSUANT TO RULE 52(B), TO AMEND OR ALTER THE
JUDGMENT PURSUANT TO RULE 59(E), FOR A NEW TRIAL
PURSUANT TO RULE 59, AND/OR FOR RECONSIDERATION OF THE
<u>AMOUNT AND ALLOCATION OF DAMAGES AWARDED</u>**

**<u>INTRODUCTION</u>**

On March 31, 2017, this Court entered judgment in favor of the Plaintiffs and against the

defendants Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security

("MOIS"), and the Syrian Arab Republic ("Syria") (collectively, "Iran and Syria" or

"Defendants"), for damages pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28

U.S.C. § 1602, *et seq.*, for providing material support to the terrorist organization Hamas,

enabling it to carry out the terrorist operation that caused the Plaintiffs' injuries and loss.

Plaintiffs obviously do not challenge the Court's findings that Iran and Syria are liable to

the Plaintiffs for damages in this case. However, plaintiffs respectfully move this Court for

reconsideration of the March 31, 2017 Order of this Court ("Order") and the Opinion of the same

date ("Opinion") and ask the Court pursuant to Fed. R. Civ. P. 52(a) to amend and make new

findings of fact; pursuant to Fed. R. Civ. P. 59(e) to alter or amend[1]; and pursuant to Fed. R. Civ. P. 59, for a new trial.

Plaintiffs bring this motion because, they respectfully submit, the amounts awarded to the plaintiffs are insufficient to provide them fair compensation for their damages. The Court's Opinion of March 31, 2017 makes an award of damages, but is silent as to the methodology, process, or precedent by which it arrived at the amounts of the damages award. Importantly, the Court's damages award differed dramatically from awards made by other courts in this district and elsewhere in similar cases, all or virtually all of which have applied or are based upon the formula articulated in the seminal case *Estate of Heiser v. Islamic Rep. of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), earlier cases that were precursors to *Heiser,* or subsequent cases that followed *Heiser*. Not only did this Court not apply *Heiser*, but it did not address *Heiser* or articulate an intent or reason to deviate from *Heiser,* a case which has become the gold standard on the calculation of damages awards in FSIA cases such as this.

Additionally, the Opinion and Order did not itemize the damage awards to each plaintiff, overlooked significant categories of damages claimed, and did not articulate the method or criteria by which the damages awarded were calculated. Finally, the damage awards are inconsistent with well-established precedent for damage awards in this type of case.[2]

_____

[1] *See Cobell v. Jewell*, 802 F.3d 12, 19 (D.C. Cir. 2015), describing a Rule 59(e) motion as a "motion for reconsideration that is filed [after] entry of a final judgment." *Id.*

[2] One additional error in the Opinion warrants mention. The first numbered finding of fact inaccurately states that the Fraenkel family "lived in the Nofa [sic] Ayalon settlement." (Opinion at 3). First, the correct spelling is "Nof Ayalon." More significantly, in the context of the Arab-Israeli conflict, the term "settlement" often carries a political connotation, referring to Israeli towns established on disputed land captured and occupied by Israel in the 1967 Six Day War (often referred to as the "West Bank"). However, Nof Ayalon is a village located in central

Plaintiffs acknowledge the significant effort made by the Court in hearing this case and composing its Opinion and Order. By making this motion plaintiffs do not mean to denigrate the Court's efforts. However, plaintiffs feel strongly that the damages awarded in the Opinion and Order are unfairly low, and award plaintiffs vastly less than the vast majority of terror victims have been awarded in actions under the FSIA. Plaintiffs thank the Court for its notation on the docket on April 6, 2017 that it would "entertain a motion to reconsider" and hope that upon reading this motion the Court will modify the damages awards in fairness to this suffering family.

Additionally, plaintiffs' counsel respectfully apologizes to the Court and its staff for any loss of professionalism following the Court's issuance of the Opinion and Order.

## **FACTUAL BACKGROUND REGARDING DAMAGES**

Thursday night, June 12, 2014, was a night that upended the world of the Fraenkel family: three innocent teenage boys, including 16-year-old Yaakov Naftali Fraenkel ("Naftali"), suffered the horror of being abducted and cruelly executed by two Hamas murderers, forever extinguishing their three young lives and marking the beginning of the suffering inflicted on these boys' families, who were thrust into an almost surreal and intensely painful 18 day period of worry, fear, panic, agony, terror, anxiety and feelings of helplessness, that they would suffer while still fighting to hold on to hope and prayer. As plaintiff Rachel Fraenkel, Naftali's mother, testified:

---

Israel proper, and not in the West Bank. It is not a "settlement" in the political sense just described. Although the Opinion cites Exhibit 12, the Declaration of Abraham Ron Fraenkel, as the source for this finding of fact, that Declaration correctly states: "I am a resident of Israel and currently reside in Nof Ayalon, Israel." (DE 31-6, ¶ 2). There is no evidence in the record referring to Nof Ayalon as a "settlement."

> There were so many dark places to go to that I really tried to control that part.
> Whenever I would think about, you know, are they together, were they put each
> one separately, are they going insane, were they thrown in some hole. Are they
> being fed, are they taken care of. Are they wounded, are they alive. That
> immediately drew all of the energy that I had and very quickly I started to focus
> and try to stay away from the really dark places.

(Tr., Dec. 6, 2016, p. 15). Naftali's father, Abraham Fraenkel, testified about this period:

> I guess for a parent to be in such a situation is one of worse things can ever be.
> It's, you know, we're not looking for him. We're sitting at home. There are other
> people doing all of that. So we just sit there. So in a way there's nothing
> physically we can do, but we had influence in a way to talk to people. People
> came to us. We tried to help, we tried to see what we can do and that's a matter of
> what we can do. Feeling is, it's like when you go to a winter park and you have
> this train, you can be one hour here and the next hour down there. It's,
> emotionally it takes all the strength you have, you hardly eat, you hardly sleep.
> But then on the other hand, you have other kids at home and you have to take care
> of them. And things are not, everything is tearing you out. You have to keep on
> living.

(Tr., Dec. 6, 2016, p. 93).

> Is it better that he's alive or dead. Maybe he's wounded and he's not getting
> treated. Maybe, you know, how is he kept. Is he tied? It's thousands of different
> scenarios and thoughts and they run in your head. There's no way you can, you
> can't tie it, you can't ignore it. It's all the time there."

(Tr., Dec. 6, 2016, p. 96). During the 18 day ordeal and the seven day mourning period
thereafter, Rachel lost 22 pounds. (Tr., Dec. 6, 2016, p. 14).

Several days after that first night, the Fraenkels' anguish was worsened further when
police played for the parents a recording of an emergency call from one of the boys in captivity.
The boy's whispers that he had been kidnapped were interrupted by angry shouts from the
captors, the sound of ten gunshots, followed by anguished moans of pain quickly drowned out by
a loud radio and shouts of joy. Investigators told the parents that the recording was inconclusive,

and that if the sounds indeed were shots, they could have been fired into the seat of the car merely to warn or scare the boys, or perhaps the boys were only injured. Rachel testified:

> I heard, I heard Eyal whispering I was kidnapped. I heard talk first in Arabic and then in Hebrew with an Arabic accent saying put down your heads. I at some point then heard puffs that were said to be gunshots with a silencer and then I heard some anguish, some physical pain, somebody, I didn't necessarily recognize Naftali's voice, but somebody there was making some sound of pain. And then there was silence which for me was very very scary, the silence scared me very much. The expert said that this still leaves all the options open. They might have been wounded. They might have murdered two and kept one. They might have been, you know, the shots were just to scare them.

(Tr., Dec. 6, 2016, p. 17). Abraham related:

> You know, 18 days later I understood that I heard my son's execution. When I heard it then, I had what the ministry of defense told us, there were gunshots. The car was found later in the morning, but it was after a fire, so there was no way to tell.

(Tr., Dec. 6, 2016, p. 99).

The anxiety and pressure on the Fraenkel family during those initial weeks continued to build, as their lives were thrust into the public. Their private struggles to endure the pain of each moment were constantly interrupted by ever-present media, and even their familial connection with Naftali was co-opted by a nation who identified with the plight of the three missing boys as if their own sons had been captured. The search for the missing boys quickly became a national concern in Israel, and anxiety began to escalate in the Fraenkel home and all over the country as hope began to wane.

Almost as abruptly as their ordeal began, after 18 days of agonizing fear, uncertainty, and fading hope, the Fraenkel family's worst nightmare was confirmed as reality. The decaying, murdered bodies of Naftali and his two teenage friends were discovered, dumped in a pit and

covered with dirt, rocks, and thorns by the terrorists in their effort to hide the remains. Rachel testified:

> When I think of the moment, the rest of the period had different sides to it. It was, it was so many people that were at their best and there was so much intensity and hope and, you know, good reasons to be optimistic, that…there are lighter sides to that memory, but the time after getting the final news is still to this minute physical pain, the memory is like physical pain to me.

(Tr., Dec. 6, 2016, p. 18). Abraham testified:

> I immediately called the friend and said what's going on? He said I'm not telling you officially, but two bodies were found and, and then ten minutes later he said three were found. I remember like all the strength came out of me as if the balloon that, you know, everything comes out. I couldn't sit. I was lying down on my back putting my legs on the couch. I stayed like that for I don't know maybe half an hour. And then we started working out what we're supposed to do. That's telling the children. And we were told that the best thing to do, we were told by experts, that the best thing to do was that we the parents will tell each child separately and I use to say I guess that's the most difficult thing I did in my life, but I don't say I guess. It's the most difficult thing I did in my life. I hope I never have to do it again. To take each and every one of them and tell every one by the way they understand that that's it, that Naftali was, is not with us, that he was murdered.

(Tr., Dec. 6, 2016, p. 101). The Fraenkel parents faced the terrible task of telling each sibling, and each sibling faced the new pain and despair of learning Naftali's fate, each with their own individual reaction. As Rachel testified:

> Because a child walks into the room and they're, you feel like this is a blooming flower and you're going to crush them and each one of them was at a different stage in life and each one of them was different age and different relationship with Naftali and they, like all of us they were all hoping that this will end well. And we were talking about the psychological rehabilitation the need when he comes back. So yeah, just it's probably the hardest thing I did.

(Tr., Dec. 6, 2016, p. 19).

> N.E. became so anxious that she started yelling is he alive, is he alive and before we got the opportunity to do anything gradual, we kind of had to tell her that he isn't. And she started shivering, her whole body was shivering like a description of a wounded animal where they physically shiver.

(Tr., Dec. 6, 2016, p. 22). Naftali's youngest sister N.S. testified:

> I got up in the morning and my mother asked that I come into the room and then they told me that they found Naftali. And then they told me that he's in the hospital. So then I told them so let's go visit him. And then they told me that it is impossible because he's no longer alive.

(Tr., Dec. 6, 2016, p. 86). The world of the Fraenkel family that had been upended when Naftali went missing and was now shattered by the trauma of learning, knowing, and having to live with the reality that, after being abducted by cruel Hamas terrorists, Naftali and his friends had been brutally murdered and would never come home again.

> Naftali's older brother Tzvi testified:

> Before the funeral about two or three hours before, I sat and tried to write Naftali a letter. I didn't write much but it was, but it was a significant moment for me. Then I burst in tears, let the tears out. I was sitting there for I guess 40 minutes. I wrote maybe four sentences, maybe less. I still have that letter, but it was a very significant moment for me.

> * * *

> I wrote him I was sorry for the things that he did or anyway hurt him. And further that I didn't relate to him or respond to him while high school. We saw each other there, but we didn't speak too much. And it help me understand that things are determined and that he's really dead and I really, I'm really not going to meet him again

(Tr., Dec. 6, 2016, pp. 50-51).

> Naftali's younger sister A.S., who was closest to his age, testified:

> I remember most of it, I didn't cry or anything, I was just like all my body was shaking and just fell to the car.

\* \* \*

First of all, it's like something, it's a different life afterwards than before. It's my best friend and I just like lost my best friend. I miss him. All the life is different. I have like problems in my studies.

(Tr., Dec. 6, 2016, pp. 61-64).

The world of each and every surviving member of the Fraenkel family still remains broken, each facing many long years or a lifetime of pain and suffering, struggling to repair the emotional and psychological injury and cope with the loss purposely inflicted upon them by Hamas terrorists in June 2014. As his younger sister A.L. testified:

Everything is so hard. Everything that I do I think about him. It's difficult because like it changed the whole fabric of the family. It hurt a lot of people. I don't think you can explain how hard it is.

(Tr., Dec. 6, 2016, p. 78). And his youngest sister N.S. testified:

Q.     N.S., what else do you do when you miss Naftali?

A.     I write him letters and I speak with him.

Q.     What do you write in the letters?

A.     All kinds of things that I'm asking of him. And at times the experiences I experience during that week.

Q.     What do you do with the letters?

A.     I put it on his bed in his room.

Q.     Anything else? Did you ever do anything else with the letter to try to get it closer to Naftali?

A.     Yeah. Once I took a helium balloon and I attached the letter to it and I flew it to the sky.

\* \* \*

There are games that Naftali could play with us and we no longer play them. And also he had a place at the table and he's no longer in this place at the table. And the basketball that he liked to play so much with nobody plays with it, almost anymore.

(Tr., Dec. 6, 2016 pp. 88-89).

At the two-day bench trial held on December 6-7, 2016, Naftali's father, mother, and five of his six siblings each testified about the terrible 18 day ordeal of pain and suffering from the time they realized that Naftali was not home until they learned of his murder, including the impact it had on them and other members of the family, and about the impact the trauma has had on their lives since then. Psychiatrist and qualified expert Dr. Rael Strous also testified that the psychological injuries, pain, and suffering experienced by each surviving member of the Fraenkel family. By way of just one example, in describing the experience of Naftali's mother, Dr. Strous testified:

> So Rachel Fraenkel described to me the nature of what happened and the experience when her son was, Naftali was kidnapped and then later murdered, 18 days later. She described to me her emotional response at the time when the, when her son was kidnapped which consisted of intense anxiety which never abated for 18 days. She described profound pain related to the fact that her special son to whom she was very close to was kidnapped. Much of her emotional pain was expressed in what we call sematic symptoms, pain in her body. This pain was so intense that she could not sleep and she tried to take medications for sleep, but she suffered from side effects, so she didn't continue with that. She fought extreme stress during this time due to the unknown. But she at the same time had to function because she had six other children to care for. When, she described when the bodies were found that her response was nothing short of catastrophic which is the word she used. Based on her physical symptomatology once again which is a very characteristic manner for her in expressing her emotional pain as well as the fact that she became hysterical at times, but she had to keep that away from her children because she still needed to care for them.

(Tr., Dec. 6, 2016, p. 39). Professor Strous also opined on his prognosis for improvement and coping with these issues. He explained that "these kind of features usually last for a very long period of time and continue to affect his life for a very long time" (Tr., Dec. 7, 2016, p. 57), and that:

> When a child gets killed and particularly violent or sudden in an unexpected manner, the incidents, the frequency of complicated grief is very high up until 72

percent and associated with PTSD and people suffer with this for many, many years. And in many cases never, never come out of it.

(Tr., Dec. 7, 2016, p. 51).

In addition, Plaintiffs submitted detailed declarations from the adult Plaintiffs, medical records and expert reports relevant to damages, as well as extensive proposed findings of fact and conclusions of law regarding the injuries suffered and calculation of damages for each Plaintiff. (DE 36).

## **APPLICABLE STANDARDS**

The Federal Rules of Civil Procedure provide multiple mechanisms by which the Court, even after judgment is entered, and particularly in the interests of justice, can open the judgment, to amend findings of fact and conclusions of law, to receive additional testimony and evidence, to make new findings of fact and conclusions of law, and to alter or amend the judgment or enter a new judgment. These include the following:

Fed. R. Civ. P. 52(b) provides that "[o]n a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." *Id.*

Fed. R. Civ. P. 59(e) permits a court to amend a judgment to "correct a clear error or prevent manifest injustice," *Firestone v. Firestone*, 76 F. 3d 1205 (D.C. Cir. 1996); *Wallace v. Warehouse Employees Union* No. 730, 482 A.2d 801, 810 (D.C. App. 1984). The Court may, without granting a new trial, correct the error by exercising related authority to alter or amend the judgment. *Lubecki v. Omega Logging, Inc.*, 674 F. Supp. 501 (W.D. Pa. 1987). The D.C. Circuit has said that manifest injustice arises from "rulings that upset settled expectations—

expectations on which a party might reasonably place reliance." *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007)." Further, a court is justified in reconsidering its previous ruling to prevent "obvious injustice." *Atlantic States Legal Foundation, Inc. v. Karg Bros., Inc.,* 841 F. Supp. 51 (N.D.N.Y. 1993). "Manifest injustice," entails a result that is fundamentally unfair in light of governing law. *Slate v. ABC*, 12 F. Supp. 3d 30, 35-36 (D.D.C. 2013).

Fed. R. Civ. P. 59(a)(2) provides for the following relief following a nonjury trial: "After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment."

## ARGUMENT

### A.    The Court's Compensatory Damages Awards are Inconsistent with Established Precedent in this District

The gold standard in this district and around the country for determination of damages awards in FSIA terrorism cases is *Estate of Heiser v. Islamic Rep. of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) ("*Heiser*"). In *Heiser,* Chief Judge Lamberth surveyed the landscape of cases deciding FSIA terrorism cases, and derived a standardized formula or approach for awarding damages in these cases. *Heiser* has been cited and followed in hundreds of similar cases, and those that do not cite *Heiser* generally cite later cases that applied *Heiser* or earlier cases that are precursors to *Heiser*. No appellate opinion, and no case in the D.C. District, to the knowledge of plaintiffs' counsel, has rejected the *Heiser* approach. Indeed, the United States Court of Appeals for the Seventh Circuit has acknowledged the special expertise of the D.C. District Court in deciding FSIA cases:

> The United States District Court for the District of Columbia has adjudicated the vast majority of suits under the FSIA's terrorism exception, many of which are

> reviewed in detail in *In re Islamic Rep[.] of Iran Terrorism Litig.,* 659 F. Supp. 2d
> 31, 43 (D.D.C. 2009). Because this District has substantial experience interpreting
> these statutory provisions, we have reviewed its cases for guidance here.

*Leibovitch v. Islamic Rep. of Iran*, 697 F.3d 561, 566 n.2 (7th Cir. 2012).

In *Wultz v. Islamic Rep. of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012), a decision that was cited by this Court its Opinion for other issues, Chief Judge Lamberth summarized the *Heiser* approach to solatium damages in FSIA terrorism cases as follows:

> This Court developed a standardized approach to calculating FSIA solatium
> damages in *Heiser v. Islamic Rep[.]of Iran,* where it surveyed past awards in the
> context of deceased victims of terrorism to determine that, based on averages,
> "[s]pouses typically receive greater damage awards than parents [or children],
> who, in turn, typically receive greater awards than siblings." 466 F. Supp. 2d 229,
> 269 (D.D.C 2006). Relying upon the average awards, the *Heiser* Court articulated
> a framework in which spouses of deceased victims were awarded approximately
> $8 million, while parents received $5 million and siblings received $2.5 million.
> *Id.;* see also *Valore,* 700 F. Supp. 2d at 85 (observing that courts have "adopted
> the framework set forth in *Heiser* as 'an appropriate measure of damages for the
> family members of victims'") (quoting *Peterson II*, 515 F. Supp. 2d at 51). As this
> Court recently explained, in the context of distress resulting from injury to loved
> ones—rather than death—courts have applied a framework where "awards are
> 'valued at half of the awards to family members of the deceased'—$4 million,
> $2.5 million and $1.25 million to spouses, parents, and siblings, respectively."
> *Oveissi v. Islamic Rep[.]of Iran*, 768 F. Supp. 2d 16, 26 n.10 (D.D.C. 2011)
> (quoting *Valore*, 700 F. Supp. 2d at 85); *see also Bland v. Islamic Rep[.] of Iran,*,
> 831 F. Supp. 2d 150, 156-158 (D.D.C. 2011). Children of a deceased victim
> typically receive an award of $3 million, while children of a surviving victim
> receive $1.5 million. *O'Brien v. Islamic Rep[.]of Iran*, 853 F. Supp. 2d 44, 46-47,
> 2012 WL 1021471, at *2 (D.D.C. Mar. 28, 2012); *Anderson v. Islamic Rep[.] of
> Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012); *Bland*, 831 F. Supp. 2d 150, at
> 156-157; *Stern v. Islamic Rep[.] of Iran*, 271 F. Supp. 2d 286, 301 (D.D.C. 2003).

*Wultz*, 864 F. Supp. 2d at 39.

More recently, in the January 9, 2017 decision in *Braun v. Islamic Rep. of Iran,*, 2017 U.S. Dist. LEXIS 2647, 2017 WL 79937 (D.D.C. Jan. 9, 2017) (Howell, *C.J.*), another decision

relied upon by this Court for other issues, Chief Judge Howell summarized the *Heiser* approach
as follows:

> Chana and Shmuel Braun, Esther and Murray Braun, and Sara and Shimshon
> Halperin seek solatium damages to compensate for the emotional distress they
> experienced as family members of victims of the attack. Compl. ¶ 86. "A claim
> for solatium seeks compensation for the 'mental anguish, bereavement and grief
> that those with a close personal relationship to a decedent experience as a result of
> the decedent's death, as well as the harm caused by the loss of the decedent,
> society and comfort.'" *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.
> Supp. 2d 48, 83 (D.D.C. 2011) (quoting *Belkin*, 667 F. Supp. 2d at 22). In
> determining the appropriate amount to compensate for victims' family members'
> emotional distress, "the Court may look to prior decisions awarding damages . . .
> for solatium." *Acosta*, 574 F. Supp. 2d at 29. Solatium damages, by their nature,
> are "unquantifiable," *Moradi*, 77 F. Supp. 3d at 72, and, therefore, this Court has
> developed a commonly accepted standardized framework, known as the *Heiser*
> damages framework, for solatium damages. *Estate of Heiser*, 466 F. Supp. 2d at
> 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by
> other courts as an appropriate measure of solatium damages for the family
> members of victims of state-sponsored terror (citing *Valore*, 700 F. Supp. 2d at
> 85)). As a baseline, the framework awards "approximately $5 million to a parent
> whose child was killed" in a terrorist attack. *Estate of Heiser*, 466 F. Supp. 2d at
> 269. "[F]amilies of victims who have died are typically awarded greater damages
> than families of victims who remain alive." *Id.* (quoting *Haim*, 425 F. Supp. 2d at
> 75). Accordingly, "in the context of distress resulting from injury to loved ones—
> rather than death—courts have applied a framework where 'awards are valued at
> half of the awards to family members of the deceased,'" *i.e.*, $2,500,000 to
> parents of surviving victims. *Wultz v. Islamic Rep[.] of Iran*, 864 F. Supp. 2d 24,
> 41 (D.D.C. 2012) (citing authorities).

*Braun*, 2017 U.S. Dist. LEXIS 2647, *38-40. Chief Judge Howell also explained that these
numbers are only a baseline from which the Court may deviate in order to compensate for
specific circumstances:

> Factors militating in favor of an award enhancement generally fall into one of
> three categories: "evidence establishing an especially close relationship between
> the plaintiff and decedent, particularly in comparison to the normal interactions to
> be expected given the familial relationship; medical proof of severe pain, grief or

suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26-27. "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ." *Id.* at 26.

*Id*.

Notably, *every one* of the D.C. District cases cited by this Court in its Opinion this case relied on the *Heiser* framework or were pre-*Heiser* cases that were consistent with *Heiser*. They include:

- *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83-84 (D.D.C. 2011) (Facciola*, M.J.)*: citing *Heiser,* awarding $5 million to each parent and between $3.125 and $2.5 million to each sibling of deceased in a hijacked airplane 30 minutes after hijacking. (Cited in Opinion, p. 29).

- *Ben-Rafael v. Islamic Rep. of Iran*, 540 F. Supp. 2d 39, 59 (D.D.C. 2008) (Huvelle, *J.)*: citing *Heiser,* awarding $5 million to each parent and $2.5 million to each sibling of deceased in terrorist bombing. (Cited in Opinion, p. 18).

- *Bodoff v. Islamic Rep. of Iran*, 424 F. Supp. 2d 74, 87-88 (D.D.C. 2006) (Lamberth, *C.J.)*: awarding $5 million to each parent and $2.5 million to each sibling for deceased killed in terrorist bus explosion. (Cited in Opinion, p. 28).

- *Braun v. Islamic Rep. of Iran*, 2017 U.S. Dist. LEXIS 2647, 2017 WL 79937, at *13-14, (D.D.C. Jan. 9, 2017) (Howell, *C.J.)*: citing *Heiser*, awarding $6.25 million to each parent and $2.5 million to each grandparent for deceased infant killed in vehicular terrorist attack. (Cited in Opinion, p. 26).

- *Eisenfeld v. Islamic Rep. of Iran*, 172 F. Supp. 2d 1, 8-10 (D.D.C. 2000) (Lamberth, *J.)*: awarding $5 million to each parent and $2.5 million to each sibling for deceased killed in terrorist bus explosion. (Cited in Opinion, p. 28).

- *Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97, 111 (D.D.C. 2000) (Green, *J.)*: awarding $5 million to each sibling for assassination of deceased by Iran. (Cited in Opinion, p. 13).

- *Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1, 32 (D.D.C. 1998) (Lamberth, *J.*): the only case cited in the Opinion with reference to solatium damages, awarding $5 million to each parent and $2.5 million to each sibling for victim killed in terrorist bus explosion. (Cited in Opinion, p. 16).

- *O'Brien v. Islamic Rep. of Iran*, 853 F. Supp. 2d 44, 48 (D.D.C. 2012) (Lamberth, *J.*): citing directly to the *Heiser* framework, awarding $850,000 for each parent and $500,000 for each sibling of *injured*, rather than deceased, victim in 1983 Beirut bombing. (Cited in Opinion, p. 25).

- *Oveissi v. Islamic Rep. of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (Lamberth, *J.*): citing *Heiser*, awarding $7.5 million in solatium to grandson of deceased. (Cited in Opinion, p. 22).

- *Owens v. Rep. of Sudan,* 71 F. Supp. 3d 252 (D.D.C. 2014)  (Bates, *J.*) following *Heiser* line of cases and awarding $5 million to parents and $2.5 million to siblings of suicide bombing victim (Opinion, p. 18, n.7 cites earlier decision in same case, *Owens v. Rep. of Sudan*, 412 F. Supp. 2d 99 (D.D.C. 2006), which dealt with liability issues).

- *Peterson v. Islamic Rep. of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) (Lamberth, *J.*): using *Heiser* framework and awarding $5 million to parents and $2.5 million to siblings of Beirut bombing victims. (Cited in Opinion, p. 13).

- *Roth v. Islamic Rep. of Iran*, 78 F. Supp. 3d 379, 405 (D.D.C. 2015) (Lamberth, *J.*): using *Heiser* framework, awarding $5 million to parent and $2.5 million to siblings in Hamas terrorist bombing of Israeli restaurant. (Cited in Opinion, p. 17).

- *Rimkus v. Islamic Rep. of Iran,* 575 F. Supp. 2d 181, 198 (2008)*;* (Lamberth, *J.*): using *Heiser* framework, awarding $5 million in compensatory damages to a parent in Hezbollah bombing of United States military base. (Cited in Opinion, p. 17).

- *Sisso v. Islamic Rep. of Iran,* No. 05-0394, 2007 WL 2007582, at  *10-11(D.D.C. July 5, 2007); (Bates, *J.*): pre *Heiser*, awarding $5 million to the son of a woman murdered in a suicide bombing. (Cited in Opinion, p. 18).

- *Spencer v. Islamic Rep. of Iran*, 71 F. Supp. 3d 23, 31 (D.D.C. 2014) (Lamberth, *J.*): making damages awards to 65 plaintiffs following *Heiser* framework. (Cited in Opinion, p. 29).

- *Stern v. Islamic Rep. of Iran,* 271 F. Supp. 2d 286, 300-01 (D.D.C. 2003)*;* (Lamberth, *J.*): pre-*Heiser* Case awarding $3 million dollars to each of the four surviving children of Leha Stern who was murdered in a terrorist bombing. (Cited in Opinion, p. 26).

- *Thuneibat v. Syrian Arab Rep.* 167 F. Supp. 3d 22, 51-53 (D.D.C. 2016) (Howell, *J.*): applying *Heiser* but granting an upward modification of the *Heiser* framework, awarding $6.25 million for each parent and $3.125 million for each sibling for victim's death in terrorist bombing. (Cited in Opinion, p. 26).

- *Valore v. Islamic Rep. of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (Lamberth, *J.*): using the *Heiser* framework, with 25 percent upward modification. (Cited in Opinion, p. 19, n.8).

- *Wachsman v. Islamic Rep. of Iran*, 603 F. Supp. 2d 148 (D.D.C. 2009) (Urbina, *J.*) using the *Heiser* framework, awarding $5 million for each parent and $2.5 million for each sibling of victim of roadside abduction and murder remarkably similar to the case at bar. (Opinion, p. 18, cites earlier decision in same case, *Wachsman v. Islamic Rep. of Iran*, 537 F. Supp. 2d 85 (D.D.C. 2008), which dealt with liability issues).

- *Weinstein v. Islamic Rep. of Iran*, 184 F. Supp. 2d 13, 23 (D.D.C. 2002)*;* (Lamberth, *J.*): pre-*Heiser* case, awarding $8 million dollars to the wife of, and $5 million dollars to each of the children of, Ira Weinstein who was murdered in a bus bombing. (Cited in Opinion, p. 13).

- *Wultz v. Islamic Rep. of Iran*, 864 F. Supp. 2d 24, 40 (D.D.C. 2012) (Lamberth, *C.J.*): applying *Heiser*, but awarding upward modification of solatium to $6 million to parent and $3.5 million to sibling in suicide bombing victim's death. (Cited in Opinion, p. 24).

That each of the cases cited by this Court follows the *Heiser* framework or was a pre-cursor to *Heiser* demonstrates that *Heiser* is the gold standard in assigning damages in FSIA terrorism cases.

Almost universally, courts in this District have looked to other damages awards in terrorism cases to determine, by analogy, the proper measure of damages in subsequent terrorism cases. *Wachsman*, 603 F. Supp. 2d at 160 (Urbina, *J.*) ("Courts in this district have reached a degree of consistency in awarding family members of terrorist victims damages for emotional

distress"); *Campuzano v. Islamic Rep. of Iran*, 281 F. Supp. 2d 258, 273 (D.D.C. 2003) (Urbina, *J.*) ("As with pain and suffering damages, courts in this circuit have a well-established practice of looking to previous solatium awards to determine solatium damages in FSIA cases"); *Hill v. Rep. of Iraq*, 175 F. Supp. 2d 36, 48 (D.D.C. 2001) (Jackson, *J.*) ("[T]he Court will adopt the figure employed by the judges of this district court in cases against the Islamic Republic of Iran for comparable criminal behavior."); *Jenco v. Islamic Rep. of Iran*, 154 F. Supp. 2d 27, 38 (D.D.C. 2001) (Lamberth, *J.*) (awarding relief based on the only four cases in the district that awarded damages to siblings of victim).

Almost all FSIA cases that post-date *Heiser* rely on *Heiser* itself, and the rest rely on later cases that in turn rely on *Heiser. Oveissi,* 768 F. Supp. 2d at 26 ("Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case, and it is that court's duty to analyze the nature of the claimant's injury and the deviation—if any—that is appropriate to compensate for such losses, while also bearing in mind the general precept that similar awards should be given in similar cases[.]"); *Roth*, 78 F. Supp. 3d at 403 ("[t]his Court developed a standardized approach for evaluating IIED claims for solatium damages in *Estate of Heiser*..." and noting the *Heiser* "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror); *Acosta v. Islamic Rep. of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008) (Lamberth, *J.*) (in determining the appropriate amount to compensate for victims' family members' emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium"); *Moradi v. Islamic Rep. of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015) (Huvelle, *J.*) ("The *Heiser* framework is a "standardized approach for evaluating solatium claims" which has been repeatedly used by courts in this jurisdiction to determine damage awards in FSIA

terrorism cases…. Accordingly, the Court will use the *Heiser* framework here and award [Plaintiff's mother] $4 million in solatium damages."); *Valore*, 700 F. Supp. 2d at 85 (observing that the *Heiser* framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror); *Bluth v. Islamic Rep. of Iran*, 203 F. Supp. 3d 1 (D.D.C. 2016) (Kessler, *J.)* (following the *Heiser* framework and awarding $2.5 million to each parent and $1.5 million to each sibling for victim's *injury but not death* in terrorist attack); *Flanagan v. Islamic Rep. of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015) (Contreras, *J.)* (departing upwardly from the *Heiser* framework and awarding the parents $6.25 million to each parent and $3.125 million to each sibling for terrorist bombing of the U.S.S. Cole); *Welch v. Islamic Rep. of Iran*, 2007 U.S. Dist. LEXIS 99192 (D.D.C. 2007) (Kollar-Kotelly, *J.*) (relying on *Heiser* and awarding $5 million to each parent and $2.5 million to each sibling for solatium for death of victim in terrorist bomb blast); *Han Kim v. Democratic People's Rep. of Korea,* 87 F. Supp. 3d 286 (D.D.C. 2015) (Roberts, *J.*) (following *Heiser* line of cases and awarding $15 million each to sibling and child of dissident minister who disappeared into North Korean prison and is presumed dead).

Here, the Court awarded compensatory damages of just $1 million to the Estate of Naftali Fraenkel, $1 million to the non-U.S. citizen plaintiff Abraham Fraenkel, the father of the decedent, and $3.1 million collectively to the remaining seven plaintiffs, which includes the mother of the decedent as well as the decedent's six siblings.

The *Heiser* framework would have resulted in a substantially different award. Without any upward or downward departures, the decedent's mother would have received an award for solatium of $5 million, and the six siblings would have received $2.5 million each ($15 million in total). The non-U.S. citizen plaintiff Abraham Frankel's damages would not be directly

determined by FSIA precedent, but since Israeli law provides comparable measure of damages there is no apparent reason to award the non-U.S. citizen plaintiff a different amount for solatium then is awarded to the mother, so an award to Abraham Fraenkel (the father) of the same amount as is awarded to his wife (the mother) would be appropriate. *See Thuneibat*, 167 F. Supp. 3d at 47 (collecting cases where courts assessed liability under foreign or state law, but applied federal standard to damage calculation). Altogether, under the *Heiser* framework, without allowing for any upward adjustments, the total award for solatium would be $25 million[3] without any departures.

In this case, however, there is ample basis for an upward departure or enhancement of the *Heiser* damages framework, given the family's closeness and extreme mental distress. *Oveissi* explained that when a death is "sudden and unexpected," in the sense that the victim was not in the army or in some other situation where they are inherently exposed to some level of risk, it can render the shock and grief more intense. *Oveissi*, 768 F. Supp. 2d at 28. That is particularly so when the deceased had a close relationship with the family he left behind. *Id.* at 26-27. *Thuneibat* awarded the parents of two victims in a suicide bombing $6.25 million each, an upward adjustment of 25 percent, *Thuneibat*, 167 F. Supp. 3d at 51, 53. It made a corresponding upward adjustment for the siblings due to their young age and the lasting impact of the tragedy on their development. *Thuneibat*, 167 F. Supp. 3d at 52-53. Likewise, *Valore* made an upward adjustment of 25 percent for the sister of a surviving terror victim who suffered a nervous breakdown following the attack. *Valore*, 700 F. Supp. 2d at 86.

The Fraenkel family was extremely close. Each member of the family suffered extreme grief for an extended period, first upon learning of Naftali's kidnaping and again upon learning

---

[3] 6 x $2.5 million + 2 x $5 million = $25 million

of his murder. Given those facts, an enhancement of 25-50 percent above the *Heiser* baseline would be appropriate. With a 50 percent enhancement, the solatium awards to the Fraenkel family would be $7.5 million to the parents, and $3.75 million each to the children, making a total of $37.5 million for solatium damages.

On November 29, 2016, the Plaintiffs filed Proposed Findings of Fact and Conclusions of Law, requesting an upward modification of 50 percent from the *Heiser* framework in favor of the Plaintiffs (DE 36, pp. 36-60). The Plaintiffs based their request on the extensive amount of psychological and emotional distress borne by the Fraenkels, as described by Dr. Strous, as well as the terror endured by Naftali Fraenkel during his kidnapping, the egregious nature of the kidnapping itself, the pain suffered by the rest of the family during the 18 agonizing days between the abduction and the discovery of Naftali's dead body, and the enduring pain caused by constant reminders of the event. (DE 36 at 36-60).

Courts in this district have granted upward modifications in cases where "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Wultz*, 864 F. Supp. 2d at 40, citing *Oveissi*, 768 F. Supp. 2d at 26-27; *see also*, *Flanagan,* 87 F. Supp. 3d at 118 (granting a 25 percent increase above the *Heiser* framework because "the violent nature in which [decedent] died further exacerbated their grief and mental suffering, with several of his family members tortured by the fact that he may have suffered before he died"); *Kilburn v. Islamic Rep. of Iran*, 699 F. Supp. 2d 136, 157 (D.D.C. 2010) (explaining that "the malice and political objectives motivating a terrorist act increase a

plaintiff's solatium damages"); *Baker,* 775 F. Supp. 2d at 83 (awarding an upward departure of 25% where the sister of the deceased victim "had to be hospitalized for asthma and shock . . . and has battled depression ever since")*; Wultz*, 864 F. Supp. 2d at 51-52 (granting the upward departure from *Heiser*, awarding the mother of the decedent $6.25 million due to the severe emotion and physical difficulties she suffered and her close relationship with her young son, killed in a terrorist bomb blast).

Here, the testimony of the plaintiffs themselves and the expert psychological testimony of Dr. Strous demonstrated the closeness of the relationships between Naftali and his siblings and parents. The Court noted this closeness in its Opinion: "The Fraenkel family is obviously very close…. Without question, the lives of each member of the family will be forever altered because Naftali is not with them." (Opinion at 28). Further, the record is replete with descriptions of the serious emotional suffering endured by Rachel and Abraham Fraenkel and all the Fraenkel children. (DE 36 at 36-60; (Tr., Dec. 6, 2016, pp. 6-41 (Rachel D. Fraenkel); pp. 43-54 (Tzvi Fraenkel); pp. 58-67 (A.S. Fraenkel); pp. 70-78 (A.L. Fraenkel); pp. 79-83 (N.E. Fraenkel); pp. 84-89 (N.S. Fraenkel); pp. 89-113 (Abraham R. Fraenkel)).

Naftali Fraenkel was "kidnapped for a period of up to 20 minutes before he was shot to death [at] point blank range." (DE 36 at 78; Tr., Dec. 7, 2016, pp. 12, 20 (expert witness Arieh Spitzen)). In the audio recording of the police call, the kidnappers are heard shouting "head down, head down" just before the gunshots are heard followed by a cry of pain. (DE 36 at 78; Tr., Dec. 7, 2016, p. 10 (expert witness, Arieh Spitzen)). Naftali was a teenager, on the cusp of adulthood. He was undoubtedly in tremendous horror throughout the period he was held captive and apparently suffered severe physical pain and psychological terror before being ruthlessly murdered. Certainly, the facts here are no less egregious than many other cases in which an

upward modification was awarded. *See*, *e.g.*, *Stethem v. Islamic Rep. of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (holding that "[a] family member's "anguish is exacerbated when [they] must live with the knowledge that their loved ones suffered horribly for an extended period of time either at the hands of their tormentors or as a direct result of their terrorist acts").

This Court awarded the plaintiffs solatium damages of only about 16 percent[4] of what would have been awarded under the *Heiser* formula (even without an enhancement). This Court gave no explanation for its substantial deviation from *Heiser,* and no explanation or reason for such a steep downward departure.

Regarding the solatium damages to the mother, plaintiff Rachel Fraenkel, it is not even clear what amount was awarded to her. Her award was lumped in with the Court's award of $3.1 million to all seven U.S. citizen plaintiffs—the mother and six siblings. Thus, the award could be viewed as granting Rachel Fraenkel one-seventh of $3.1 million, which is just $442,857 for the murder of her son. There is no apparent reason why she should receive so little, and so much less than her non-U.S.-citizen husband's $1 million award. There is also no apparent reason why she should receive the same as her children, since the damage suffered by a mother who lost her child is certainly greater than the damage suffered by a sibling. *Heiser* and the multitude of cases that follow its approach suggest that this award is grossly inadequate, as compared to the general *Heiser* framework of $5 million to a parent as a baseline, which is almost 11 times what Rachel Fraenkel was apparently awarded.

Turning now to the conscious pain and suffering damages awarded to the Estate of Naftali Fraenkel: While there is no formula, many cases in this district have awarded plaintiffs

---

[4] The Court's total solatium damages award was $4.1 million. As noted, under *Hesier* (without any upward adjustments), the plaintiffs would have received $25 million.

far more for conscious pain and suffering than this Court awarded the Estate of Naftali Fraenkel. For example, this Court in *Gates v. Syrian Arab Rep.*, 580 F. Supp. 2d 53 (D.D.C. 2008) (Collyer, *J.*) awarded $50 million each to the estates of two U.S. citizens who were beheaded by al-Qaeda terrorists. While certainly the manner of death in *Gates*, beheading with a knife, was much more painful than the manner of death in this case, shooting, a damages award 50 times higher does not appear to be justified. Like the *Gates* plaintiffs, Naftali Fraenkel endured terror knowing he had been kidnapped at gunpoint and lived with that knowledge for 20 minutes until he was executed by multiple gunshots. While the two $50 million awards to the two estates in *Gates* is much higher than the norm, the disparity between what this Court awarded the *Gates* plaintiffs and what this Court awarded the plaintiffs in this case is striking.

It should be noted that while the awards to the estates in *Gates* were quite high, the awards to the individual plaintiffs in *Gates* for solatium were much lower than the *Heiser* norm. For example, decedent Jack Armstrong's mother and sister, Francis Gates and Jan Smith (who sued under a pseudonym) received $3 million and $1.5 million respectively, and Patti and Sara Hensley, the widow and orphaned daughter of decedent Jack Hensley, received $3 million each. All of these numbers are several times larger than the amounts awarded to the plaintiffs in our case. Moreover, even though the solatium awards to the *Gates* plaintiffs was lower than the norm, because the awards to the estates were much higher than the norm and presumably the awards to the estates devolved to the mothers, sister, and daughter in any event, the net result of the awards in *Gates* was somewhat equivalent to the award that would have been obtained had *Heiser* been followed along with a more traditional damages award to the estate for conscious pain and suffering.

The evidence and testimony at the trial in this case was overwhelming. Since the kidnapping and murder of Yaakov Naftali Fraenkel, his parents and siblings have suffered interminable and inexplicable anguish and suffering by reason of the kidnapping and murder and their concomitant loss of Naftali's society, guidance and company. From the moment Naftali was kidnapped and his parents learned that his cell phone had been located to the Hebron area, the family was plunged into a horrifying period of uncertainty, not knowing whether their son and brother was dead or alive, and if he was alive, the treatment he was receiving. For 18 interminable days, until his body was discovered, they feared for his safety and security, imagining the worst possible scenarios. Plaintiffs' pain and suffering is obviously enormous, has been with them constantly since the day of the kidnapping and the day they learned of Naftali's murder, and they will continue to experience the effects of the tragedy for the remainder of their lives. Not only should *Heiser* be followed, but in light of the circumstances, an upward departure would be more than appropriate.

B.    **The Court Should Have Awarded Damages for the Pain and Suffering of the Individual Surviving Plaintiffs, Either Separately or as a Component of Solatium Damages**

The FSIA provides that damages recoverable under that statute for acts of terrorism "may include economic damages, pain and suffering, solatium, and punitive damages." 28 U.S.C. § 1605A(c). In this case, the Court did not award damages for "pain and suffering" to the individual surviving Plaintiffs, nor did the Court make specific findings of fact as to the injury, pain and suffering inflicted upon each individual surviving Plaintiff, despite extensive evidence of such damages in the form of affidavits, trial testimony, medical expert reports and medical testimony.

While damages for pain and suffering related to the death of a close family member are often included in an award of solatium, in this case there was a separate, intensely agonizing period of 18 days when it was apparent that Naftali had been kidnapped but his fate was unknown. During this time, before learning of Naftali's brutal murder, the Fraenkel family members suffered tremendous emotional pain and suffering and psychological injury, which even included manifestations of physical pain, anxiety, insomnia, weight loss and more, due to the terrorist kidnapping of Naftali.

The Court's Opinion makes it clear that these 18 days of suffering were not considered as part of the solatium damages in this case. In its Opinion, the Court explained solatium as follows:

> The legal term "solatium" is a Latin word for "solace" and is defined as "[c]ompensation; esp. damages for hurt feelings or grief, as distinguished from physical injury." Black's Law Dictionary 1426 (8th ed. 2004). "Solatium is traditionally a compensatory damages which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society." *Flatow*, 999 F. Supp. at 29. Damages for solatium are awarded to close family members. *Id.* at 30-31. "[M]ental anguish, bereavement and grief resulting from the fact of a decedent's death constitute the preponderant element of a claim for solatium." *Id.* at 30.

(Opinion at 27). The Court's description of the Fraenkel family's entitlement to solatium likewise focused on their grief and loss arising out of Naftali's death, without any mention of the pain and suffering they endured during the 18 days he was missing:

> The Fraenkel family is obviously very close. Each member testified in detail about Naftali's role in the family (second oldest and second son) and what he meant in their lives specifically. The testimony provided a picture of a loving family, wherein Naftali played a central role in their spiritual and personal lives. Multiple family members testified about Naftali's musical ability and how it enriched their celebrations on the Sabbath and other holy days. Without question, the lives of each member of the family will be forever altered because Naftali is not with them.

-25-

(Opinion at 28).

As the individual Plaintiffs presented extensive proof that the kidnapping of Naftali, and the 18 days of terror and uncertainty when his fate was unknown, caused them each to endure extreme pain and suffering separate and apart from the pain and suffering they experienced as a result of his death (and even causing the later pain and suffering to be more devastating), Plaintiffs submit that the Court should have ordered a separate damages award for pain and suffering to each individual Plaintiff in addition to solatium, or alternatively, the award for solatium should be increased to reflect such additional pain and suffering.

C.    **The Punitive Damages Award is Inconsistent with Precedent for Awards of Punitive Damages in FSIA Terrorism Cases**

Precedent has also evolved regarding punitive damages awards in FSIA terrorism cases.

In *Braun* Chief Judge Howell summarized the cases as follows:

> The plaintiffs also seek punitive damages, which are awarded not to compensate the victims, but to "punish outrageous behavior and deter such outrageous conduct in the future." *Kim*, 87 F. Supp. 3d at 290 (quoting *Bodoff v. Islamic Rep. of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012) (internal quotation marks omitted)); *see also* Restatement (Second) of Torts § 908(1) (1977). Punitive damages are warranted where "defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others." *Baker*, 775 F. Supp. 2d at 85. The defendants' conduct in supporting Hamas justifies the imposition of punitive damages here.
>
> In determining the appropriate amount of punitive damages, courts consider "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Wultz*, 864 F. Supp. 2d at 41 (quoting *Acosta*, 574 F. Supp. 2d at 30). Taking into account these factors, several approaches have been articulated for calculation of the appropriate amount of punitive damages in state-sponsored terrorism cases involving Iran, Syria, and

other similar defendants. One approach is to multiply the foreign state's "annual expenditures on terrorism" by a factor between three and five. *See Baker*, 775 F. Supp. 2d at 85 (citing *Valore*, 700 F. Supp. 2d at 88-90; *Estate of Heiser*, 659 F. Supp. 2d at 30-31; *Acosta*, 574 F. Supp. 2d at 31); *Beer v. Islamic Rep. of Iran*, 789 F. Supp. 2d 14, 26 (D.D.C. 2011). This approach, which may result in awards in the billions of dollars, has been used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen. *See Baker*, 775 F. Supp. 2d at 85. Another approach awards a fixed amount of $150,000,000 per affected family. *See Wyatt*, 908 F. Supp. 2d at 233 (awarding $300,000,000 in total to two victims and their families); *Baker*, 775 F. Supp. 2d at 86 (awarding $150,000,000 each to families of three deceased victims); *Gates*, 580 F. Supp. 2d at 75 (awarding $150,000,000 each to the estates of two victims).

The defendants' conduct in providing material support to the terrorist group that perpetrated the attacks here is indeed outrageous, and the results are indisputably tragic. The conduct here, however, is more akin to the conduct in cases awarding $150,000,000 per family than the cases in which a multiple of a foreign state's entire sponsorship of terrorism is used. In *Gates*, for example, where $150,000,000 in punitive damages per family was awarded, two American civilians working in Iraq were brutally decapitated and their deaths videotaped to be broadcast to the world, 580 F. Supp. 2d at 55, and in *Baker*, terrorists, who hijacked a Cairo-bound plane, shot "execution-style" three Americans on board the flight, 775 F. Supp. 2d at 55. Mindful of these precedents, this Court will award $150,000,000 in punitive damages against the defendants in this case.

*Braun*, 2017 U.S. Dist. LEXIS 2647, *43-45.

This Court in *Gates* awarded $150 million in punitive damages to each of the two estates in that case. A punitive damages award in that range is consistent with the majority of cases. In numerous previous civil terrorism cases tried under FSIA judges have awarded punitive damages to punish defendants and to deter future acts of terrorism. Typically, courts have imposed punitive damage of three times of a state sponsor's annual budget for the export of terrorism. *Acosta* , 574 F. Supp. 2d at 31 (D.D.C. 2008); *Bodoff,* 424 F. Supp. 2d at 89; *Stern,* 271 F. Supp. 2d at 301; *Cronin v. Islamic Rep. of Iran,* 238 F. Supp. 2d 222, 235-36 (D.D.C. 2002) (abrogated

on other grounds by *Cicippio-Puleo v. Islamic Rep. of Iran*, 353 F.3d 1024 (D.C. Cir. 2004));
*Eisenfeld v. Islamic Rep. of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000). Even when the amount of
the annual budget is not known or cannot be determined the courts have followed the format set
out in the FSIA cases against Iran. *See* also *Calderon-Cardona*, 723 F. Supp. 2d at 485.

      The expert testimony at trial established that the Iranian and Syrian defendants' have a
well-known policy to encourage, support and direct a campaign of murder against civilians,
which amply justifies the imposition of punitive damages against them. In adopting the "typical
punitive damages award" of $300 million[5] courts have reasoned that "[t]here is no reason to
depart from settled case law regarding the amount of punitive damages in terrorism cases."
*Wultz*, 864 F. Supp. 2d at 41-42; *Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d 43, 58-59
(D.D.C. 2009); *see also Acosta*, 574 F. Supp. 2d at 31.

      Yet this Court awarded only $50 million in punitive damages, against two separate state
sponsors of terrorism, without articulating any reason to depart so markedly from the award this
Court made itself in *Gates,* and the awards made by other courts in similar cases. Indeed, the
conduct giving rise to the punitive damages in *Gates* was essentially the same conduct as in this
case, and included the same defendant, the Syrian Arab Republic. The plaintiffs should receive a
total punitive damages award of $300 million and certainly not less than $150 million.

**D.**     **The Opinion Fails to Satisfy the D.C. Circuit's Requirement that Damages
Calculations be Explained**

      Fed. R. Civ. P. 52(a) requires that a court presiding over a bench trial "must find the facts
specially and state its conclusions of law separately." Fed. R. Civ. P. 52 (a)(1). The purpose of

---

     [5] Numerous cases are cited *infra* that awarded $300 million in punitive damages in FSIA
cases against Iran.

this requirement is to facilitate appellate review by providing the appellate court with an explanation of what the trial court has ruled and why. *Garner v. Kennedy*, 713 F.3d 237, 243 (5th Cir. 2013). It is this "court's duty to analyze the nature of the claimant's injury and the deviation [from the framework adopted in *Heiser*]—if any—that is appropriate to compensate for such losses, while also bearing in mind the general precept that similar awards should be given in similar cases." *Oveissi*, 768 F. Supp. 2d at 26 (Lamberth, *C.J.*). No such analysis was provided here.

This Court's Opinion did not explain the methodology used by the court in determining how much to award each plaintiff. The Opinion cited no case law as precedent for the award amounts, and made no conclusions of law as to why this Court digressed from *Heiser* and the established line of cases dealing with damages awards in FSIA terrorism cases.

An example from the Opinion illustrates the summary manner in which the damages awards were stated by the Court: in awarding solatium damages to the U.S. citizen plaintiffs, the Court wrote nothing more than the following, quoted here in full:

> The Court finds the evidence of the Plaintiffs' entitlement to solatium compensation fully satisfactory. As a result, the Court awards Rachel Fraenkel and her children $3,100,000 in solatium damages.

(DE 39 at 28). The Court did not address at any other point in its opinion the measure of the U.S. citizen plaintiffs' solatium damages, and gave no explanation as to how it reached the determination to award $3.1 million collectively to seven plaintiffs (approximately $442,857 each), or why that amount is appropriate. Aside from not explaining *how* the plaintiffs' awards were computed, the Court did not indicate *whether* they were determined by any sort of calculation by reference to any precedent, neutral principal, or reproducible calculation. The awards were simply decreed in conclusory sentences, such as the one quoted above.

These concerns are not limited to the compensatory damage award. The Court also did not explain its determination that an award of $50 million in punitive damages is adequate, notwithstanding that courts in this district have consistently awarded $150 to $300 million in FSIA terrorism cases against Iran, basing such awards on information available about the amount of money Iran spends on sponsorship of terrorism. *Wultz*, 864 F. Supp. 2d at41-42 (awarding punitive damages of $300 million); *Brewer*, 664 F. Supp. 2d at 58-59 (awarding punitive damages of $300 million); *Acosta*, 574 F. Supp. 2d at 31 (awarding punitive damages of $300 million); *Bodoff,* 424 F. Supp. 2d 74 (awarding punitive damages of $300 million); *Stern,* 271 F. Supp. 2d at 301 (awarding punitive damages of $300 million); *Cronin,* 238 F. Supp. 2d at 235-36 (D.D.C. 2002) (awarding punitive damages of $300 million) (abrogated on other grounds by *Cicippio-Puleo,* 353 F.3d 1024); *and Eisenfeld,* 172 F. Supp. 2d at 9 (awarding punitive damages of $300 million).

By not providing an explanation of how it arrived at its damages awards, this Court precluded effective appellate review, which will likely render the damages awards subject to summary reversal on appeal with a remand to explain the reasoning and methodology. *Eureka Inv. v. Chicago Title Ins.*, 743 F.2d 932, 940 (D.C. Cir. 1984) ("[I]t is essential that the trial court give sufficient indication of how it computed the amount so that the reviewing court can determine whether it is supported by the record.") (citing *Hatahley v. United States*, 351 U.S. 173, 182 (1956)); *Safer v. Perper*, 569 F.2d 87, 100 (D.C. Cir. 1977) ("The measure of damages and method of computation [must] be exposed so as to inform the litigants and afford a possibility of intelligent review."); *see also Rhodes v. United States*, 967 F. Supp. 2d 246, 314 (D.D.C. 2013) ("The D.C. Circuit has instructed that the trial court must explain the reasons for the determination of the damages award and tether these reasons to the record.").

The Federal Torts Claims Act ("FTCA") provides an analogous procedure. FTCA claims are heard in federal court without a jury. In *Rhodes* the Court ruled:

> The D.C. Circuit has instructed that the trial court must explain the reasons for the determination of the damages award and tether these reasons to the record. See *Eureka Inv. Corp. v. Chicago Title Ins. Co.,* 743 F.2d 932, 940 (D.C. Cir. 1984) ("[I]t is essential that the trial court give sufficient indication of how it computed the amount so that the reviewing court can determine whether it is supported by the record.") (citing *Hatahley v. United States*, 351 U.S. 173, 182 (1956)); see also *Safer v. Perper*, 569 F.2d 87, 100 (D.C. Cir. 1977) ("The measure of damages and method of computation [must] be exposed so as to inform the litigants and afford a possibility of intelligent review.").[6]

*Id.* (internal parallel citations omitted).

### E.    The Opinion Does Not Itemize the Award to Each Plaintiff

The Opinion and Order granted a collective award of $3.1 million to the U.S. citizen plaintiffs, which includes the plaintiff mother and six plaintiff siblings of the decedent. This award is not itemized as to how much is awarded to each of these individual plaintiffs. The Court did not explain why each plaintiff is not entitled to receive his or her own individual award.

Awarding damages collectively exposes the plaintiffs to myriad problems. For example, most of the sibling plaintiffs are minors, so any money recovered for them will have to be held in trust until they reach majority. In the absence of an individual award, it is impossible to

---

[6] Notably *Rhodes* cited *Bodoff,* a D.C. FSIA case, in its non-economic damages analysis. "The defendant has failed to address the issue of non-economic damages at all in its proposed conclusions of law. Thus, the Court is left with virtually no response to the plaintiff's request in determining the "notoriously difficult" matter "determining an appropriate figure for intangible losses such as emotional suffering." *Bodoff*, 424 F. Supp. 2d at 86. Conversely, the plaintiffs herein provided the Court with detailed analysis and precedent for awarding non-economic damages in terrorism cases in their Proposed Findings of Fact & Conclusions of Law. (DE 36, pp. 62-82).

determine how much money would belong to each minor. These plaintiffs are also placed in a conundrum should any of them ever have a judgment creditor, bankruptcy, divorce, or other circumstance that makes it necessary to determine such plaintiff's assets. Additionally, as many courts have noted "damages for solatium belong *to the individual heir personally* for injury to the feelings and loss of decedent's comfort and society." *See, e.g., Weinstein*, 184 F. Supp. 2d at 19, *citing, Flatow*, 999 F. Supp. 1. As such, awards are generally made to each individual Plaintiff, as was the case in each of the numerous FSIA cases cited above and all the cases cited in the Court's Opinion.

Itemizing damages awards is required by Fed. R. Civ. P. 52(a)(1) ("the court must find the facts specially.") *See Cole v. United States*, 861 F.2d 1261, 1263 (11th Cir. 1988) (remanding with instructions to itemize damages); *Noble v. Bank Line, Ltd.,* 431 F.2d 520, 523 (5th Cir. 1970) (same); *Alexander v. Nash-Kelvinator Corp.,* 261 F.2d 187, 190 (2d Cir. 1958).

F.    **As a Practical Matter of Judgment Enforcement, a Sizable Award of Compensatory Damages Is More Likely to Be at Least Partially Collectible Than an Award of Punitive Damages**

It must be mentioned that this Court's compensatory damages award is not merely a symbolic act. Compensatory damages awards, in contrast to punitive damages awards, have been and will almost certainly continue to be collected by plaintiffs in FSIA cases. Historically plaintiffs holding FSIA judgments have had to vie with each other in a "cruel race" to execute against meager assets of the defendants within the reach of U.S. courts, *Gates v. Syrian Arab Rep.,* 755 F.3d 568, 571 (7th Cir. 2014) (granting the *Gates* plaintiffs priority as to approximately $80 million of Syrian assets as against the plaintiffs in *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48 (D.D.C. 2011)); *see also Wyatt v. Syrian Arab Rep.*, 800 F.3d 331 (7th Cir. 2015) (granting the *Gates* plaintiffs priority as to approximately $80

million of Syrian assets as against the plaintiffs in *Wyatt v. Syrian Arab Rep.*, 908 F. Supp. 2d 216 (D.D.C. 2012)), and have had to await the fortuitous discovery of a forgotten foreign asset amenable to jurisdiction in the United States. *See, e.g., Weinstein v. Islamic Rep. of Iran,* 609 F.3d 43 (2d Cir. 2010) (allowing execution against house owned by Iranian Bank); *Bank Markazi v. Peterson,* 136 S. Ct. 1310 (2016) (allowing execution against $1.75 billion bond portfolio by 16 groups of FSIA judgment holders who had priority liens); *650 Fifth Ave. v. and Related Companies,* 830 F.3d 66 (2d Cir. 2016) (vacating award of summary judgment and remanding for trial in case involving a commercial office building in Manhattan alleged to be owned by a Iranian front company).

While execution of a judgement as against particular assets is still possible, Congress has enacted 42 U.S.C. § 10609, the United States Victims of State Sponsored Terrorism Act, which allows holders of FSIA judgments to file claims with a United States Victims of State Sponsored Terrorism Fund, and receive distribution of money from certain forfeited assets and sanctions paid by violators of U.S. sanctions programs, which are prorated among all eligible judgment holders. Only the compensatory awards are eligible, not the punitive damages awards. People who held judgements entered before December 1, 2016 received prorated distributions amounting to 13.66 percent of their compensatory damages judgments last year. Nobody yet knows how much money will be in the Fund at the end of this year or what percentage of the eligible judgments will be paid.[7] But whatever the percentage is, the money the Fraenkels will be able to foreseeably collect will based solely on the compensatory damages award.

---

[7] Though the amount of the Fraenkels' potential recovery from the Fund is presently unknown and unknowable, it will likely not be the same 13.66 percent of the compensatory

It must additionally be noted that the Fund operates according to strict rules and deadlines. If the Fraenkels are to be eligible for the Fund's distribution this year, their judgment must be entered, final, no longer appealable, and served on the defendants during 2017. Today in April getting that all accomplished in 2017 might seem an easy task. But serving a default judgment on Syria and Iran can be a lengthy process, sometimes involving delays of many months.[8] The plaintiffs understand that the Court's schedule is often unforgiving, but would gratefully appreciate receiving a modified final in the near future so that they may begin the process of serving that judgment and hopefully have the opportunity to participate in the Fund's 2017 distribution.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court enter an order modifying the judgment herein to increase the damages awarded to Plaintiffs in accordance with the established precedent of this district. Plaintiffs further request that the misnomer in the Court's Opinion regarding Nof Ayalon be corrected.

Dated:    Brooklyn, New York
           April 27, 2017

---

judgment as was awarded to Fund claimants last year, because the Fund was initially seeded with a particularly large sum in its first year.

[8] For example, the plaintiffs in *Kaplan v. Central Bank of the Islamic Rep. of Iran* report that service of their default judgment on Iran via the U.S. State Department (*see* 28 U.S.C. § 1608(a)(4)) required over five months. (D.C. Cir. No. 16-7142, Brief for Plaintiffs-Appellants at 37 (Mar. 20, 2017)).

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for the Plaintiffs*

by: _____

Robert J. Tolchin

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the date indicated below a true copy of the foregoing was served via ECF on all counsel of record herein:

Dated:    Brooklyn, New York
          April 27, 2017

                                        _____
                                        Robert J. Tolchin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

-----------------------------------------------------------------X

ABRAHAM RON FRAENKEL, *et al.*,

                     Plaintiff,                 Docket No:

                             1:15-CV-01080(RMC)

              -against-

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

                    Defendants.

-----------------------------------------------------------------X

## ORDER

The opinion and order dated March 31, 2017 (DE 30 and 31) are modified to the extent that:

1.      The reference in the opinion to "Nofa Ayalon" is corrected to read "Nof Ayalon," and the reference to that locality as a "settlement" is corrected to refer to it as a "village in central Israel."

2.      The damages awards are modified, and the clerk shall enter judgment against the defendants and in favor of the plaintiffs as follows:

     a.     Plaintiff Abraham Fraenkel in the amount of $7.5 million for compensatory damages.

     b.     Plaintiff Rachel Devora Sprecher Fraenkel in the amount of $7.5 million for compensatory damages.

     c.     Plaintiff Tzvi Amitay Fraenkel in the amount of $3.75 million for compensatory damages.

     d.     Plaintiff A.H.H.F. in the amount of $3.75 million for compensatory damages.

     e.     Plaintiff A.L.F. in the amount of $3.75 million for compensatory damages.

f.  Plaintiff N.E.F. in the amount of $3.75 million for compensatory damages.

g.  Plaintiff N.S.F. in the amount of $3.75 million for compensatory damages.

h.  Plaintiff S.R.F. in the amount of $3.75 million for compensatory damages.

i.  Plaintiff Estate of Yaakov Naftali Fraenkel in the amount of $5 million for compensatory damages.

j.  Plaintiff Estate of Yaakov Naftali Fraenkel in the amount of $150 million for punitive damages.

Dated: May ___, 2017

_____
ROSEMARY M. COLLYER
United States District Judge